EXHIBITS A THROUGH G

EXHIBIT A

Limited Liability Company Agreement

Of

DuPont-Akra Polyester, LLC

Between

E. I. du Pont de Nemours and Company

and

Polimor, S.A. de C.V.

EXECUTION-COPY

Section 6:  Rights and Duties of, Designation and Appointment of, and
Supervision of Business by, the Members Committee

6.1 Member Representatives; Members Committee.

REDACTED

(i) The Members hereby create the offices of Co-Chairmen, President, Vice President of Finance, Vice President of Operations, Vice President of Marketing, Secretary and Assistant Secretary (the "Officers"). The responsibilities of the Officers shall be as set forth in this Section 6.1(i), except as otherwise expanded or restricted by written action of the Members Committee from time to time.

(1) Prior to the expiration of the Initial Term, DuPont shall have the sole power to appoint the President and the Vice President of Marketing and Polimor

-   29

REDACTED

shall have the sole power to appoint the Vice President of Finance and the Vice President of Operations. All such appointments are subject to the approval of the Members Committee, which shall not be unreasonably withheld. Prior the expiration of the Initial Term, either of DuPont or Polimor shall have the power to remove the President and/or the Vice President of Finance. In addition, the President shall have the power to remove any Officer; provided, however, that the President shall not remove the Vice President of Finance without the approval of each Co-Chairmen.

(2) From and after the expiration of the Initial Term, Polimor shall have the sole power to appoint the President and DuPont shall have the sole power to appoint the Vice President of Finance. The President shall have the sole power to appoint the Vice President of Operations, the Vice President of Marketing. All such appointments are subject to the approval of the Members Committee, which shall not be unreasonably withheld. From and after the expiration of the Initial Term, either of DuPont or Polimor shall have the power to remove the President and/or the Vice President of Finance. In addition, the President shall have the power to remove any Officer; provided, however, that the President shall not remove the Vice President of Finance without the approval of each Co-Chairman.

(3) The Co-Chairmen shall have no powers except the specific consent rights set forth in this Section 6.1(i).

(4) The President shall be responsible for the overall management of the Company to the extent of specific delegations of power thereto by the Management Committee, including the responsibility for establishing the employment terms of the Officers (reasonably in keeping with similarly situated officers of comparable business organizations).

(5) The Vice President of Finance shall report to the President and shall be responsible and accountable for all administrative support systems required to operate the Company, including, but not limited to, financial, fiscal, tax, accounting, human resources, purchasing payroll, and information systems.

(6) The Vice President of Operations shall report to the President and shall have responsibility over all of the Company's operations and maintenance at the Cape Fear Site and the Cooper River Site.

(7) The Vice President of Marketing shall report to the President and shall have responsibility for sales of all Company products in the United States and Canada.

(8) The Secretary and Assistant Secretary shall be responsible for recording the minutes of meetings of the Members and the Members Committee, maintaining the official records of the Company and performing other duties as generally pertain to the office of Secretary.

**REDACTED**

## Section 9: Accounting, Books and Records.

9.1 Accounting, Books and Records.

(a) The Company shall keep on site at its principal place of business each of the following:

(i)    Separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of the Business in accordance with this Agreement.

(ii)    A current list of the full name and last known business, residence, or mailing address of each Member and Member Representative, both past and present;

(iii)    A copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v)    Copies of this Agreement;

(vi)    Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

(vii)    Unless contained in this Agreement, a statement prepared and certified as accurate by the Members Committee of the Company which describes:

(1) The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

-    39

**REDACTED**

(2) The times at which or events on the happening of which any Additional Capital Contributions agreed to be made by each Member are to be made;

(3) If agreed upon, the time at which or the events on the happening of which a Member may terminate its Membership Interest in the Company and the amount of, or the method of determining, the distribution to which it may be entitled respecting his Membership Interest and the terms and conditions of the termination and distribution;

(4) Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution;

(5) Any written consents obtained from Members pursuant to Section 18-302 of the Act regarding action taken by Members without a meeting; and

(6) Minutes of every meeting of the Members.

(b) The Company shall use the accrual method of accounting in preparation of its financial reports and for tax purposes and shall keep its books and records accordingly. Any Member or its designated representative has the right to have reasonable access to and inspect and copy the contents of such books or records and shall also have reasonable access during normal business hours to such additional financial information, documents, books and records. The rights granted to a Member pursuant to this Section 9.1 are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

REDACTED

EXHIBIT B

Execution Copy

THIS FRAMEWORK AGREEMENT ("this Agreement") is entered into and effective as of the 12th day of June, 2001, by and among:

DAK Monomers LLC, a Delaware limited liability company ("DAK Monomers"),

DAK Resins LLC, a Delaware limited liability company ("DAK Resins"),

DuPont-Akra Polyester, LLC a Delaware limited liability company ("LLC"), each of the above listed parties, a "Buyer" and together the "Buyers",

DAK Americas LLC, a Delaware limited liability company ("DAK Americas"),

DAK Fibers LLC, a Delaware limited liability company ("DAK Fibers"),

Alpek, S.A. de C.V., a corporation organized and existing under the laws of Mexico ("Alpek"),

Polimor, S.A. de C.V., a corporation organized and existing under the laws of Mexico ("Polimor"),

Petrotemex, S.A. de C.V., a corporation organized and existing under the laws of Mexico ("Petrotemex"),

Polykron, S.A. de C.V., a corporation organized and existing under the laws of Mexico ("Polykron"), each of the above listed parties, an "Alpek Party" and together the "Alpek Parties" and

E. I. du Pont de Nemours and Company, a Delaware corporation, with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898 ("DuPont"),

(each of the parties listed above, a "Party" and together, the "Parties").

## BACKGROUND

On April 1, 1999, Alpek, Polimor, Petrotemex, Polykron, LLC and DuPont entered into a "Master Agreement" and certain related agreements pursuant to which: DuPont contributed its polyester staple fiber business in the United States to LLC in return for a 50% ownership interest therein; Polimor contributed cash to LLC in return for a 50% ownership interest therein; Alpek sold shares of Polykron which Alpek owned to DuPont to increase DuPont's ownership interest in Polykron from 40% to 50% minus one share; and Petrotemex further agreed to transfer and promised to transfer certain shares which Petrotemex owned in Productos Derivados del Xileno, S.A. de C.V. to Polykron (the "Staple Fiber JV").

DuPont and Alpek have now decided that DuPont will terminate its ownership interest in Polykron and that DuPont will terminate its ownership interest in LLC at a future date. In the context of these changes the following transactions will occur as of the Transaction Closing Date.

> (1)    DuPont will cease to be a shareholder in Polykron.

> (2)    Polimor will grant DuPont an option to put all (and not less than all) of DuPont's Membership Interest in LLC to Polimor and DuPont will grant Polimor an option to call all (and not less than all) of DuPont's Membership Interest in LLC from DuPont.

Execution Copy

## ARTICLE 8
## WITHDRAWAL OF DUPONT FROM STAPLE JV

8.1    Put Option. In consideration of the payment by DuPont to Polimor of one dollar ($1), receipt of which is hereby acknowledged by Polimor, Polimor hereby irrevocably and unconditionally grants to DuPont an option to transfer to Polimor all and not less than all of DuPont's Membership Interest in LLC. Such put option ("Put Option") shall be exercisable by DuPont:

(a)    on or at any time after the earlier of 9:00 am ET on April 1, 2002 and the date upon which an Insolvency Event with respect to LLC occurs or, if Polimor transfers its Membership Interest to a party that is not an Affiliate of Alpek, the date of such transfer, but in no event earlier than the Transaction Closing Date; and

(b)    by written notice from DuPont to Polimor substantially in the form of Exhibit 8 hereto.

**REDACTED**

Execution Copy

8.2 <u>Call Option</u>. In consideration of the payment by Polimor to DuPont of one dollar ($1), receipt of which is hereby acknowledged by DuPont, DuPont hereby irrevocably and unconditionally grants to Polimor an option to require transfer to Polimor of all and not less than all of DuPont's Membership Interest in LLC. Such call option ("Call Option") shall be exercisable by Polimor:

(a)    at any time, but in no event earlier than the Transaction Closing Date; and

(b)    by written notice from Polimor to DuPont substantially in the form of Exhibit 8 hereto.

8.3 <u>Formalities following withdrawal from LLC.</u>

8.3.1    Upon exercise of the Call Option or the Put Option, as the case may be, the LLC Agreement shall terminate.

8.3.2    Promptly following exercise of the Call Option or the Put Option, as the case may be, Polimor shall cause LLC to change its name so that there is not reference to "DuPont" or any variant thereof.

8.3.3    Polimor (or its successor in interest to the ownership of all of its Membership Interest in LLC) and DuPont shall share equally any costs incurred in preparing any new tax returns for LLC for any tax periods ending on or prior to the date of exercise of the Put Option or Call Option as the case may be.

8.4 <u>Withdrawal from Polykron</u>. Alpek, DuPont and Petrotemex, as owners of the share capital of Polykron, shall hold an extraordinary meeting of shareholders of Polykron for the adoption of a resolution to be effective as of the Transaction Closing Date under which the share capital of Polykron shall be reduced in a manner affecting only the total shares of Polykron owned by DuPont (the "Shares"). Such reduction shall be effected as a redemption of the Shares at a price equal to the aggregate par value thereof. DuPont hereby waives any right to have such redemption of the Shares made at any other valuation of shares of Polykron in connection with its participation in the shareholders' equity of Polykron.

REDACTED

EXHIBIT C

02/04/2005  12:46    7043627550    DUPAKRA    PAGE  02

March 25, 2002

E.I. DU PONT DE NEMOURS AND COMPANY
1007 Market Street
Wilmington, Delaware 19898

Attention: Corporate Secretary

### CALL OPTION NOTICE

This Call Option Notice is delivered to you pursuant to Section 8.2(b) and
Section 16.1 of the Framework Agreement dated July 12, 2001, entered by and
among DAK Monomers, LLC, DAK Resins LLC, DAK Americas, LLC, DAK
Fibers, LLC, Dupont-Akra Polyester, LLC, Alpek, S.A. de C.V., Polimor, S.A. de
C.V., Petrotemex, S.A. de C.V., Polykron, S.A. de C.V. and E.I. du Pont de
Nemours and Company.

We hereby give notice that the LLC Interest Purchase and Sale
Agreement between E.I. du Pont de Nemours and Company and Polimor, S.A.
de C.V. dated July 12, 2001 shall become effective at 12:00 a.m. on April 1st,
2002.

Sincerely yours,

Polimor, S.A. de C.V.

Juan Luis San José
Attorney-in-fact

Martin X. Villarreal
Attorney-in-fact

EXHIBIT D

1 of 1 DOCUMENT

**CHRISTIANA MARINE SERVICE CORPORATION, Plaintiff, v. TEXACO FUEL AND MARINE MARKETING INC. and TEXACO INC., Defendants.**

C.A. No. 98C-02-217 WCC

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2002 Del. Super. LEXIS 305

January 2, 2002, Submitted
June 13, 2002, Decided

**DISPOSITION:** [*1] Defendant Texaco Fuel and Marine Marketing Inc., and Texaco Inc.'s Motion for Summary Judgment Granted in part; denied in part.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff barge contractor filed a complaint against defendant oil provider, alleging various claims, including breach of contract and negligent misrepresentation. The oil provider filed a motion for summary judgment, requesting the dismissal of all claims.

**OVERVIEW:** The barge contractor alleged that the oil provider breached the parties' oral contract. The oil provider asserted that the claims were barred by the doctrine of laches. The court found that the statute of limitations did not begin to run until there was an affirmative termination of the arrangement between the two parties. The instant action was instituted within the applicable limitation period. In addition, the oil provider was an international corporation. The court found that it appeared to have acted like a mom and pop grocery store in the instant case, relying on a handshake and goodwill to perform an important business function. The laches argument was rejected, as there was no unreasonable delay and no prejudice. As to whether or not there was an oral contract, or a contract created by conduct, the court found that this could not be decided upon summary judgment. The facts were not settled and undisputed, when viewed in the light most favorable to the non-moving party. As for the claim of negligent misrepresentation, the oil provider was generally in the business of supplying oil, not information. As such, the litigation would proceed as a contract dispute only.

**OUTCOME:** The motion for summary judgment as to the breach of contract claim was denied, but the motion for summary judgment as to the negligent misrepresen-

tation claim was granted.

**CORE TERMS:** bunker, fuel, supplying, barge, oil, negligent misrepresentation, economic loss, breach of contract, summary judgment, business relationship, supplied, delivery, ship, negligent misrepresentation claim, statute of limitations, contractor, provider, supplier, laches, bbls, assent, business transactions, transportation, manufacturers, undisputed, throughput, tangible, tugboats, barrels, seller

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate. Moreover, if it appears to the court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied. The court is required to examine all pleadings, affidavits, and discovery material provided to the court, accept all non-disputed facts as true, and must accept the non-movant's version of any disputed facts.

*Torts > Procedure > Commencement*
[HN2] The test of laches is both unreasonable delay and consequent significant prejudice. In an attempt to determine what constitutes unreasonable delay, the court should first consider the time limitation fixed by the statute of limitations.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN3] Delaware's statute of limitations for contract and negligence actions is found in Del. Code Ann. tit. 10, §

  

Case 1:05-cv-00071-KAJ    Document 6-2    Filed 03/04/2005    Page 18 of 55

Page 2
2002 Del. Super. LEXIS 305, *1

8106. The three-year limitation on causes of action for an alleged breach of contract accrues at the time of the breach, whereas a tort claim accrues at the time of the injury.

*Civil Procedure > Jury Trials > Province of Court & Jury*
[HN4] While it is the court's province to define a contract, it is the jury's function to decide whether a contract exists.

*Contracts Law > Formation > Formation Generally*
*Civil Procedure > Jury Trials > Province of Court & Jury*
[HN5] It is the court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged. This rule does not apply where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of documents considered in connection with other pertinent facts and circumstances proved. Stated differently, when other facts and circumstances germane to the issue are to be considered in addition to any documentary evidence, a jury is to decide whether or not a contract was formed, not the court.

*Contracts Law > Formation > Offer*
[HN6] The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act. The conduct of a party may manifest assent even though they do not in fact assent.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN7] Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

*Torts > Damages > Damages Generally*
[HN8] The economic loss doctrine prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage. The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. Economic loss is any monetary loss, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value. While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount of plaintiff's tort claims, which result when contract pro-

visions limit their recoveries, or where a contract may not have existed at all.

*Torts > Damages > Damages Generally*
[HN9] Economic loss is defined as damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN10] One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if they fail to exercise reasonable care or competence in obtaining or communicating the information.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN11] For a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties. A plaintiff, in addition to the first element, must also show that the defendant is in the business of supplying information.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN12] In Illinois, for a negligent misrepresentation claim, a plaintiff must demonstrate that: (1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN13] A precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions. Whether a defendant can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted. While there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information, manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information.

*Torts > Business & Employment Torts > Negligent*

  

*Misrepresentation*

[HN14] A great many businesses exchange information as well as products and where the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings. Businesses that supply tangible goods and/or non-informational good or services may exchange information, but the information relates only to the goods or services and, thus, is supplied incidental to the sale of the product. This is what it means to be in the business of supplying information for the purposes of a negligent misrepresentation claim.

*Torts > Business & Employment Torts > Negligent Misrepresentation*

[HN15] Businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite inspectors and environmental assessors are pure information providers, which constitute being in the business of supplying information for the guidance of others, for purposes of a negligent misrepresentation claim. Certain professions are tangible good providers, that of manufacturers of computers and software or products of any type.

*Torts > Business & Employment Torts > Negligent Misrepresentation*

[HN16] By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which they manifest an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests.

**COUNSEL:** John D. Balaguer, White & Williams LLP, Wilmington, Delaware, Attorney for Plaintiff, Christiana Marine.

James J. Maron & John P. Daniello, Maron & Marvel, P.A., Wilmington, Delaware, Attorneys for Defendants, Texaco Inc.

Peter R. Kahana & Daniel M. Cohen, Berger & Montague, P.C., Philadelphia, PA, Attorneys for Defendant, Texaco Fuel and Marine Marketing, Inc. And Texaco, Inc.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINIONBY:** William C. Carpenter, Jr.

**OPINION:**

## MEMORANDUM OPINION

### CARPENTER, J.

Defendants have filed a motion for summary judgment pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The core of this controversy centers upon an alleged oral long term requirement contract between Texaco Fuel and Marine Marketing, Inc. (hereinafter "Texaco"), and Christiana Marine Service Corporation (hereinafter "Christiana") a bunker fuel provider. n1 Christiana seeks compensatory damages without limitation to its lost profits; and consequential damages, consisting of Christiana's economic [*2] losses. The Court has heard oral argument on the motion and for the reasons set forth below, Texaco's motion for summary judgment is denied in part, and granted in part.

> n1 Christiana has sued Texaco's parent company, Texaco Incorporated, in addition to Texaco, pursuant to vicarious liability.

### FACTS

Christiana Marine was incorporated in 1986, after its successor corporation, Compass Marine Corporation, ceased doing business. Christiana was a barge contractor that transported marine bunker fuel, a low grade black oil, in the Delaware River. Usually, when ships are at sea and need fuel, they will notify the oil providers in a particular port, such as Texaco or its competitors. The oil provider, is informed of the ship's arrival date, and the amount of bunker fuel needed to which the oil companies reply with their bids. Once awarded a contract, the oil company hires a barge contractor to transport the oil to the ships who requested the fuel. n2

> n2 Christiana had two business locations: one in Chester, Pennsylvania, where delivery vessels were berthed during non-use and repair, and one in Wilmington, Delaware, where orders were received, invoices were sent, and where payments were received from Texaco.

[*3]

In 1988 Texaco purchased a new supply facility, the Delaware Terminal Corporation ("DTC") in Wilmington, Delaware to increase Texaco's market share in the Delaware River area. Because DTC was in Wilmington, and not in, or as near to Philadelphia, it was slightly alienated from (1) the highest business activity where most other supply facilities were located; and (2) where most of the ships that had to be serviced were

  

2002 Del. Super. LEXIS 305, *3

located. n3 Bunker fuel deliveries from a more distant area, such as Wilmington, were assessed higher rates to transport bunker fuel, as compared to the established rates in the Delaware River zone. In addition, DTC was not equipped to handle bunkers, and had experienced substantial congestion problems because of this. n4 To solve these problems, Texaco needed a barge carrier who would agree to provide below market prices for fuel deliveries from DTC, and who would also agree to exclude demurrage for loading delays at Texaco's congested terminal. n5 It was in this environment that the business relationship between Texaco and Christiana began.

n3 Most supply facilities are located in Philadelphia, Pennsylvania.

[*4]

n4 Bruce Bond Dep. at 51. Barge contractors like Christiana, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, Texaco would pay Christiana, Christiana's barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid Texaco for the fuel.

n5 Plaintiff's Response Brief at 2.

Before the alleged contract with Texaco, Christiana had a virtual monopoly on small to medium size bunker jobs in the Delaware River area, n6 and had sufficient equipment to conduct its usual business successfully. According to Christiana, Texaco proposed a long term agreement, which provided that Texaco would employ Christiana as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for Christiana's commitment to have ample equipment on hand to deliver Texaco's requirements upon demand. n7 In addition to these terms, Christiana and Texaco allegedly agreed that Texaco would receive discounted delivery charges, at below [*5] market rates, along with no additional penalties for loading delays at DTC. n8 In 1990, the parties apparently orally modified their business relationship and agreed that Christiana would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which Texaco may have encountered, in return for Texaco's commitment to put through an average 200,000 bbls. of oil per month. n9 Christiana considered the 200,000 quote a minimum average, with Texaco anticipating a 225,000 or 250,000 bbls a month throughput. In other words, Christiana presumed the 200,000 barrels was a floor, not a ceiling. Regardless, Texaco did not meet this alleged "guaranteed" minimum

monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months Christiana and Texaco had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

n6 York's Report at 6 (citing the October 28, 1999 Bruce R. Bond deposition p. 238).

n7 Texaco even published a pamphlet, which stated "[Christiana], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [Christiana] operates several barge units ranging in capacity from 1700 - 3000 metric tons. DTC and [Christiana] offer Texaco flexibility second to none any supplier on the river."

[*6]

n8 Because barge carriage is generally a small margin, fixed cost business, Christiana would have a unique opportunity to secure a steady, expanding stream of business, provided by Texaco, if it entered into this "agreement."

n9 Bates Dep. at 86.

Based upon Texaco's alleged representations that it planned to put through 200,000 bbls. of oil per month, Christiana went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work Texaco and Christiana anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a "favorable reference from Mr. Bruce Bond of Texaco," that Texaco referred to Mr. Bates as a "no-nonsense businessman who always gets the job [*7] done," that on a "monthly basis, Christiana moves roughly 150,000 barrels of bunkers, and [Texaco] wants to increase this to 200,000," and that "Texaco is looking for a long term relationship with Christiana." n10

n10 June 20, 1989 loan document.

The alleged oral contract between Christiana and Texaco ensued until Christiana wrote Texaco a letter in

  

August of 1995, informing them that Christiana could not continue to provide bunker transportation because of the lack of Texaco's business and the cost of providing the service. n11

> n11 "It is with regret that [Christiana] had to inform Texaco last week that we could no longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high . . . ." August 16, 1995 letter from William Bates to C. Michael Bandy of Texaco.

## PROCEDURAL POSTURE [*8]

On February 20, 1998, Christiana filed a complaint against Texaco and alleged six separate counts: (1) breach of contract – volume of business; (2) breach of contract–duration; (3) breach of contract – notice of termination; (4) breach of contract – duty of good faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. Texaco has filed a summary judgment motion requesting the dismissal of all claims.

## STANDARD OF REVIEW

[HN1] A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. n12 If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate. n13 Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied. n14 The Court is required to examine all pleadings, affidavits and discovery material provided to the Court, n15 accept all non-disputed facts as true, and must accept the non-movant's version of any [*9] disputed facts. n16

> n12 See Schueler v. Martin, 674 A.2d 882, 885 (Del. Super. 1996); Pierce v. International Ins. Co. of Ill., 671 A.2d 1361, 1363 (Del. 1996); Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).

> n13 Kysor Industrial Corp. v. Margaux, 674 A.2d 889, 894 (Del. Super. 1996).

> n14 Vanaman v. Milford Memorial Hospital, Inc., 272 A.2d 718, 720 (Del. 1970).

> n15 Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., 312 A.2d 322 (Del. Super. 1973).

> n16 Merrill v. Crothall–American, Inc., 606

A.2d 96 (Del. 1992).

## DISCUSSION

### A. Doctrine of Laches / Statute of Limitations

Texaco asserts that Christiana's breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because Christiana's time to bring suit started in July 1993, when it became clear the terms of the contract as alleged [*10] by Christiana were not being met. n17 Additionally, Texaco claims that Christiana consulted counsel in 1995, when it went out of business, to consider bringing a claim against Texaco; that Christiana intentionally misled Texaco "by writing Texaco a soothing, non-accusatory" 1995 letter saying nothing about a claim; that Christiana and its former attorney deliberately chose not tell Texaco about the alleged claim to inhibit Texaco from taking steps to defend itself. Texaco alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by Christiana's delay because: (1) out of the 48 months Christiana transported Texaco's bunker oil, Texaco only reached the alleged 200,000 barrels a month for 8 months, so if Christiana considered this "lower throughput" a breach of contract, they had an obligation to notify Texaco so it could have limited its damages by terminating the alleged contract at that point in time, and (2) Texaco is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. Texaco stated that its computer files only date back until 1994, which makes locating precise [*11] and complete data for the relevant time period impossible.

> n17 Texaco's Brief at 20

Christiana contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated. Christiana claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to Texaco notifying it that Christiana would be unable to participate in further business. Christiana also asserts that a laches agreement is unavailable to Texaco because Texaco "effectively" caused the termination of the agreement in its continuously low throughput, which caused Christiana to be prejudiced and to go out of business. And lastly, Christiana claims that Texaco is responsible for the lost computer files and documents, as Texaco took their mainframe computer out of service at the end of 1993. Christiana also points out that Texaco has been

  

on notice of this lawsuit since May 1, 1996, and thus, could've kept records and documents for its [*12] defense as of that date. n18

n18 Plaintiff's Brief in Opposition to Defendant's Motion at 20.

[HN2] "The test of laches is both unreasonable delay and consequent significant prejudice." n19 In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations. n20 [HN3] Delaware's statute of limitations for contract and negligence actions is found in 10 Del. C. § 8106. The 3 year limitation on cause of actions for an alleged breach of contract accrues at the time of the breach, n21 whereas a tort claim accrues at the time of the injury. n22

n19 Wilkes v. H.M. Wrangell & Co., 293 F. Supp. 522, 524 (D.Del. 1968)(citing Gutierrez v. Waterman S.A. Corp., 373 U.S. 206, 215, 10 L. Ed. 2d 297, 83 S. Ct. 1185 (1963); Claussen v. Mene Grande Oil Co., 275 F.2d 108, 113 (3d Cir. 1960)).

n20 Wilkes, 293 F. Supp. at 524.

[*13]

n21 Fineberg v. Credit Int'l Bancshares, Ltd., 857 F. Supp. 338 (D.Del. 1994); Nardo v. Guido DeAscanis & Sons, 254 A.2d 254 (Del. Super. 1969).

n22 Howmet Corp. v. City of Wilmington, 285 A.2d 423 (Del. Super. 1971).

The Court finds that the statute of limitations, 10 Del. C. § 8106, did not begin to run until there was an affirmative termination by one of the parties. Christiana wrote the August 1995 letter to Texaco, which terminated the arrangement between these two parties. Until then, the two parties continuously conducted business with one another and Christiana operated as Texaco's bunker fuel contractor. As such, under the statute of limitations applicable to contracts, Christiana had until August, 1998 to file its claims against Texaco. n23 Since Christiana filed the instant action on February 20, 1998, it appears that Christiana successfully brought its claims within its window of opportunity. The Court finds that Christiana's claims have not been unreasonably delayed.

n23 An issue not addressed by the parties is whether the statute of limitations would prevent

the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

[*14]

Additionally, the Court is not convinced that Texaco has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue the passing of time has limited Texaco's access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that Texaco, during its business relationship with Christiana, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by Christiana to terminate the relationship so Texaco could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. Texaco is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and [*15] ones goodwill to perform an important business function. To argue that Christiana has tricked or mislead Texaco is simply an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds neither unreasonably delay or prejudice and thus the claims are not barred by the doctrine of laches.

## B. Breach of Contract Claims

[HN4] While it is the Court's province to define a contract, it is the jury's function to decide whether a contract exists. n24 In Universal Products Co. v. Emerson, n25 the Supreme Court of Delaware followed numerous other court's holdings that [HN5] it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged. n26 The Emerson court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved." n27 Stated differently, when other facts and circumstances germane to the is-

  

2002 Del. Super. LEXIS 305, *15

sue are to be considered in addition to any documentary [*16] evidence, a jury is to decide whether or not a contract was formed, not the Court.

> n24 *Corletto v. Morgan*, 27 Del. 530, 4 Boyce 530, 89 A. 738 (Del. Super. 1914).

> n25 *Universal Products Co. v. Emerson*, 36 Del. 553, 6 W.W. Harr. 553, 179 A. 387 (Del. 1935).

> n26 *Id.* at 393.

> n27 *Id.* at 394.

Texaco contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, Texaco's expert, Patrick J. Studdert, stated in his report that

> in all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between Christiana and Texaco and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry. n28

Texaco asserts that "it is undisputed in the bunker fuel barge delivery industry – that deliveries are made by barge carriers [*17] for oil companies on an "as available basis." n29 Texaco further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by Christiana – long term oral contracts with minimum guaranteed monthly delivery quotas. Texaco then asserts that because Christiana did not exclusively work for Texaco, and it continued to conduct business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of Texaco's alleged "long term agreement" to put through the amount of oil it allegedly promised.

> n28 Studdert's Report at 3.

> n29 Texaco's motion at 3.

Christiana contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. Christiana points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland ("FNBM")'s represen-

tative); and the [*18] mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. Christiana's expert, Robert B. York contends that Christiana and Texaco's relationship was contractual, and more specifically stated in his report that

> "[a] contract existed between [Christiana] and [Texaco] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract. n30

> n30 York's Report at 20.

The Court first finds that whether an oral contract, or a contract created by conduct was established between Christiana and Texaco, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, Texaco and Christiana had mutual, beneficial interests at stake in this business venture, and as such, an enforceable contract was created. The [*19] Restatement Second of Torts § 19 provides that [HN6] "the manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." n31 Subsection (3) further states that "the conduct of a party may manifest assent even though he does not in fact assent." n32 The jury may find that Texaco's conduct manifested an assent to be bound, based upon Mr. Bates' testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. Texaco's arguments are simply ones that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between Texaco and Christiana is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. [HN7] Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

> n31 Restatement (Second) Torts § 19.

[*20]

> n32 *Id.*

  

## C. Negligent Misrepresentation Claim

Finally, Texaco asserts that Christiana's negligent misrepresentation claim is barred by the economic loss doctrine and must be dismissed as all of Christiana's alleged losses are purely economic in nature, *i.e.*, lost profits, lost investments, and acquired debt. Texaco also asserts that Christiana cannot employ the Restatement (Second) of Torts § 552, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine. n33

> n33 The Court need not decide whether federal maritime law governs this action as Christiana's negligent misrepresentation will be dismissed on other grounds.

Christiana admits its damages are purely economic in nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable [*21] to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to Christiana's claims, Delaware has adopted the Restatement (Second) of Torts § 552, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. Christiana asserts it falls within this exception.

[HN8] The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage." n34 The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. n35 Economic loss is "any monetary loss[], costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value." n36 While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount [*22] of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that Christiana's damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim.

n34 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule*, 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

n35 *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del. 1992)(citing *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill. 2d 69, 435 N.E. 2d 443, 448 (Ill. Supr. 1982).

n36 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule*, 89 Ill. B.J. at 406. *See also Danforth*, 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 435 N.E.2d at 449)(noting that [HN9] economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits — without any claim of personal injury or damage to other property.").

[*23]

The Restatement (Second) of Torts § 552 provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson*. n37 The Restatement provides that

> [HN10] One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

n37 583 A.2d 1378 (Del. Super. 1990).

Delaware's narrow application and strict construction of § 552, has thus far held that [HN11] for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, "the plaintiff must show that the defendant supplied the information to the plaintiff [*24] for use in business transactions with third parties." n38 Christiana has satisfied this element.

  

When viewed in a light most favorable to Christiana, there is sufficient evidence, which would indicate that Texaco allegedly informed Christiana, on several occasions, that it intended to put through 200,000 bbls. of oil per month. Christiana relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug boats, barges, and equipment to transport Texaco's bunker oil. Thus, it appears that Christiana shared the information Texaco supplied to it, to use in its business transactions, the loans, with FNBM. Christiana as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

n38 *Danforth v. Acorn Structures, Inc.*, Del. Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem. Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.*, n39 the [*25] Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that "the defendant is in the business of supplying information." n40 In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations. n41

n39 The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely economic losses and were thus barred by the economic loss doctrine. *Danforth v. Acorn Structures Inc.*, C.A. No. 90 C-JN-30, 1991 WL 215658 (Del. Super. Aug. 27, 1991). Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the Restatement (Second) of Torts § 552 exception to the economic loss doctrine, and thus his negligent misrepresentation claim against the defendant should survive. *Danforth v. Acorn Structures, Inc.*, C.A. No. 90 C-JN-30, 1991 WL 269956 (Del. Super. Nov. 22, 1991). The Court's expansive discussion concerning the Restatement (Second) of Torts § 552, and the two requirements a plaintiff must satisfy to lift the economic loss doctrine's bar are found in the November 22, 1991 opinion.

[*26]

n40 *Danforth v. Acorn Structures, Inc.*, Del.

Super. C.A. No. 90 C-JN-30, 1991 WL 269956, (Del. Super. Nov. 22, 1991) Since *Danforth*, [HN12] Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 719 N.E.2d 288, 296 (App.Ct.Ill. 1999).

n41 *Danforth*, at *4 (citing *Rankow v. First Chicago Bank*, 870 F.2d 356, 360-366 (7th Cir. 1989); *Gerdes v. John Hancock Mutual Life Insurance Co.*, 712 F.Supp 692, 697-98(N.D.Ill. 1989)).

In *Rankow v. First Chicago Corp.*, n42 the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that [HN13] "[a] precise, case-specific [*27] inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." n43 The *Rankow* court went further to hold that "whether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted." n44 In its attempts to determine whether a bank was "in the business of supplying information" the *Rankow* court noted that "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that "manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information." n45 The *Rankow* court then noted that

a great many businesses involve an exchange of information as well as of tangible products – manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of [*28] these cases, it becomes clear that the product (a building, pecipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental. n46

  

n42 870 F.2d 356 (7th Cir. 1989).

n43 *Rankow*, 870 F.2d at 360.

n44 *Rankow*, 870 F.2d at 361.

n45 Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.*, 109 Ill. App. 3d 132, 440 N.E. 2d 282 (Ill.App.Ct. 1982)(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.*, 117 Ill. App. 3d 304, 453 N.E. 2d 8 (Ill.App.Ct. 1983)(holding a roofing materials supplier was not in the business of supplying information); *Tan v. Boyke*, 156 Ill. App. 3d 49, 508 N.E.2d 390 (Ill.App.Ct. 1987)(seller of an apartment building was not a supplier of information); *Vacuum Industrial Pollution*, 764 F Supp 507 (N.D.Ill. 1991)(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information);.

[*29]

n46 *Rankow*, 870 F.2d at 364.

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.*, n47 the Illinois court noted that [HN14] "a great many businesses exchange information as well as products" and "where the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." n48 The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services . . . may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." n49

n47 308 Ill. App. 3d 18, 719 N.E 2d 288 (Ill.App.3d 1999).

n48 *Tolan Sons Inc.*, 719 N.E.2d at 296.

n49 *Tolan*, 719 N.E.2d at 297.

The [*30] Court finds the above cited reasoning to be a fair interpretation of what it means to be "in the business of supplying information" for the purposes of a negligent misrepresentation claim. Based upon the

above reasoning, and in heeding the prior precedent of *Guardian Construction*, and *Danforth*, the Court finds that Texaco was not "in the business of supplying information for the guidance of others." n50 The information Texaco supplied to Christiana is more aptly categorized as information incidentally supplied to Christiana for the ultimate service – that of transporting bunker fuel oil. Clearly, Texaco is generally in the business of supplying oil, not information. n51 The information Texaco supplied, if any, is best classified as ancillary to the provided service. n52 As such, this litigation will move forward as a contract dispute only and the tort claim is dismissed

n50 *See Tolan*, 719 N.E.2d at 296–96(delineating what business are pure information providers where the end product is an idea, what businesses are tangible product end manufacturers, and what businesses fall between the two.). *Tolan* notes that [HN15] businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite inspectors and environmental assessors are "pure information providers, which would constitute "in the business of supplying information for the guidance of others." *Tolan* also notes certain professions that are tangible good providers, which is where this Court finds Texaco falls – that of manufacturers of computers and software or products of any type.

[*31]

n51 *See Vacuum Industrial Pollution, Inc. v. Union Oil Co.*, 764 F Supp. 507 (N.D.Ill. 1991)(holding that a defendant oil company was not in the business of supplying information ).

n52 *See* the Restatement (Second) of Torts § 552 comment a explaining that [HN16] "by limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests."

While this Court has followed the earlier decisions of the Court that have addressed this issue, other jurisdictions have taken a more expansive view of § 552 n53 and clearly an argument can be made that the decisions from Illinois followed by Delaware are too limiting and fail to give full effect to the negligent misrepresentation

  

2002 Del. Super. LEXIS 305, *31

exception. The question of when does a business cross the line into the world of "supplying information" or whether [*32] that requirement is mandated, is anything but clear. If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

> n53 *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582 (Md. 2000)(holding that the negligent misrepresentation requires: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge hat the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence "); *Jacobson v. Environmental Risk Limited*, No. CV 950550991, 1996 WL 168086, at *3 (Conn. Super. Mar. 4, 1996)(following the "governing principals" of the Restatement (Second) of Torts § 552 and holding that negligent misrepresentation requires a plaintiff to "allege and prove that the reliance on the misstatement was justified or reasonable," and "reasonableness is a question of fact for the trier to determine based on all of the circumstances.")

[*33]

### CONCLUSION

For the reasons set forth above, Texaco's motion for summary judgment as to the breach of contract claim is denied, but Texaco's motion for summary judgment as to Christiana's negligent misrepresentation claims is granted.

Judge William C. Carpenter, Jr

  

EXHIBIT E

1 of 1 DOCUMENT

GEORGE DANFORTH, Plaintiff, v. ACORN STRUCTURES, INC., a Massachusetts corporation, Defendant.

CIVIL ACTION NUMBER 90C–JN–30

SUPERIOR COURT OF DELAWARE, NEW CASTLE

1991 Del. Super. LEXIS 454

October 18, 1990, Submitted
November 22, 1991, Decided

**PRIOR HISTORY:** [*1] Upon Motion of Plaintiff for Reargument

**DISPOSITION:** DENIED

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff customer moved for reargument of the court's decision in favor of defendant supplier in the customer's claim for negligent misrepresentation.

**OVERVIEW:** The customer purchased home-building materials, which came with design and assembly instructions. The customer filed an action for negligent misrepresentation against the supplier after the customer experienced problems with the water proofing and insulating material. The court found in favor of the supplier, and the customer unsuccessfully moved for reargument. The court found that in order to succeed on a claim of negligent misrepresentation: 1) the information had to have been supplied for the guidance of others in their business transactions with third parties; and 2) a plaintiff had to show that the defendant was in the business of supplying information. The court determined that the customer failed to prove either element. The court noted that the customer did not claim that he took the supplier's information and in any way used that with a third party; rather, he used it in subsequent dealings with the supplier itself. The court also found that the supplier was in the business of providing materials and that the design and assembly instructions were merely incidental to the provision of the material.

**OUTCOME:** The court denied the customer's motion for reargument.

**CORE TERMS:** negligent misrepresentation, third parties, cause of action, supplying, business of providing, general contractor, involvement, third party, supplied, specifications, intends, incidental, reargument, tangible, assembly, package, seller, build, business transactions, clarification, subcontractor, bid, home building, franchisor, software, surveyor, supplier, roofing, loss suffered, state agency

**LexisNexis(R) Headnotes**

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN1] In order to sustain a claim for negligent misrepresentation, the information must be supplied for the guidance of others in their business transactions with third parties.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN2] The second element of a claim for negligent misrepresentation is that a plaintiff must show that the defendant is in the business of supplying information.

**COUNSEL:** John K. Newcomer, Jr., Esq., of Bayard, Handelman & Murdoch, P. A., attorney for plaintiff George Danforth

Howard M. Berg, Esq., and Paul Cottrell, Esq., of Berg, Bifferato, Tighe & Cottrell, P. A., attorneys for defendant Acorn Structures, Inc.

**JUDGES:** HERLIHY

**OPINIONBY:** HERLIHY

**OPINION:**

*MEMORANDUM OPINION*

HERLIHY, Judge

Plaintiff George Danforth [Danforth] has moved for

  

reargument of this Court's decision of August 27, 1991. He argues that his claim falls within the negligent misrepresentation exception to the economic loss rule which was recognized in *Guardian Construction Co. v. Tetra Tech Richardson,* Del.Super., 583 A.2d 1378 (1990). Specifically, Danforth contends that Guardian allows his claim because he signed a "Custom Design Agreement" [agreement] with Acorn Structures, Inc. [Acorn] which agreement contained defective plans which were used to build his house. Danforth obtained a home building package from Acorn after completion of the agreement. The home building package is the material used to construct the house.

*Guardian* adopted for Delaware *Restatement, Second, Torts* § 552. n1 The cause of action recognized in *Guardian* [*2] is known also as negligent misrepresentation. Danforth's motion for reargument requires this Court to reexamine *Guardian.* That reexamination further requires a clarification of *Guardian* and its adoption of § 552 and its application to this case.

n1 Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Restatement, Second, Torts* § 552.

[*3]

It has been noted that § 552 is unclear whether an element of a claim for negligent misrepresentation is that the information be supplied for a transaction not involving the defendant. *Colorado Nat. Bank of Denver v. Adventura Assoc.,* D.Colo., 757 F.Supp. 1167 (1991). The court in *Guardian* did not specifically address this issue, however, an examination of the facts in *Guardian* clearly shows that the Court applied § 552 to just that kind of situation.

The defendant in *Guardian* supplied information to a state agency for the preparation of bid specifications. The successful general contractor bidder used those specifications not only to prepare its bid but to eventually subcontract out the work. Later it was found that the defendant's specifications were faulty causing increased cost to the subcontractor and, thus, to the state.

Without expressly so ruling, the *Guardian* court found that the plaintiff general contractor had used the defendant's information in dealings with third parties, neither one of whom was the defendant. There were two third parties. One was the state agency to whom the general contractor offered a bid, using the specifications [*4] to develop a price. The other third party was the subcontractor who used the information to prepare its work, including the price to be charged to the general contractor.

As noted in this Court's original decision, *Guardian* was presaged in *Hodges v. Smith,* Del.Super., 517 A.2d 299 (1986). In that case, too, the plaintiff used the defendant's survey information in transactions with third parties. *Hodges,* 517 A.2d at 301. While not expressly stated in *Hodges,* the factual setting clearly implicates, as did *Guardian,* the need for the plaintiff to use the defendant's information in transactions with third parties. The Court in *Hodges,* when using the negligent misrepresentation basis of liability, cited an Illinois case as authority. Illinois has had much litigation in this area and had adopted and used § 552 for a period of time prior to Delaware's adoption in *Guardian. See Penrod v. Merrill, Lynch, Pierce, Fenner and Smith,* Ill.App.Ct., 385 N.E.2d 376, 381 (1979).

Illinois has now made it clear that [HN1] in order to sustain a claim for negligent misrepresentation, the information must be supplied for the guidance of [*5] others in their business transactions. *Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.,* Ill.App.Ct., 440 N.E.2d 282, 284 (1982). This requirement has been further refined to mean that the information supplied must be "for the guidance of others in their business relations with third parties". *Id.* The Illinois



Supreme Court has confirmed this as an element in a negligent misrepresentation cause of action. *Moorman Mfg. Co. v. National Tank Co.*, Ill..Supr., 435 N.E.2d 443, 452 (1982).

Subsequent litigation has made it clear that Illinois retains the element of third party involvement as a prerequisite to recover for negligent misrepresentation *Rankow v. First Chicago Corp.*, 870 F.2d 356 (7th Cir. 1989); *Gerdes v. John Hancock Mut. Life Ins. Co.*, D.C.N.D.Ill., 712 F.Supp. 692 (1989); *Vacuum Industrial Pollution, Inc. v. Union Oil Co. of California*, D.C.N.D.Ill., 764 F.Supp.. 507 (1991). Illinois is not alone in requiring that the information be used in transactions involving third parties. *See Meier v. Alfa-Laval, Inc.*, Ia..Supr., 454 N.W.2d 576, 581 (1990) [*6] where Iowa joined Illinois. Iowa, too, had previously adopted § 552. *Id.* at 581

Colorado also has adopted § 552. *First National Bank in Lamar v. Collins*, Colo.Ct.App., 616 P.2d 154 (1980). In that case, the plaintiff had relied on information from a franchisor to mortgage property he owned. The plaintiff bank (mortgagee) filed foreclosure and the plaintiff cross-claimed against the franchisor, including a claim for negligent misrepresentation. Colorado also would appear to require the involvement of third parties as an element of cause of action under negligent misrepresentation and § 552. *Jardel Enterprises, Inc. v. Triconsultants, Inc.*, Colo.Ct.App., 770 P.2d 1301, 1304-05 (1988); *Colorado Nat. Bank*, 757 F.Supp. at 1173.

In *Devore v. Hobart Manuf. Co.*, La..Supr., 367 So..2d 836 (1979), Louisiana recognized the existence of the tort of negligent misrepresentation under § 552. However, the facts of that case show an implicit acknowledgment of the need for involvement of third parties.

Thus, it is clear that in order for a plaintiff to invoke a cause of action under negligent misrepresentation [*7] involving § 552, the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties. In other words, the information must be used in a transaction not involving the defendant. Insomuch as this is a clarification of *Guardian's* adoption of § 552, the definite weight of authority, particularly recent decisions, justifies such a clarification.

Danforth's claim fails on this ground alone. He did not and does not claim that he took Acorn's information in the agreement and in any way used that with a third party. There is no claim that he selected any contractors or subcontractors based on that information. In addition, while Danforth may have contracted with a

third party, a general contractor, to build his house from the package (materials) Acorn provided, Danforth used Acorn's "information" to sign a second contract with Acorn. That step hardly meets the test of a transaction involving a party other than the defendant. Accordingly, on this ground, Danforth's negligent misrepresentation claim must fail.

There is an additional element to the cause of action under negligent misrepresentation. Again, while neither [*8] *Hodges* nor *Guardian* expressly made this second element a prerequisite to recovery under this type of tort, it can be fairly read into the opinions.

[HN2] The second element is that the plaintiff must show that the defendant is in the business of supplying information. A surveyor such as the defendant in *Hodges* clearly meets that criteria. *Hodges* cited as support for its holding the Illinois case of *Rozny v. Marnul*, Ill.Supr., 250 N.E.2d 656 (1969) allowing a negligent misrepresentation cause of action against a surveyor. Again, it is constructive to examine Illinois case history in understanding the development of this cause of action. The Illinois Supreme Court clarified after *Rozny* that negligent misrepresentation requires the defendant to be in the business of supplying information. *Moorman Mfg. Co.*, 435 N.E.2d at 452. *See Rankow*, 870 F.2d at 362; *Black, Jackson and Simmons*, 440 N.E.2d at 284; *Gerdes*, 712 F.Supp. at 696.

In *Guardian*, while again not explicitly stated as an element of negligent misrepresentation under § 552, the facts clearly show the defendant was [*9] in the business of providing information. The defendant was a design engineer.

In light of the extensive litigation history in Illinois involving claims of negligent misrepresentation, this Court deems it appropriate to adopt explicitly that which was implicit in *Hodges* and *Guardian*. That is, a plaintiff must show as an element of this cause of action that the defendant is in the business of providing information.

"There has been no clear discussion in the [Illinois] cases to date as to what principle should be applied in determining whether a party is 'in the business of supplying information'." *Rankow*, 870 F.2d at 363. Various Illinois cases, *Hodges* and *Guardian* do provide guidance applicable to this case. *Black, Jackson and Simmons*, 440 N.E.2d at 284 (computer hardware and software supplier not in business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.*, Ill.App.Ct., 453 N.E.2d 8, 11 (1983) (roofing materials supplier not in information business); *Tan v. Boyke*, Ill.App.Ct., 508 N.E.2d 390, 396, *appeal denied*, Ill.Supr., 515 N.E.2d 127 (1987) [*10] (seller

  

1991 Del. Super. LEXIS 454, *10

of an apartment building); *Vacuum Industrial Pollution,* 764 F.Supp. at 514 (oil company not in business of supplying information).

As the Court in *Rankow* stated:

Obviously, a great many businesses involve an exchange of information as well as of tangible products – manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.

*Rankow,* 870 F.2d at 364.

It is not necessary for this Court to presently delineate those types of businesses which are or are not in the business of providing information. Lists of those which clearly are in the information business are found in *Rankow,* 720 F.2d at 360–66 and *Gerdes,* F.Supp. at 697–98.

Suffice it to say that Acorn in this instance does not fall into the category of concerns which are in the business of supplying information. Danforth's complaint

makes it clear that Acorn primarily [*11] sold a tangible product – materials with which to build homes. The design and "assembly instructions" were incidental.

Even if the design function approaches the level of an architect providing information and perhaps placing Acorn in the business of providing information, Danforth's claim still fails. It is the instructed use of a water proofing and/or insulating material which is the gravamen of Danforth's complaint. In the context of the construction of the house that was an assembly instruction relating to a tangible product. It was incidental to the home's construction and had nothing to do with design in the traditional architectural sense.

Accordingly, Danforth has not met his burden of showing that as an element of the claim of negligent misrepresentation, Acorn is in the business of providing information. On this ground alone, and/or in conjunction with his failure to meet the first element of involvement of third parties, Danforth's claim fails.

For the reasons stated herein, Danforth's motion for reargument is *DENIED.*

*IT IS SO ORDERED.*

Herlihy, J.

  

EXHIBIT F

1 of 1 DOCUMENT

IRVING FELDBAUM, Plaintiff, v. McCRORY CORPORATION, et al.,
Defendant. UNITED APPLE SALES INCORPORATED PROFIT SHARING
TRUST U/A DTD 8/1/71, et al., Plaintiffs, v. E-II HOLDINGS
INC., et al., IN RE McCRORY PARENT CORPORATION (NOTE AND
DEBENTURE HOLDER LITIGATION)

Civil Action No. 11866, Civil Action No. 11920, Consolidated
Civil Action No. 12006

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

1992 Del. Ch. LEXIS 113

October 2, 1991, Submitted
June 1, 1992, Decided

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT
IS SUBJECT TO REVISION OR WITHDRAWAL.

CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant debtors filed motions to dismiss plaintiff debt
holders' action against debtors for an invalid restructuring on the grounds of
lack of subject matter jurisdiction as to all the claims, forum non conveniens,
lack of personal jurisdiction as to two debtors and failure to state claims upon
which relief could be granted, as well as motions to stay all claims because of
the pending bankruptcy proceedings against two debtors.

**OVERVIEW:** The court held that (1) the court's jurisdiction did not present an
inconvenient forum for the litigation, (2) the no-action clauses in the
indentures constituted waivers by debt holder of any right to bring the
following claims against debtors, without first satisfying the procedural
requirements of those clauses: the fraudulent conveyance claims, the claims for
breaches of implied covenants of good faith and fair dealing, and those common
law fraud claims that were based on injuries allegedly arising from a missed
opportunity for debt holders to enjoin the restructuring, (3) an individual debt
holder's claim that he was injured by holding bonds fell outside the reach of
the no-action clauses, but debt holders had not succeeded in their effort to
transmute their breach of contract claim into a litigable claim for fraud, (4)
because debt holders' claims for anticipatory repudiation and past due interest
and principal arose before the commencement of bankruptcy proceedings and were
asserted against the bankrupt debtor they were automatically stayed under 11
U.S.C.S. § 362(a)(1), and (5) the stay of action against the issuer was
dispositive of these claims in all respects.

**OUTCOME:** The court did not dismiss the case on forum non conveniens grounds,
but did dismiss, with respect to all debtors, each of debt holders' claims
except two, and these two were stayed because of debtor's pending bankruptcy
proceeding.

**CORE TERMS:** bondholder, no-action, indenture, issuer, holder, fraudulent
conveyance, restructuring, conveniens, common law fraud, fair dealing,
inconvenience, contract claim, misstatement, covenant, ratably, duty, omission,

  

1992 Del. Ch. LEXIS 113, *

subject matter jurisdiction, bankruptcy proceedings, bring suit, shareholder, hardship, barring, enjoin, failure to comply, outstanding, prosecuted, breached, default, motion to dismiss

LexisNexis(R) Headnotes


**Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action**
[HN1] The Court of Chancery has subject matter jurisdiction whenever the remedies available at law would not be fully adequate.

**Civil Procedure > Venue > Change of Venue Generally**
[HN2] Under Delaware law, suits must ordinarily proceed in the court in which they are first commenced, notwithstanding the existence of an arguably more convenient forum elsewhere. This approach reflects the view that the inefficiency inherent in any change in forum is warranted only when (1) litigating in the existing forum would impose hardship upon defendant and (2) an alternative forum would be substantially more convenient. A defendant seeking a dismissal or stay on forum non conveniens grounds must accordingly meet a high burden which incorporates each of these two criteria.

**Civil Procedure > Venue > Forum Non Conveniens**
**Civil Procedure > Venue > Change of Venue Generally**
[HN3] A pending suit will never be dismissed on forum non conveniens grounds unless the defendant shows inconvenience and hardship. Simply put, a Delaware court need not and, indeed, should not consider the merits of alternative forums until it first has determined that litigation here would impose an unjustifiable burden upon defendant. If litigation in Delaware would not be particularly burdensome to a defendant, the forum non conveniens analysis would accordingly come to an end. If, however, litigation in Delaware would indeed work a hardship on defendant or substantially inconvenience it, the analysis proceeds to the second step. The court then should ask, not merely whether another forum would be better, but whether that alternative forum would be so much better as to justify dismissal of the case. This second step entails a weighing of both the benefits and the costs of litigating the dispute in the other jurisdiction.

**Contracts Law > Contract Conditions & Provisions > Waivers**
[HN4] Absent an allegation of fraud in the inducement of the purchase, no-action clauses are generally applied to foreclose bondholder suits under the indenture, where plaintiff has not complied. Such clauses are bargained-for contractual provisions which inure, not only to the benefit of issuers, but also to the benefit of the investors in bonds. Such clauses need not prevent the prosecution of meritorious suits. They do, however, make it difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders. This, in fact, is their primary purpose.

**Contracts Law > Contract Conditions & Provisions > Waivers**
[HN5] No matter what legal theory a plaintiff advances, if the trustee is capable of satisfying its obligations, then any claim that can be enforced by the trustee on behalf of all bonds, other than a claim for the recovery of past due interest or principle, is subject to the terms of a no-action clause.

**Contracts Law > Contract Conditions & Provisions > Waivers**
[HN6] For the same reason that equity has long recognized that, in some circumstances, corporate shareholders will be excused from making a demand to sue upon corporate directors, but will be permitted to sue in the corporation's



name themselves, bondholders will be excused from compliance with a no-action provision where they allege specific facts which if true establish that the trustee itself has breached its duty under the indenture or is incapable of disinterestedly performing that duty.

**Contracts Law > Contract Conditions & Provisions > Waivers**
[HN7] Absent circumstances making application of a no-action clause inappropriate, courts systematically conclude that, in consenting to no-action clauses by purchasing bonds, plaintiffs waive their rights to bring claims that are common to all bondholders, and thus can be prosecuted by the trustee, unless they first comply with the procedures set forth in the clause or their claims are for the payment of past-due amounts.

**Contracts Law > Contract Conditions & Provisions > Waivers**
[HN8] The policy favoring the channeling of bondholder suits through trustees mandates the dismissal of individual-bondholder actions no matter whom the bondholders sue. So long as the suits to be dismissed seek to enforce rights shared ratably by all bondholders, they should be prosecuted by the trustee.

**Contracts Law > Contract Conditions & Provisions > Waivers**
[HN9] No-action clauses of will not bar a plaintiff who alleges that she was fraudulently induced to purchase bonds.

**Securities Law > Bases for Liability > Liability for Fraud**
[HN10] The essence of any alleged fraud is a misrepresentation (or failure to disclose under circumstances where a duty to do so existed) made to the plaintiff with knowledge of its falsity and an intention to mislead plaintiff, upon which the plaintiff reasonably relied to his detriment.

COUNSEL: [*1]

   Pamela Tikellis, Esquire, Carolyn D. Mack, Esquire, and James C. Strum, Esquire, of GREENFIELD CHIMICLES, Wilmington, Delaware; Of Counsel: Melvyn I. Weiss, Esquire, Steven G. Schulman, Esquire, and Lee S. Shalor, Esquire, of MILBERG WEISS BERSHAD SPECTHRIE & LERACH, New York, New York; Joseph A. Rosenthal, Esquire, of ROSENTHAL, MONHAIT & GROSS, P.A., Wilmington, Delaware and Christopher Lovell, Esquire, New York, New York; Attorneys for Plaintiffs in Civil Action No. 11920.

   Wayne N. Elliott, Esquire, of PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, Wilmington, Delaware; Of Counsel: Stuart Savett, Esquire, of KOHN, SAVETT, KLEIN & GRAF, P.C., Philadelphia, Pennsylvania and Mordecai Rosenfeld, Esquire, New York, New York; HEIMAN, ABER & GOLDLUST, Wilmington, Delaware; MEREDITH & COHEN, Philadelphia, Pennsylvania; and LEVIN, FISHBEIN, SEDRAN & BERMAN, Philadelphia, Pennsylvania; Attorneys for Plaintiffs in Civil Action No. 12006.

   Thomas G. Hughes, Esquire, and Brian P. Glancy, Esquire, of SCHLUSSER, REIVER, HUGHES & SISK, Wilmington, Delaware, and Gary K. Feldbaum, Esquire, Philadelphia, Pennsylvania; Attorneys for Plaintiff in Civil Action No. 11866.

   Charles F. Richards, Jr., [*2] Esquire, William F. Mongan, Esquire, and Ann C. Foster, Esquire, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Of Counsel: Joseph T. Baio, Esquire, and William J. Borner, Esquire, of WILLKIE FARR & GALLAGHER, New York, New York; Attorneys for Defendants E-II Holdings, Inc. and McGregor Acquisition Corp.

   Martin P. Tully, Esquire and Jon E. Abramczyk, Esquire, of MORRIS, NICHOLS,

   LexisNexis™   LexisNexis™   LexisNexis™

ARSHT & TUNNELL, Wilmington, Delaware; Of Counsel: Gerald Harris, Esquire, Martin J. Schwartz, Esquire, Paul H. Aloe, Esquire, and Jennifer Rothschild, Esquire, of RUBIN BAUM LEVIN CONSTANT & FRIEDMAN, New York, New York; Attorneys for Defendants McCrory Parent Corporation, McCrory Corporation, Meshulam Riklis, Riklis Family Corporation, McGregor Holding Corporation, World Wide Financial Partnership L.P. and Riklis Holding Corporation.

JUDGES: ALLEN

OPINIONBY: ALLEN

OPINION:

    MEMORANDUM OPINION

ALLEN, Chancellor

    This opinion disposes of pending motions in three, consolidated class action suits.

    I. The Parties

    Each suit is brought by a different plaintiff, and each plaintiff purports to represent holders of a different debtor defendant's public debt instruments. There are three such debtor defendants: E-II Holdings [*3] Inc. ("E-II"), McCrory Parent Corporation ("MPC") and McCrory Corporation ("McCrory"). This opinion refers to E-II, MPC and McCrory collectively as the "debtor defendants" and to the plaintiffs in each suit respectively as the "E-II plaintiffs," the "MPC plaintiffs" and the "McCrory plaintiffs."

    The financier Meshulam Riklis owns and controls each of the debtor defendants and is named as a defendant. Also named as defendants are other Riklis-controlled entities.

    Prior to the corporate restructuring that is most centrally involved in this litigation, the relationship among the debtor defendants was as follows: E-II was a holding company, an important asset of which was its 100% ownership of MPC. MPC was, in turn, a holding company owning 100% of the voting stock of McCrory. McCrory was (and is) an operating company that owns a nationwide chain of retail variety stores.

    According to plaintiffs, these corporate relationships came about as follows: In 1989, E-II acquired MPC and, with it, MPC's subsidiary, McCrory, from Riklis Family Holding Company, E-II's own indirect parent. As part of this transaction, E-II committed itself to finance McCrory's capital requirements until [*4] January 1, 1991. Specifically, it agreed to lend McCrory up to $ 60 million per year. Although the plaintiff classes disagree as to the extent of McCrory's resulting debt to E-II, they do not dispute that McCrory was later substantially indebted to E-II. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


    n1 E-II plaintiffs allege that, on December 6, 1990, following an earlier restructuring, E-II's financial support for McCrory totalled $ 372 million. This included some preferred stock.

  

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

II. The Challenged Transactions

    Although the wrongs complained of differ, in some respects, among the three
suits, and, in at least one instance, are inconsistent with each other, each
suit challenges the same series of transactions. That is, each suit challenges
a three-step, December 1990 corporate restructuring which, plaintiffs say,
Riklis instigated for the sole purpose of distancing various bondholders from
McCrory so that its cash flow and assets could be preserved rather than used to
repay the various debtor defendants' notes and debentures.

    The challenged restructuring [*5] involved (1) E-II's transferring its
interest in MPC and, with it, McCrory and (2) MPC's transferring its interest in
McCrory. According to plaintiffs, it happened in the following manner: First,
at Riklis's direction, MPC authorized amendment of the McCrory certificate of
incorporation to permit the issuance of a new series of McCrory common shares.
Second, in exchange for forgiveness of E-II's outstanding advances (see n. 1)
and cancellation of preferred stock with a face value of $ 204 million, McCrory
issued to E-II 10,000 shares of common stock, including the newly authorized
ones, carrying 90% of the voting power of the company. McCrory also issued to
E-II 1,000 shares of newly-created McCrory subordinated junior preference shares
with an aggregate liquidation preference of $ 100 million and a senior,
non-interest bearing, allegedly secured promissory note in the amount of $ 22.35
million. Finally, upon receipt of the 90% interest in McCrory, E-II immediately
resold it to a new Nevada corporation set up by Riklis solely for this
transaction and referred to as Riklis Holding Corp. ("Riklis Holding"). In
exchange, Riklis Holdings gave E-II a $ 250 million, non-interest [*6] bearing,
non-recourse, unsecured promissory note, payable upon certain conditions
allegedly in the control of Riklis Holding. At the same time the McCrory sale
took place, E-II also sold to Riklis Holding for nominal consideration its 100%
interest in MPC.

    When the dust had settled, the restructuring transactions had had the
following impacts:

(1) McCrory had issued a controlling interest in new stock and $ 22.35 million
in new "senior" debt, in exchange for the cancellation of existing debts and had
replaced its existing preferred stock with another issue having a reduced
liquidation preference;

(2) MPC had given up control of, and thus access to, McCrory's cash flow and
assets (although it retained a 10% interest), in consideration of its 10% share
of whatever benefit McCrory may have reaped in its debt-for-equity swap with
E-II; and

(3) E-II had given up (a) its interest in MPC, (b) its indirect control of and
access to McCrory's cash flow and assets (i.e., through MPC) and (c) its direct
loans to McCrory, all in exchange for unsecured, non-recourse loans to a newly
formed holding company, over which it has no control.

    Plaintiffs allege that the December [*7] 1990 transactions increased the
risk of default on the outstanding bonds of each of the debtor defendants and
constituted fraudulent conveyances. The MPC plaintiffs also allege that MPC in
fact has defaulted on certain principal and interest payments. Both E-II and
MPC are now in bankruptcy proceedings; thus suits against those issuers of the
bonds have been automatically stayed.

  

III.  The Plaintiffs' Claims

A.  Contract Claims

   The plaintiffs challenge the December 1990 transactions with an array of
theories.  First, they assert contract claims, i.e., that the debtor defendants
with the help, or at the direction, of other defendants breached each of the
indentures.

   Specifically, the E-II bondholders allege that E-II violated its indentures'
implied covenants of good faith and fair dealing (1) by extending loans to
McCrory in the amounts that it lent; (2) by selling MPC and McCrory to Riklis
Holding for inadequate consideration; and (3) by engaging in a number of other
unrelated transactions with Riklis companies and third parties which involved
E-II's receipt of inadequate consideration or assumption of unwarranted risk.

   The MPC bondholders allege that MPC (1) breached [*8]  explicit indenture
provisions by failing to make certain interest and principal payments and (2)
repudiated the indentures by announcing a suspension of future interest
payments.  They also allege (3) that MPC breached implied covenants of good
faith and fair dealing by, inter alia, facilitating the December 1990
transactions, while knowing that the transactions would result in its defaulting
on its own obligations and would accomplish surreptitiously an end prohibited by
its own indentures, namely the transfer of an asset, ownership of McCrory, to
its parent, E-II.

   The McCrory plaintiffs assert only one contract claim: a breach of the
implied covenant of good faith and fair dealing. Specifically, plaintiffs
contend that McCrory breached that covenant by issuing a controlling, 90%
interest in itself to E-II, while knowing that E-II would sell that interest to
Riklis Holding. According to plaintiffs, in knowingly permitting such a sale,
McCrory knowingly allowed itself to be delivered up to an entity (Riklis
Holding) that can be expected to plunder it.  Plaintiffs, however, allege no
transfers from McCrory to Riklis Holding or another affiliate, since the date of
that transaction,  [*9]  that would render McCrory less able to pay the
principal and interest on its bonds.

B.  Fraudulent Conveyance Claims

   In addition to the contract claims, plaintiffs in two of the suits assert
fraudulent conveyance claims which, in my opinion, are governed by New York law.
See New York Debtor and Creditor Law, § 270 et seq. (McKinney 1990).  The E-II
plaintiffs assert that the following constituted fraudulent conveyances: (1) the
December 1990 exchange with McCrory of McCrory loans for McCrory equity; (2)
E-II's sale of MPC and McCrory to Riklis Holding; and (3) a series of
transactions pre-dating the December 1990 transactions.

   The MPC plaintiffs assert that MPC fraudulently conveyed its controlling
stake in McCrory to E-II, when it authorized new McCrory shares, thereby
allowing McCrory to give E-II 90% ownership.

   The McCrory defendants assert no fraudulent conveyance claims.

C.  Common Law Fraud Claims

   Finally, plaintiffs in two of the suits assert common law fraud claims.  The



1992 Del. Ch. LEXIS 113, *9

MPC bondholders allege that MPC materially misled its public debt holders when it stated (long after the completed underwriting of plaintiffs' bonds) that the December restructuring [*10] did not violate any of its indentures and when it failed to state that the restructuring would increase the riskiness of the debentures, result in a lowering of their credit rating and lead to MPC's failure to repay them.

The McCrory plaintiffs allege generally that McCrory had a common law duty to, but did not, disclose material information that would have allowed them to evaluate realistically the risks presented by the transaction. It is not alleged that any bondholders had a right to vote on any aspect of the transaction.

IV. Disposition of Defendants' Motions

Defendants in each of the suits have filed motions to dismiss. n2 These motions are premised on a variety of grounds: (1) lack of subject matter jurisdiction as to all the claims; (2) forum non conveniens; (3) lack of personal jurisdiction as to Meshulam Riklis and Riklis Holding; and (4) failure to state claims upon which relief can be granted. Defendants also have filed motions to stay all claims in each of the three suits because of the pending bankruptcy proceedings against MPC and McCrory.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n2 On motion of defendants in each action discovery in these cases has been stayed pending resolution of their motions to dismiss.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*11]

For the reasons provided below, I conclude that this court has subject matter jurisdiction over all the claims and that this case need not be dismissed on forum non conveniens grounds. I nonetheless do dismiss, with respect to all defendants, each of plaintiffs' claims except two. The two that are not dismissed are, however, stayed because of MPC's pending bankruptcy proceeding.

Each of the claims dismissed at this time is dismissed either because it is barred by no-action clauses n3 appearing in the indentures or because, although it escapes the barring effect of such clauses, it nonetheless fails to state a legal wrong. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n3 As explained below, four claims escape the barring effect of the no-action clauses. They are two fraud claims, one in the MPC action and one in the McCrory action, and two contract claims, both in the MPC action, one for principal and interest and the other for anticipatory repudiation.


n4 The claims that both escape the barring effect of the no-action clauses and do state claims upon which relief may be granted, but which are nevertheless stayed are the two common law fraud claims: one in the MPC action and the other in the McCrory action.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*12]

  

As all the claims are either dismissed or stayed, I need not address the question whether the court has personal jurisdiction over Riklis and Riklis Holding. Nor, of course, need I address the question whether the claims that are dismissed might otherwise have been stayed by the pending bankruptcy proceedings against MPC and McCrory. Compare Hart Holding Co. v. Drexel Burnham Lambert, Inc., Del. Ch., C.A. No. 11514, Allen, C. (Nov. 7, 1991).

A. Subject Matter Jurisdiction

Defendants contend that this court has no subject matter jurisdiction to adjudicate these consolidated suits. n5 I cannot agree. [HN1] The Court of Chancery has subject matter jurisdiction whenever the remedies available at law would not be fully adequate. International Bus. Mach. Corp. v. Comdisco, Inc., Del. Ch., 602 A.2d 74, 78 (1991). Such is the case here. Plaintiffs seek rescission of the December 1990 restructuring and other transactions and a return of the parties to the status quo ante. This would involve, among other things, cancellation of instruments in order to reverse the issuance of stock and debt. Such relief is unavailable in a court of law.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 All defendants make this point with respect to the E-II action. E-II is the only defendant to make the point with respect to the MPC action. And only E-II and McGregor Acquisition Corp. make it in the McCrory action.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*13]

B. Forum Non Conveniens

Defendants in all three suits argue that the claims pending against them here should be dismissed on forum non conveniens grounds. They say the better forum is provided by New York. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 At the time that defendants originally made this argument in their motions to dismiss, a later-filed, allegedly parallel action was pending in the federal district court for the Southern District of New York. Plaintiffs had based a portion of their forum non conveniens argument on the pendency of that suit. However, it has since been dismissed. See Victor v. Riklis, No. 91 Civ. 2897 (S.D.N.Y. May 15, 1992).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN2]

Under our law, suits must ordinarily proceed in the court in which they are first commenced, notwithstanding the existence of an arguably more convenient forum elsewhere. This approach reflects the view that the inefficiency inherent in any change in forum is warranted only when (1) litigating in the existing forum would impose hardship upon defendant and (2) an alternative forum [*14] would be substantially more convenient. A defendant seeking a dismissal or stay

  

on forum non conveniens grounds must accordingly meet a high burden which incorporates each of these two criteria.

As articulated by the Supreme Court, in the cases ANR Pipeline Co. v. Shell Oil Co., Del. Supr., 525 A.2d 991 (1987) and Texas City Refining, Inc. v. Grand Bahama Petroleum Co , Ltd., Del. Supr., 347 A.2d 657 (1975), [HN3] a pending suit will never be dismissed on forum non conveniens grounds unless the defendant shows "inconvenience and hardship." Simply put, a Delaware court need not and, indeed, should not consider the merits of alternative forums until it first has determined that litigation here would impose an unjustifiable burden upon defendant.

If litigation here would not be particularly burdensome to defendant, the forum non conveniens analysis would accordingly come to an end. See, e.g., St. Joe Minerals Corp. v. Horsehead Indus., Inc., Del. Ch., C.A. No. 10522, Allen, C. (Apr. 7, 1989) at 2. If, however, litigation in Delaware would indeed work a hardship on defendant or substantially inconvenience it, the analysis proceeds [*15] to the second step. The court then should ask, not merely whether another forum would be better, but whether that alternative forum would be so much better as to justify dismissal of the case. See id. This second step entails a weighing of both the benefits and the costs of litigating the dispute in the other jurisdiction.

I need not focus on the second stage analysis with its concern for comparative analysis of fora, as I conclude that this jurisdiction does not present an inconvenient forum for this litigation.

Defendants make just one colorable allegation of inconvenience. They allege that the location, in New York, of documents responsive to plaintiffs' interrogatories would impose on defendants, their counsel and witnesses the inconvenience and expense of travelling from New York to Delaware. n7 This argument has been made and rejected before. n8 And, as before, see St. Joe Minerals, supra, p. 10 at 9, I am unable to conclude that the two-hour train ride to Delaware for trial at the tail end of the long litigation process works any significant hardship or substantial inconvenience on defendants. Indeed, Delaware courts regularly decide complex cases in which parties [*16] travel from, and conduct discovery in, places much further from Delaware than New York without incurring any inconvenience greater than that which they routinely incur as executives operating in a modern, international economy.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n7 Plaintiffs had alleged that continued Delaware proceedings impose on them the burden of defending similar suits simultaneously in two jurisdictions, New York and Delaware. I need no longer consider this allegation because of the recent dismissal of the New York action, discussed infra p. 19. However, the result would not have been different had the New York case continued to pend. The pendency of a similar suit in an alternative jurisdiction may be relevant, on the second step of forum non conveniens analysis, in measuring the benefits of dismissing or staying suits here in favor of proceedings in an alternative forum. But, it would have had no bearing on the immediate question whether the location of litigation in Delaware constitutes a hardship or substantial inconvenience to defendants.

  

1992 Del. Ch. LEXIS 113, *16

n8 See, e.g., Texas City Refining, 347 A.2d 658; St. Joe Minerals, supra, p. 10 at 2 (denying motion to dismiss on forum non conveniens grounds and holding that two-hour train ride from New York caused no hardship or substantial inconvenience); see also ANR Pipeline, 525 A.2d 991.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*17]

I accordingly deny their motion to dismiss the present proceedings on forum non conveniens grounds.

## C. Failure to State Claims

On the merits, I turn first to the question of the effect on these actions of clauses in the indentures limiting the ability of bondholders to prosecute claims that they purportedly hold in their capacities as bondholders. For the reasons that follow, I conclude that the "no-action" clauses in the indentures constitute waivers by plaintiffs of any right to bring the following claims against any defendants, without first satisfying the procedural requirements of those clauses: (1) the fraudulent conveyance claims; (2) the claims for breaches of implied covenants of good faith and fair dealing; and (3) those common law fraud claims that are based on injuries allegedly arising from a missed opportunity for plaintiffs' to enjoin the December 1990 transactions.

* * *

The no-action clause in the E-II indentures is representative. It reads as follows:

A Securityholder may not pursue any remedy with respect to this Indenture or the Securities unless:

(1) the Holder gives to the Trustee written notice of a continuing event of default;

(2) the [*18] Holders of at least a majority in principal amount of outstanding Securities make a written request to the Trustee to pursue the remedy;

(3) such Holder or Holders offer to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;

(4) the Trustee does not comply with the request within 60 days after receipt of the request and the offer of indemnity; and

(5) during the 60-day period the Holders of a majority in principal amount of the outstanding Securities do not give the Trustee a direction which is inconsistent with the request.

(E-II Indenture § 6.06) (emphasis added).

[HN4] Absent an allegation of fraud in the inducement of the purchase, clauses of this sort are generally applied to foreclose bondholder suits under the indenture, where plaintiff has not complied. See Elliott Associates, L.P. v. Bio-Response, Inc., Del. Ch., C.A. No. 10,624, Berger, V.C. (May 23, 1989); Friedman v. Chesapeake & Ohio Ry., 395 F.2d 663 (2d Cir. 1968); Ernst v. Film Production Co., N.Y. Supr., 264 N.Y.S. 227 (1933). Such clauses are bargained-for contractual provisions which inure, not only to the benefit of





1992 Del. Ch. LEXIS 113, *19

issuers, but [*19] also to the benefit of the investors in bonds. Such clauses
need not prevent the prosecution of meritorious suits. n9 They do, however, make
it difficult for individual bondholders to bring suits that are unpopular with
their fellow bondholders. This, in fact, is their primary purpose. As the
American Bar Foundation's Commentaries on Indentures, § 5.7, at 232 (1971),
notes, regarding the Foundation's proposed model no-action clause,

   The major purpose of this Section is to deter individual debentureholders
   from bringing independent law suits for unworthy or unjustifiable reasons,
   causing expense to the Company and diminishing its assets. The theory is that
   if the suit is worthwhile, [a significant percent] n10 of the debentureholders
   would be willing to join in sponsoring it. . . . An additional purpose is the
   expression of the principle of law that would otherwise be implied that all
   rights and remedies of the indenture are for the equal and ratable benefit of
   all holders.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -


   n9 This, as a practical matter, is especially true of bonds of failing or
bankrupt companies whose bonds tend to move into the hands of specialists,
so-called vulture funds, for whom, given their small numbers and significant
holdings, collective action problems do not present the obstacle to collective
action that frequently accompanies wide-spread distribution of financial
interests.   See, e.g., Marcel Kahan & Bruce Tuckman, Do Bondholders Lose From
Junk Bond Covenant Changes? (Feb. 1992) (unpublished study on file with authors)
(exit consent solicitation of bondholders of failing companies appear not to
have a "coercive" effect).   [*20]




   n10 The no-action clause proposed by the American Bar Foundation requires
that an investor seeking to bring a suit get at least 25% of securityholders
(including itself) to ask the Trustee to bring suit before the bondholders --
upon the Trustee's refusal to take up the action -- may bring suit individually.
The no-action clauses at issue in the present case require a would-be plaintiff
to join, not 25%, but a majority of debentureholders in asking the trustee to
bring suit. I attach no legal importance to this higher threshold.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -


   The primary purpose of a no-action clause is thus to protect issuers from the
expense involved in defending lawsuits that are either frivolous or otherwise
not in the economic interest of the corporation and its creditors.  In
protecting the issuer such clauses protect bondholders. They protect against the
exercise of poor judgment by a single bondholder or a small group of
bondholders, who might otherwise bring a suit against the issuer that most
bondholders would consider not to be in their collective economic interest.   In
addition to providing protection against [*21]  improvident litigation
decisions, a no-action clause also protects against the risk of strike suits.
Obviously the class features of any such suits make that prospect somewhat more
likely and somewhat more risky to the issuer than it would otherwise be.

   No-action clauses address these twin problems by delegating the right to
bring a suit enforcing rights of bondholders to the trustee, or to the holders
of a substantial amount of bonds, and by delegating to the trustee the right to

 LexisNexis™    LexisNexis™    LexisNexis™

prosecute such a suit in the first instance. These clauses also ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all bondholders. n11

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


    n11 "No-action" clauses are thus consistent with, if not central to, the indentures in which they are found, for the primary purpose of such indentures is to centralize enforcement powers by vesting legal title to the securities in one trustee. See George G. Bogert & George T. Bogert, The Law of Trusts and Trustees, § 250, at 280 (rev. 2d ed. 1992) ("In the case of debenture bonds, . . . the issue is often made payable to a trustee in order that the powers of enforcement may be centralized.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - [*22]

    In this case, plaintiffs argue that no-action clauses apply only to claims for breaches of express indenture provisions. They assert that their claims, predicated upon breaches of implied obligations of fair dealing, for fraudulent conveyance and for fraud, are not affected by the no-action clauses. Given the purposes for which no-action clauses are designed, I cannot accept plaintiffs' position. No principled reason or factual particularity of this case is advanced that would justify this view. In my opinion, [HN5] no matter what legal theory a plaintiff advances, if the trustee is capable of satisfying its obligations, then any claim that can be enforced by the trustee on behalf of all bonds, other than a claim for the recovery of past due interest or principle, is subject to the terms of a no-action clause of this type. See, e.g., N.Y. Supr., Ernst v. Film Production Corp., 264 N.Y.S. 227, 228 (1933) (fraudulent conveyance claim); Elliott Associates, supra p. 13 (receivership claim and claim for breach of implied covenant of good faith and fair dealing); Friedman, 395 F.2d at 664 (contract claim for breach of indenture provisions [*23] requiring sinking fund payments, payment of back interest upon any distribution of dividends and payment of principal upon breach of indenture); Feder v. Union Carbide Corp., N.Y. App. Div., 530 N.Y.S.2d 165 (1988) (contract claim for breach of indenture provision requiring the adjustment of terms for conversion to common stock); Sutter v. Hudson Coal Co., N.Y. App. Div., 21 N.Y.S.2d 40 (1940) (contract claim for breach of sinking fund obligations created by indenture); Relmar Holding Co. v. Paramount Publix Corp., N.Y. Supr., 263 N.Y.S. 776 (1932), aff'd mem., N.Y. App. Div., 237 A.D. 870 (1933) (contract claim for breach of indenture provision prohibiting the creation of liens not shared ratably by the bondholders).

    I do not mean to imply that courts will apply no-action clauses to bar claims where misconduct by the trustee is alleged. [HN6] For the same reason that equity has long recognized that, in some circumstances, corporate shareholders will be excused from making a demand to sue upon corporate directors, but will be permitted to sue in the corporation's name themselves, bondholders will be excused [*24] from compliance with a no-action provision where they allege specific facts which if true establish that the trustee itself has breached its duty under the indenture or is incapable of disinterestedly performing that duty. See Cruden v. Bank of New York [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 95, 466 at 97,413 (S.D.N.Y. Sept. 4, 1990). n12

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

  

n12 In Victor v. Riklis, No. 91 Civ. 2897 (S.D.N.Y. May 15, 1992), discussed infra pp. 18-19, the federal district court for the Southern District of New York addressed Cruden, supra, an earlier case in which that court had permitted fraud and RICO claims brought by individual bondholders to proceed in the face of a no-action clause. It concluded that the facts with which it was then presented (which I conclude below are substantively identical to those alleged here) differed from those of the Cruden case in that the clause with which it was then presented was broader than that addressed by the court in Cruden. It accordingly declared that the Cruden holding did not control its determination and declared that the no-action clause with which it was presented barred plaintiffs' claims.

I note that, even if there had been no difference between the no-action clauses addressed in the two cases, i.e., the no-action clause interpreted in Cruden had been as broad as that considered in Victor, the cases likely would still have come out differently. Application of the no-action clause in Cruden still may well have not been appropriate because the trustee in Cruden was accused of impropriety. In Victor, as here, no such conflict was alleged.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - [*25]

I rather conclude only that, [HN7] absent circumstances making application of a no-action clause inappropriate, such as those described above, courts systematically conclude that, in consenting to no-action clauses by purchasing bonds, plaintiffs waive their rights to bring claims that are common to all bondholders, and thus can be prosecuted by the trustee, unless they first comply with the procedures set forth in the clause or their claims are for the payment of past-due amounts.

Courts have implicitly concluded that this waiver by a bondholder applies equally to claims against non-issuer defendants as to claims against issuers. See Norte & Co. v. Manor Healthcare Corp., Del. Ch., C.A. Nos. 6827, 6831, Berger, V.C. (Nov. 21, 1985) (dismissing for failure to comply with a no-action clause breach of indenture claims against issuer and codefendants); Levy v. Paramount Publix Corp., N.Y. Supr., 266 N.Y.S. 271, aff'd, N.Y. App. Div., 269 N.Y.S.2d 997 (1934) (dismissing for failure to comply with no-action clause breach of fiduciary duty claims against issuer's directors in connection with issuer's alleged fraudulent conveyance); Relmar Holding, 262 N.Y.S. 776 [*26] (dismissing for failure to comply with no-action clause fraudulent conveyance claim against recipient of transferred assets).

[HN8] The policy favoring the channeling of bondholder suits through trustees mandates the dismissal of individual-bondholder actions no matter whom the bondholders sue. So long as the suits to be dismissed seek to enforce rights shared ratably by all bondholders, they should be prosecuted by the trustee. Moreover, like other no-action clauses, the clauses at issue here explicitly make their scope depend on the nature of the claims brought, not on the identity of the defendant. For example, the E-II clauses quoted earlier begin: "A Securityholder may not pursue any remedy with respect to this Indenture or the Securities unless . . . ."

1. The No-Action Clauses Bar Plaintiffs' Fraudulent Conveyance Claims.

Plaintiffs assert that the fraudulent conveyance action is a statutory action that does not arise under the "Indenture or the Securities." Thus, they say it is not covered by the no-action clause. I cannot agree. The clause in question bars all action "with respect to" the indenture or the securities. A fraudulent



conveyance action is such an [*27] action. On May 15 of this year, in an action parallel to this one but brought by a different plaintiff, the federal district court for the Southern District of New York addressed the question whether the no-action clause in the E-II indenture barred plaintiff's claim that E-II and the other Riklis companies, all of which are also joined as defendants here, fraudulently conveyed E-II's interest in MPC and McCrory to Riklis Holdings. See Victor, supra p. 17 n. 12. It held that the no-action clause did bar the claim.

I concur. The fraudulent conveyance claims brought here, which are substantively identical to the claim addressed by the district court, plainly do fall within the scope of the no-action clauses. The claims allegedly arise from transactions by issuers of their bonds and assert injuries arising from the bondholder status of plaintiffs. If plaintiffs have been legally injured by the transactions complained of, they are hurt derivatively. They can allege no harm different from that suffered by their fellow bondholders and thus should share any remedy they receive on a pari passu basis with other bondholders.

Given the derivative character of these claims, it [*28] is clear that they can be prosecuted by the trustees representing the bondholders as a group, provided the trustees are in a position in which they can represent plaintiffs fairly. See Continental Illinois National Bank and Trust Co. v. Hunt International Resources Corp., Del. Ch., C.A. Nos. 7888, 7844, Jacobs, V.C. (February 27, 1987) (denying motion to dismiss suit by trustee on fraudulent conveyance theory against non-issuer defendants). Plaintiffs have not alleged that the trustees have engaged in any impropriety or are otherwise, incapable of performing their duties. I thus find that plaintiffs' claims arising under the fraudulent conveyance statute are subject to the no-action clauses. Since plaintiffs have not complied with the procedures for bringing suit set forth in those clauses, I further conclude that they as individual holders of bonds may not maintain their fraudulent conveyance claims. See cases cited at pp. 15-16 supra.

2. The No-Action Clauses Bar Plaintiffs' Claims for Breaches of Implied Covenants of Good Faith and Fair Dealing.

With respect to plaintiffs' claims for breaches of covenants of good faith and fair dealing which, plaintiffs say, [*29] are implied in the indentures, I conclude that they too are barred by the no-action clauses. Any conduct by the issuer that violates an indenture covenant, implied or otherwise, necessarily harms all bondholders in the same manner, to wit, through an increased risk of default and a corresponding reduction in the market value of the bonds. Such conduct thus gives rise to claims that bondholders share ratably and therefore can be, and should be, enforced by the trustee. Elliott Associates, supra p. 13 (barring for failure to comply with no-action clause receivership claim and claim for breach of implied covenant of good faith and fair dealing).

3. Common Law Fraud Claims

a. The No-Action Clauses Bar Plaintiffs' Claims for Common Law Fraud to the Extent that They Allege Injury Based on a Missed Opportunity for Plaintiffs to Attempt to Prevent the December 1990 Transactions.

The rule stated above (p. 17) applies to certain claims of fraud but not others. [HN9] No-action clauses of this type will not bar a plaintiff who alleges that she was fraudulently induced to purchase bonds. See Kusner v. First Pennsylvania Corp., 531 F.2d 1234, 1239 (3d Cir. 1976); [*30] Slater

  

1992 Del. Ch. LEXIS 113, *30

Trust Co. v. Randolph-Macon Coal Co., 166 F. 172, 173, 177 (S.D.N.Y. 1908). In such cases, the fraud alleged is in the inducement of the relationship and thus goes to the question whether the bondholder effectively consented to the transaction, including the no-action clause itself. If the bondholder did not implicitly consent to the no-action clause, she cannot be bound by it. Nor do these clauses bar claims in which a bondholder alleges that she was induced to sell her bonds by her issuer's fraud. See Mann v. Oppenheimer & Co., Del. Ch., C.A. No. 7275, Walsh, V.C. (Apr. 4, 1985). Once she sells her bonds, her status as a bondholder ends, and her continuing relationship with the trustee concludes. The trustee can no longer represent her interests, whatever they may be. It represents the holders of bonds. It thus makes no sense to require a former holder to request the trustee to bring suit. Put differently, one in those circumstances is not bound by a no-action clause because she does not necessarily share her claim ratably with the other bondholders.

The common-law fraud claims in this case, however, have nothing to do with the purchase [*31] or sale of the bonds by defendant. Generally, [HN10] the essence of any alleged fraud is a misrepresentation (or failure to disclose under circumstances where a duty to do so existed) made to the plaintiff with knowledge of its falsity and an intention to mislead plaintiff, upon which the plaintiff reasonably relied to his detriment. See Simons v. Cogan, Del. Ch., 542 A.2d 785, 791 (1987), aff'd, Del. Supr., 549 A.2d 300 (1988); Harmon v. Masoneilan International, Inc., Del. Supr., 163 A.2d 278 (1960); N. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David Owen, Prosser and Keeton on the Law of Torts § 105, at 728 (5th ed. 1984). The common law fraud claims asserted here are unusual in that they do not allege that defendants sought to deceive plaintiffs into making any transfer, casting a vote, giving a consent, or otherwise performing any act necessary to effectuate a transfer. How then can the bondholders plausibly assert a theory of common law fraud arising out of "untrue" public statements or omissions?

Plaintiffs theory is as follows: through a 10Q filing, defendants made false public statements with respect to the [*32] restructuring transactions' compliance with the indentures and neglected to state the true purpose and effect of the transactions (see pp. 6-7 supra); plaintiffs reasonably relied on these misstatements and omissions by (a) not suing to enjoin the allegedly harmful transactions and (b) not selling their bonds; and, as a result of their inaction, the transactions were completed to their (prospective) injury.

These claims are difficult to analyze in terms of the no-action clause. The first claim of injury -- that defendants' misstatements and omissions precluded a suit to enjoin the December 1990 transactions -- reflects injury that, if suffered at all, was suffered, not by the bondholders individually, but derivatively. Only the trustee could have brought suits to enjoin the transactions, unless the holders of more than half of the bonds concurred. It would seem that a claim that someone was wrongfully deprived (by false statements) of an opportunity to bring suit could be held only by the person with a right to bring suit. In this case, such a person was only the trustee or holders of more than half of the bonds. Thus, insofar as the complaints purport to allege damages based [*33] on a missed opportunity to enjoin the December 1990 transactions, plaintiffs' common law fraud theory is inconsistent with legal effect of the no-action clause and therefore fails to state a claim.

b. To the Extent that Plaintiffs' Common Law Fraud Claims Allege Injury Based on a Missed Opportunity for Plaintiffs to Sell their Bonds, They Fail to State Claims upon which Relief Could Be Granted.

  

1992 Del. Ch. LEXIS 113, *33

Insofar as plaintiffs' common law fraud claims allege damages from the bondholders' being wrongfully induced to hold their bonds to their injury, they are not claims that the trustee could litigate. These claims are not necessarily held ratably by all bondholders (some might not have been fooled for example). The trustee is concerned only about the bonds It has no interest in whether one holder gets to unload bonds into the hands of others or holds onto the bonds. Thus, an individual holder's claim that he has been injured by holding bonds falls outside the reach of the no-action clauses.

This aspect of plaintiffs common law fraud theory, however, is simply an attempt to convert a breach of contract claim into a fraud claim. The gist of the alleged misstatements were that these [*34] transactions were in breach of the indentures, n13 and were a prelude to a prospective looting of McCrory. If the transactions were in violation of the indentures, the indenture trustee or, upon compliance with the no-action provision, the bondholders can achieve a remedy. But of course defendants deny that the substantive violation of the indentures has occurred. Thus, in order to litigate the purported misstatement theory that plaintiffs wish to press, they will have to litigate the breach of the indenture claim. If their common law fraud theory were sound, therefore, it would defeat the purpose of the indentures' no-action clause. Plaintiffs would have found a way to transmute a contract claim litigable only by the indenture trustee into an individual fraud claim.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 "Plaintiffs allege that MPC stated falsely in its December 14, 1990 10Q that the December 1990 restructuring was not prohibited by the company's indentures. Plaintiffs further allege that MPC should have, but did not, disclose that the restructuring (1) would increase the riskiness of plaintiffs' MPC bonds; (2) would result in a lowering of the bonds' credit rating; and (3) would lead to MPC's eventual default on the bonds. Finally, they allege that McCrory should have, but did not, disclose that the transactions would increase the riskiness of their bonds.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - [*35]

This effort has occurred in other contexts. Shareholder class action plaintiffs have regularly attempted to transmute an alleged breach of fiduciary duty by corporate directors into a claim for breach of a disclosure obligation by the expedient of alleging that the board failed to state that the transaction in question constituted a wrong. This stratagem has been regularly, if not uniformly, rejected under both state and federal disclosure law. See, e.g, Fischer v. United Technologies Corp., Del. Ch., C.A. No. 5847, Hartnett, V.C. (May 12, 1981) at 7; Columbia Pictures Indus., Inc. v. Kerkorian, Del. Ch., C.A. No. 6394, Marvel, C. (December 16, 1980); Michelson v. Duncan, Del. Ch., 386 A.2d 1144, 1154-55 (1978), aff'd, Del. Supr., 407 A.2d 211 (1979); Goldberger v. Baker, 442 F. Supp. 659, 664-65 (S.D.N.Y. 1977); Markewich v. Adickes, 422 F. Supp. 1144, 1147 (E.D.N.Y. 1976); see generally Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977).

There is even less reason to credit this stratagem in the bondholder context than in the shareholder context. In the shareholder [*36] setting the defendants are inevitably proposing a transaction that requires shareholder assent through vote or tendering of stock. Thus, there is some surface plausibility to the notion that the directors could be misleading them about the bona fides of the transaction. Nevertheless, the courts have rejected the

  

conversion technique. Here, the defendants had (1) no need to get the consent of the bondholders to the transactions and (2) no economic (or other) interest in whether these particular bondholders held or sold their bonds. This lack of substantial interest in misleading the bondholders (even if one assumes that the transactions do constitute a breach of the indentures) is reflected in plaintiffs' pleadings, by an absence of specification with respect to the element of a fraud claim that requires that plaintiff allege and prove that false statements were made with an intention that plaintiff rely upon them. Prosser & Keeton, supra, § 105, at 728.

I thus conclude that plaintiffs have not succeeded in their effort to transmute a breach of contract claim into a litigable claim for fraud. This claim too must therefore be dismissed. n14 [*37]

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n14 Although this reasoning applies to the misstatement and omission allegations alike, I focus it on the misstatement allegations because there is an alternative ground for dismissing the omission allegations. Neither MPC nor McCrory had a duty to disclose the information that plaintiffs say they should have disclosed. Indeed, absent a need to clarify a misimpression left by an earlier statement or to comply with a contractual disclosure provision, a defendant will have a duty to disclose information to its bondholders only in rare situations. No such duty will arise unless bondholders have some role in approving the transaction. See Glinert v. Wickes Co., Del. Ch., C.A. No. 10407, Allen, C. (Mar. 27, 1990); see generally Chiarella v. United States, 445 U.S. 222 (1980). Absent such duty, no fraud action will lie.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

D. Plaintiffs' Claims Based on Explicit Breaches of the Indentures Are Stayed Automatically Because of MPC's Pending Bankruptcy

Like plaintiffs' fraud claims that allege injury from a missed opportunity to sell bonds, the claims for past due principal and interest escape the barring effect of the no-action clauses. The Indentures themselves [*38] make this clear. For example, Section 8.04 of the MPC 14 1/2% Indenture contains a provision making the right of a bondholder to sue for past due principal and interest absolute and unconditional. Such provisions, in fact, are a requirement of the Trust Indenture Act § 313(b). 15 U.S.C. § 77 (1981). See also General Investment Co. v. Interborough Rapid Transit Co., 200 N.Y. App. Div., 794, 193 N.Y.S. 903 (1st Dept. 1922); Mabon, Nugent and Co. v. Texas American Energy Corp., Del. Ch., No. 8578, Berger, V.C. (January 27, 1988); Feder, 141 A.D.2d 799, 530 N.Y.S.2d at 167. Additionally, I assume, although without deciding, that the anticipatory repudiation claims likewise would not be subject to the effect of the no-action clauses.

On November 25, 1991, three MPC bondholders filed an involuntary bankruptcy petition against MPC Section 362(a)(1) of the federal bankruptcy law stays all "claims against the debtor that arose before the commencement" of bankruptcy proceedings. Thus, since plaintiffs' claims for anticipatory repudiation and past due interest and principal arose before the commencement of bankruptcy proceedings and [*39] are asserted against the bankrupt debtor (MPC) they are automatically stayed under 11 U.S.C. § 362(a)(1). Moreover, since these claims of breach of contract may only be asserted against the issuer, see Simons, 542 A.2d at 792, the stay of action against the issuer is dispositive of these claims for present purposes in all respects.

  

1992 Del. Ch. LEXIS 113, *39

* * *

    The complaints allege serious charges of misconduct.  Whether those charges
are based in fact or not is not yet determined.  But it is plain that the
issuers, the underwriters and the trustees created at the outset of this
commercial relationship a legal structure to permit and to govern the resolution
of claims relating to the bonds.  No fact has been alleged (such as the
conspiracy of the trustee or other circumstance causing the original structure
to lose its effectiveness) that might justify a court of equity in entertaining
these suits at this time.  Defendants may submit on notice a form of
implementing order consistent with the foregoing.

  

EXHIBIT G

1 of 1 DOCUMENT

International Fidelity Insurance Company, a New Jersey Corporation, v. Mattes
Electric, Inc., a Delaware Corporation; Delaware Technical & Community College, an
Agency of the State of Delaware; and EDIS Company

C.A. No. 99C-10-065 WCC

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2002 Del. Super. LEXIS 441

January 23, 2002, Submitted
June 27, 2002, Decided

**DISPOSITION:** [*1] Defendant EDIS Company's
Motion to Dismiss Granted.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant contract man-
ager filed a motion to dismiss a count in plaintiff surety
company's complaint which asserted that the manager
had been negligent in its performance of a construction
project at a training facility.

**OVERVIEW:** The surety company issued payment and
performance bonds for electrical work that was done
in connection with a construction project at a training
facility. The contract manager was hired by the facil-
ity and after the electrical contractor defaulted, a dis-
pute arose concerning the surety's obligation under the
bonds. The surety filed a claim against the manager, as-
serting that it performed its responsibilities negligently
by having failed to obtain a contract between the fa-
cility and the electrical contractor. This led to claims
against the bond by the electrical contractor's suppliers
and sub-contractors after the electrical contractor quit.
The dismissal motion by the manager alleged that the
claim was barred by the economic loss doctrine in that
the asserted liability was based solely on a negligence
tort action, there being no contractual relationship be-
tween the surety and the manager. The court granted
the motion, noting that the doctrine had been expanded
beyond defective product cases. There were no applica-
ble exceptions, such as negligent misrepresentation or
breach of a duty between the parties, that would have
avoided the doctrine's bar to recovery.

**OUTCOME:** The motion to dismiss was granted.

**CORE TERMS:** economic loss, negligent misrepre-
sentation, duty, Moorman Doctrine, defective product,
professional malpractice, executed contract, costs of re-
pair, case law, replacement

**LexisNexis(R) Headnotes**

*Torts > Damages > Damages Generally*
[HN1] The economic loss doctrine prohibits recovery
in tort for losses unaccompanied by a bodily harm or a
property damage. The doctrine in its purest form for-
bids plaintiffs from recovering in tort for losses suffered
that are solely economic in nature. Economic loss is any
monetary loss, costs of repair or replacement, loss of
employment, loss of business or employment opportu-
nities, loss of good will, and diminution in value. While
initially a doctrine related to product liability actions, the
courts have expanded the doctrine's application beyond
its original scope to nearly any kind of dispute arising
from a commercial transaction where the alleged dam-
ages do no harm to a person or to property other than the
bargained for item. The doctrine has become a signifi-
cant shield for defendants to protect against increasing
tort claims, which result when contract provisions limit
a plaintiff's recovery, or where no contract exists at all.

*Torts > Business & Employment Torts > Negligent
Misrepresentation*
*Torts > Damages > Damages Generally*
[HN2] One exception to the economic loss doctrine is
that relating to negligent misrepresentation. The plain-
tiff must show that the defendant supplied information
to the plaintiff for use in business transactions with third
parties and second, the defendant must be in the business
of supplying such information.

*Torts > Damages > Damages Generally*
[HN3] The economic loss doctrine cannot be overcome
by a general claim of malpractice when no relationship
between the parties exists.

  

**COUNSEL:** Richard L. Abbott, Esquire, Wilmington, DE.

Marc P. Niedzielski, Esquire, Department of Justice, Wilmington, DE.

Dawn C. Stewart, Esquire, Washington, DC.

Donald L. Logan, Esquire, Wilmington, DE.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINIONBY:** William C. Carpenter, Jr.

**OPINION:**

The Court has before it a Motion to Dismiss filed by EDIS Company (EDIS) relating to the negligence claim included in International Fidelity Insurance Company's (IFIC) amended complaint. In essence, EDIS asserts that Count II of the Complaint is barred by the economic loss doctrine. The Court agrees, and the Motion will be granted.

IFIC is a surety company that issued payment and performance bonds relating to electrical work to be done by Mattes Electric, Inc. (Mattes) in the construction of a training facility at the Delaware Technical and Community College (Del Tech) Wilmington campus. Mattes defaulted, and a dispute has arisen concerning IFIC's obligation under the bonds. EDIS was hired by Del Tech to act as the contract manager of the project, and in an amended complaint filed on August 27, 2001, IFIC asserts that they negligently performed this [*2] responsibility which led to IFIC suffering damages. In particular, IFIC claims that EDIS's failure to obtain an executed contract between Del Tech and Mattes provided the basis for Mattes to quit the project, not pay his suppliers or sub-contractors and has lead to claims being made against the bonds issue by IFIC. There is no contractual relationship between IFIC and EDIS and thus the asserted liability is strictly based on a negligent tort action. EDIS now requests dismissal based upon the economic loss doctrine, and IFIC argues the doctrine is not applicable to the facts of this case or the exceptions of negligent misrepresentation or professional malpractice apply.

On June 13, 2002, this Court issued an extensive decision on the economic loss doctrine and the applicability of the negligent misrepresentation exception in the case of *Christiana Marine Service Corporation v. Texaco Fuel and Marine Marketing Inc. And Texaco, Inc.* n1 While the cases are factually different, the case law and the reasoning in the *Christiana Marine* decision have equal application here and are relied on in deciding this motion. [HN1] The economic loss doctrine "prohibits recovery in tort for losses [*3] unaccompanied by a bodily harm or a property damage." n2 The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. n3 Economic loss is "any monetary loss, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value." n4 While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to nearly any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against increasing tort claims, which result when contract provisions limit a plaintiff's recovery, or where no contract exists at all.

n1 *Christiana Marine Service Corp. V. Texaco Fuel and Marine Marketing Inc., and Texaco, Inc.*, 2002 Del. Super. LEXIS 305, Del. Super. C.A. No. 98C-02-217, Carpenter, J. (June 13, 2002) (Mem. Op.).

n2 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule*, 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

[*4]

n3 *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del. 1992)(citing *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill. 2d 69, 435 N.E. 2d 443, 448, 61 Ill. Dec. 746 (Ill. Supr. 1982).

n4 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule*, 89 Ill. B.J. at 406. *See also Danforth*, 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 435 N.E.2d at 449)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits — without any claim of personal injury or damage to other property.").

As a result of the above, the Court first rejects IFIC's

  

argument that the doctrine of economic loss is only applicable in a "defective product" context. The doctrine, over time, has been expanded to other commercial transactions, and there is no reason to excuse the type of transaction present in this litigation. Secondly, the Court finds that if IFIC suffered any damages relating to [*5] any party in this litigation, it clearly is only economic in nature. If there is an obligation under the bonds, IFIC will be forced to pay money to compensate for Mattes' failure to perform. Thus, if EDIS was in some manner negligent, the only damages that they caused IFIC to suffer were monetary in nature and fit the definition of economic loss. As such, unless EDIS' conduct falls within an exception, the economic loss doctrine would prevent recovery by IFIC.

[HN2] The first exception claimed by IFIC is that relating to negligent misrepresentation. This exception was extensively addressed in the *Christiana Marine* decision and requires the finding of two elements. First, the plaintiff must show that the defendant supplied information to the plaintiff for use in business transactions with third parties and second, the defendant must be in the business of supplying such information. Neither of these requirements have been asserted nor can they be established by the plaintiff under the facts of this case. At best, this case involves the discovery of a lack of an executed contract after a claim under the bonds was made. IFIC never relied upon any information provided by EDIS since there [*6] was never any such communication. In fact, in their complaint there is no assertion that there was any contact between IFIC or EDIS until this litigation arose. Simply put, by any reasonable interpretation of the facts of this case, even in the light most favorable to IFIC, the negligent misrepresentation exception is not applicable.

In a final desperate attempt to maintain the negligence count, IFIC cites to a footnote in the *Danforth* decision in which the Supreme Court indicated that in that case they were not addressing whether the economic loss doctrine would bar recovery when the claim relates to professional malpractice. Unfortunately what was intended by the statement is not further reflected in the opinion. However, this Court finds that at a minimum some duty by the defendant to the plaintiff would be required consistent with the Supreme Court of Illinois opinion in *2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.* n5 This obligation and duty must be one generally recognized by the profession as traditionally owed the client or the group of persons the client intended to benefit. There is no dispute that there was no professional relationship [*7] or duty between EDIS and IFIC and no relationship between EDIS's client, that is Del Tech, and IFIC to infer an intended benefit. This Court does not believe that [HN3] the economic loss doctrine can be overcome by a general claim of malpractice when no relationship between the parties exists. As such, this Court finds that to the extent an exception is recognized by the Supreme Court, the facts of this case will not support its application here.

n5 See *2314 Lincoln Park West Condo. Ass'n*, Ill., 136 Ill. 2d 302, 555 N.E.2d 346, 144 Ill. Dec. 227 (1990).

Finding that the economic loss doctrine would generally bar recovery and the exceptions to the doctrine are not applicable, the negligence claims set forth in Count II of IFIC's amended complaint are dismissed.

IT IS SO ORDERED this 27th day of June, 2002.

Judge William C. Carpenter, Jr.

