# EXHIBIT A

LEXSEE 2000 DEL. CH. LEXIS 129

**DEBAKEY CORPORATION, a Nevada Corporation, INTERACTIVE TELEMEDICAL SYSTEMS, a Florida corporation, and ITS-RAYTHEON-DEBAKEY TELEMEDICINE SYSTEMS, a Delaware Partnership, Plaintiffs, v. RAYTHEON SERVICE COMPANY, a Delaware corporation, Defendants. RAYTHEON SERVICE COMPANY, a Delaware corporation, Counterclaim Plaintiff, v. INTERACTIVE TELEMEDICAL SYSTEMS, a Florida corporation, and DEBAKEY CORPORATION, a Nevada Corporation, Counterclaim Defendants.**

**C.A. No. 14947**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2000 Del. Ch. LEXIS 129*

**December 14, 1999, Date Submitted**
**August 25, 2000, Date Issued**

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court September 22, 2000.

**LexisNexis(R) Headnotes**

**COUNSEL:** Stuart M. Grant and Megan D. McIntyre, Esquires, of GRANT & EISENHOFER, Wilmington, Delaware; and Charles M. Hartz and Daniel D. Dolan, Esquires, of GEORGE, HARTZ, LUNDEEN, FLAGG & FULMER, Coral Gables, Florida; Attorneys for Plaintiffs.

Jesse A. Finkelstein, C. Malcolm Cochran, IV, Robert J. Stearn, Jr., Lisa A. Schmidt, J. Travis Laster and Chad M. Shandler, Esquires, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Attorneys for Defendants and Counterclaim Plaintiffs Raytheon Service Company and Raytheon Company.

**JUDGES:** Jack B. Jacobs, Vice Chancellor.

**OPINIONBY:** Jack B. Jacobs

**OPINION:**

MEMORANDUM OPINION

JACOBS, VICE CHANCELLOR

The event that generated this action for money damages was the failure of a joint venture partnership (the "Partnership") formed by three entities in September, 1993. Those entities, which were the joint venture partners, were Raytheon Service Company ("RSC"), a subsidiary of the Raytheon Company ("Raytheon"); n1 the DeBakey Corporation ("DeBakey"); and Interactive Telemedical Systems ("ITS"). The Partnership was named "MedTel," and its purpose was to sell telemedicine systems worldwide. [*2] The Joint Venture Agreement that formalized the parties' relationship (the "JV Agreement") obligated RSC to provide initial financing to the Partnership, but also entitled RSC to terminate the joint venture "in its sole discretion" if RSC's required financing exceeded $ 2 million dollars. One year later, when RSC's financial contribution had reached or exceeded $ 2 million, RSC gave notice on September 2, 1994 that it was terminating the Partnership, which occurred shortly thereafter.

n1 RSC and Raytheon are sometimes referred to collectively as "RSC/Raytheon." In other contexts where it is important to distinguish between those two entities, they are referred to separately as "RSC" or "Raytheon."

Nearly two years thereafter, the plaintiffs--DeBakey, ITS, and the Partnership-- filed this lawsuit, naming RSC and Raytheon as defendants. The plaintiffs claim that RSC's performance and termination of the JV Agreement, constituted breaches of contract and of fiduciary and other duties [*3] that RSC owed the plaintiffs. The plaintiffs separately charge Raytheon (RSC's parent company) with tortious interference with the contract between plaintiffs and RSC, and with aiding and abetting RSC's breach of fiduciary duties. Lastly, the plaintiffs claim that Raytheon, through fraudulent or negligent misrepresentations, induced them to enter into the JV Agreement. As a consequence of these claimed wrongs, the plaintiffs seek damages in excess of $ 51.5 million.

The defendants deny that they committed any wrongdoing, and have counterclaimed against the plaintiffs for breaching the JV Agreement and inducing RSC to invest in the joint venture through fraudulent or negligent misrepresentations. The defendants seek to recover the $ 2 million they invested in MedTel, plus consequential damages (including attorneys' fees) on their counterclaims.

The merits of these claims and counterclaims were tried between July 7 through July 21, 1999. This is the Opinion of the Court after post-trial briefing. For the reasons next discussed, I conclude that (1) the plaintiffs have failed to prove their claims against RSC and Raytheon, and (2) RSC and Raytheon have failed to prove their counterclaims [*4] against the plaintiffs. Accordingly, judgment will be entered in favor of the defendants on the plaintiffs' claims, and in favor of the plaintiffs on the defendants' counterclaims. n2

n2 This outcome makes it unnecessary for the Court to consider the various motions in limine that were reserved for posttrial decision.

## I. THE PERTINENT FACTS

What follows are the pertinent facts that convey the essential "story line" of this case. Additional facts are set forth, where appropriate, in those sections of this Opinion that are devoted to analyzing the parties' claims and counterclaims. Certain fundamental facts are undisputed, but where there are disputes--and there are many--the facts are as found herein.

### A. The Parties

As earlier noted, on September 14, 1993, RSC, DeBakey, and ITS entered into the JV Agreement, which established MedTel, a joint venture partnership organized under the Delaware Uniform Partnership Act,

"to obtain and perform contracts to provide telemedicine capabilities, world [*5] wide." n3 RSC was the managing partner of the Partnership, whose operations were conducted in Burlington, Massachusetts where Raytheon's headquarters were located.

n3 JV Agreement, PX 55, at § 3.1

Telemedicine is the practice of long-distance medical consultation, diagnosis and evaluation through the use of computer telecommunications technology. A telemedicine system combines off-the-shelf telecommunications equipment with medical diagnostic devices to create a video network that allows patients in remote locations to be examined in "real time" by specialists at major medical centers via two-way television. That technology affords patients throughout the world access to both a broad group of medical specialists (including the world-renowned heart surgeon, Dr. Michael E. DeBakey) and access to advanced medical technology and diagnostic services. n4

n4 The core of a telemedicine system is a set of video conferencing machines. One set (the "hub unit") is installed at the site of the physician(s) who will be using it. The other machines are set up at the remote site where the patient is located. The remote units are connected to the diagnostic tools or modalities that are needed for the types of examination and diagnosis involved (e.g., stethoscopes, x-ray machines, electrocardiogram machines). Once these devices are connected, diagnostic information is transferred electronically to the physicians at the hub unit for evaluation.

[*6]

RSC, MedTel's managing partner, is a wholly-owned subsidiary of Raytheon, a Delaware corporation that for many years was one of the country's leading defense contractors. The other two venture partners, ITS and DeBakey, were corporations with which two prominent physicians, Dr. Jay Sanders and Dr. Michael B. DeBakey, were affiliated, respectively, as either principals or agents. ITS is a Florida corporation whose principal office was located in Coral Gables, Florida. DeBakey is a Nevada corporation whose principal office was located in Las Vegas, Nevada. Dr. Sanders is a Professor of Telemedicine at the Medical College of Georgia ("MCG"), and Dr. DeBakey, as previously noted, is a world renowned heart surgeon who was based at the Texas Medical Center ("TMC") in Houston, Texas.

## B. Events Leading To The Joint Venture Agreement

The parties' initial contacts started in April, 1992. How those contacts began and who initiated them is a subject of considerable dispute. Plaintiffs claim that RSC became interested in entering the telemedicine business, and after consulting with experts, began exploring the telemedicine market. According to plaintiffs, RSC contacted Dr. DeBakey, who [*7] had designed and built hospitals that would be equipped with updated equipment and technology in various countries. RSC viewed Dr. DeBakey's projects as "ideal opportunities to bring telemedicine to the global market," and his involvement as "lending medical credibility to the project," and "opening the market for Raytheon's construction division to provide infrastructure as part of the telemedicine venture." Accordingly (plaintiffs say) Raytheon went "all-out in its efforts to convince Dr. DeBakey and his company, DeBakey Corporation to enter into a telemedicine joint venture." n5

n5 Pl. Op. Posttrial Br. at 7.

The defendants tell the story quite differently. They insist that RSC initially contacted Dr. Sanders to explore whether telemedicine might offer business opportunities for RSC, and that Dr. Sanders responded by visiting Raytheon and meeting with RSC's Fred Beissner and William Stevens ("Stevens") in May, 1992. Dr. Sanders overviewed the potential telemedicine market, and made a slide presentation [*8] demonstrating what he contended was "his" telemedicine system at the Medical College of Georgia (MCG). The defendants contend that Dr. Sanders represented to them that (i) the telemedicine market was large, (ii) telemedicine technology was mature, (iii) he (Dr. Sanders) had an established reputation in this field and had an existing telemedicine system in place, and (iv) Dr. Sanders was looking for a corporate partner that could provide worldwide capabilities and financial backing. Defendants urge that in reliance on those representations, Mr. Stevens wrote to Dr. Sanders and expressed RSC's interest in pursuing a business relationship. They further contend that during RSC's initial discussions with DeBakey Group n6 representatives, it was DeBakey who proposed entering into a joint venture relationship.

n6 The various enterprises with which Dr. DeBakey was affiliated are sometimes referred to as the "DeBakey Group."

At this juncture this dispute need not be resolved. Whatever the sequence of events may have [*9] been, no one questions that over the next 19 months Dr. Sanders and RSC engaged in joint venture discussions that by December, 1992 had been expanded to include the DeBakey Group. Participating in those discussions were representatives of RSC (Mr. Stevens and RSC's President, Pat Roddy), ITS (Dr. Sanders), and the DeBakey Group (Raymond Hofker and Herman Frietsch). The post-trial briefs argue at length about what each party did (and did not) represent to the others in the course of the negotiations. Suffice it to say that each party claims to have come away with a different understanding of what it and the others were obligated to contribute to the joint venture.

The plaintiffs claim that Raytheon, which held itself out as a systems integrator, would be responsible for the technical aspects of setting up and integrating the telemedicine system and its components. Specifically, Raytheon would contribute system design integration and overall system configuration to the venture, and would not rely upon the other partners for technical expertise. Dr. Sanders would instruct the integrator (RSC) as to the kinds of equipment that would be needed and how the system should be configured, and [*10] DeBakey would then market and sell the system through a telemedicine hub at TMC, which would serve as the demonstration unit. Finally, Raytheon would provide the initial funding for the joint venture, the magnitude of which is a critical issue in this litigation.

The defendants claim a quite different understanding. They contend that Dr. Sanders' company, ITS, would provide the "ITS System," which was represented as a fully functional and integrated state-of-the-art telemedicine system currently in operation at MCG. DeBakey and ITS would also provide immediate and near-term sales, with DeBakey's sales to flow from certain "exclusive contracts" it then had to build hospitals in foreign countries. RSC would provide initial financing for the joint venture, as well as management support, system installation and integration, and system maintenance services. RSC would not design, develop or engineer the baseline ITS System, however, and no Partnership funds would be used for that purpose. Rather, RSC would assemble the "ITS System" using technical information provided by ITS, and would later improve the ITS System with funds derived from fixture sales. Lastly, the defendants claim, there [*11] was no understanding that a "demonstration" telemedicine unit would be installed immediately at the "DeBakey hub" (TMC) at Partnership expense, as the plaintiffs contend.

RSC contends that in reliance on this understanding, it sought funding for the new venture from Raytheon, based upon a business plan for MedTel which rested on

two basic premises, namely, that: (1) the Partnership would market and sell the existing interactive telemedicine system developed by ITS, and (2) over the next four and one half years the Partnership would achieve sales totaling approximately $ 433 million. Neither of those premises turned out to be correct.

## C. The Negotiation and Execution of the Joint Venture Agreement

Between April and September, 1993, highly sophisticated and experienced representatives of ITS, the DeBakey Group, and RSC negotiated the JV Agreement. The negotiations were vigorous and protracted, and involved an ongoing exchange of a series of term sheets, drafts, letters, and riders.

The first draft of the JV Agreement was circulated on July 14, 1993. It provided that the Agreement would automatically terminate if the required financing by RSC exceeded $ 1.5 million, and it [*12] also envisioned a decreasing share of profits for DeBakey. The plaintiffs' objections to that draft led to written comments, further negotiations, and ultimately to a second draft that was circulated on August 4, 1993.

The second draft triggered further meetings and negotiations, which led to a third draft agreement that the parties' representatives met to finalize on September 14, 1993. Even at the September 14 meeting the parties continued to negotiate, and the signed version of the Agreement contained initialed changes and interlineations.

A significant issue during that meeting was Section 4.2(c) of the JV Agreement, which entitled RSC to terminate the Joint Venture in its "sole discretion" if RSC's required financing exceed $ 2 million. At meetings that took place both before and at the time the JV Agreement was signed, the DeBakey Group and ITS opposed this provision. They urged that more funding was needed and had to be provided, because (i) over $ 1 million of the $ 2 million was already committed, and (ii) the remaining $ 1 million would not be nearly enough to cover the expenditures required to launch worldwide sales of telemedicine products in a newly emerging market. [*13]

How Raytheon and RSC responded to the plaintiffs' funding position is hotly disputed. The defendants contend that RSC's Mr. Brond and Mr. Stevens responded clearly and unequivocally that the total limit of Raytheon's liability was $ 2 million, and that at that point in time only $ 2 million was authorized. Mr. Stevens did tell ITS and the DeBakey Group, however, that once MedTel achieved some level of success, he would go back and ask Raytheon to authorize more funding, but at the time the JV Agreement was executed there was no commitment beyond the $ 2 million. n7

n7 Stevens Dep., Vol. I at 188; Id., Vol. II, at 269-271.

The plaintiffs' quite different version of these events is that Mr. Stevens told them that the $ 2 million reflected only the initial funding, and that Raytheon followed an appropriations process whereby a project's funding would be continually supplemented over time. Plaintiffs claim that Mr. Stevens assured them that Raytheon would provide additional funding as the project progressed, and [*14] that they accepted Mr. Stevens' assurances as those of Raytheon. Finally, plaintiffs claim that at no time were they ever told that the additional funding was dependent upon their achieving sales quotas of any kind.

Despite these divergent positions (and the conflicting witness testimony supporting both sides of the dispute), the defendants signed the JV Agreement that contained Section 4.2(c), which (to repeat) permitted RSC to terminate the Agreement in its "sole discretion" once its required financing exceeded $ 2 million. ITS signed the Agreement fully aware of the risk that RSC could rely on Section 4.2(c) as a ground to terminate the Agreement. For the reasons more fully elaborated elsewhere in this Opinion, I find as fact that RSC's (and Raytheon's) legally binding commitment to finance the joint venture was limited to a $ 2 million ceiling, as the Agreement unambiguously provided.

## D. The Joint Venture Agreement Terms

The JV Agreement, as executed, established a joint venture partnership among ITS, DeBakey, and RSC, with RSC being the managing partner. Any profits realized by the joint venture would be divided 40% to RSC, 40% to ITS, and 20% to DeBakey. The Partnership's [*15] business would be managed by a Management Committee consisting of two members from RSC and one each from ITS and DeBakey. Any binding action by the Management Committee would require the approval of at least three of the four committee members. The Management Committee had the power to approve RSC's appointment of a General Manager for the Partnership and to approve all proposals, contracts, and financial and business plans. ITS's representative on the Management Committee was Dr. Gamal Badreg ("Badreg"); DeBakey's representative was Raymond Hofker ("Hofker"), and RSC's two representatives were Messrs. Stevens and Morton L. Brond ("Brond"). Mr. Stevens was designated as both the senior RSC representative and as RSC's appointee to

2000 Del. Ch. LEXIS 129, *

serve as the Partnership's General Manager to run its day-to-day business.

Plaintiffs contend that the defendants breached several distinct provisions of the JV Agreement while it was in force. With two exceptions, those provisions (and the facts that pertain to them) are set forth and discussed in those sections of this Opinion that analyze these contract claims. The exceptions are Sections 5.1 and 4.2(c), the two provisions that relate to RSC's obligation [*16] to fund the joint venture. Section 5.1 pertinently provides:

> RSC shall provide initial financing to the Joint Venture Partnership, according to a schedule established by the... Partners, in a total amount not to exceed One Million Dollars ($ 1,000,000), in order to establish working capital resources. Subject to paragraph 4.2(c), ... RSC shall provide additional financing as the... Management Committee shall determine necessary to meet the obligations of the ... Partnership ... (emphasis added)

And Section 4.2(c) states:

> This Agreement may be determined at the sole discretion of RSC if the required financing by RSC (see Section 5.1 below) exceed $ 2,000,000; provided however, that RSC shall give the parties notice of such intention to terminate and give the parties, or either of them, sixty (60) days to provide alternate financing that is non-recourse to RSC.

**E. Post-Agreement Events Leading To The Termination of the Joint Venture**

The JV Agreement was executed on September 14, 1993. On September 2, 1994, almost one year later, RSC formally terminated the joint venture after having invested $ 2 million in the Partnership. During that period [*17] MedTel sold no telemedicine units. These core facts are not disputed. Almost everything else that happened before and during that one year period is.

Resolving those disputes has proved to be problematic, not only because of their multitude, but also because the extensive post-trial briefs submitted by both sides devote minimal space to legal and factual analysis, and maximum effort to embellishing the facts with large dollops of "spin." To say it bluntly, this overlitigated, overpapered and overbriefed lawsuit appears more an occasion for the parties to vent their spleen on each other than to establish the validity and justice of their legal claims in a detached, reasoned manner. The principal casualty of this self-indulgent exercise has been analytical clarity.

There is no quick or easy way to wade through the resulting morass. What follows is the Court's best effort. The approach I have adopted is to proceed chronologically through the significant events that occurred during MedTel's single year of life under the JV Agreement, highlighting in each case the fact dispute and each party's perspective, and resolving the dispute where necessary.

Starting with the parties' "big picture"    [*18] perspective, the plaintiffs' portrayal, simply put, is that no sooner did RSC sign the JV Agreement than Raytheon decided to scuttle the telemedicine project, and over the next year RSC and Raytheon surreptitiously sabotaged the project by various means. The defendants' quite contrary view is that RSC/Raytheon worked diligently on behalf of the Partnership with no support from ITS, which failed to deliver the ITS telemedicine system or any of the specifications therefor. In July 1994, after months of no sales and after disagreements had erupted between DeBakey and ITS, Raytheon commissioned a study of the telemedicine market and discovered that the telemedicine market was far smaller than Raytheon had initially been led to believe, and that in this market MedTel's product was not competitive. Mindful that it would soon reach the $ 2 million funding limit, Raytheon decided that its most prudent course would be to exit the telemedicine business altogether.

This dispute over this larger perspective spills over into many of the lower level disputes about key specific events, which are then discussed.

(1) The Saudi Arabian Contract

The plaintiffs contend that before the JV Agreement [*19] was executed, Raytheon was told that ITS had received an urgent request from the Saudi Arabian Kingdom for a proposal to install 39 telemedicine units. Shortly after signing the JV Agreement, RSC prepared a $ 50 million proposal, which (plaintiffs claim) included not only the cost of the telemedicine units but also "an unrelated proposal for Raytheon to complete tens of millions of dollars worth of peripheral services to rewire and upgrade Saudi Arabia's internal telecommunications system..." n8 According to plaintiffs, RSC's refusal to "unbundle" these two components led to Saudi Arabia's rejection of the proposal--including the telemedicine contract--in its entirety.

n8 P1. Op. Posttrial Br. at 21.

2000 Del. Ch. LEXIS 129, *

RSC prepared the Saudi Arabian proposal, but it denies that the proposal included inflated and unnecessary costs to rewire and upgrade Saudi Arabia's telecommunications system. Some communication components were included in the cost estimate, defendants say, because Saudi Arabia's existing analog network would [*20] not support the proposal being requested. Nor, defendants argue, did RSC refuse to change the Saudi Arabian estimate to offer less expensive alternatives or to remove the telecommunications component from the proposal. Rather, RSC included the components that it believed were essential, and scaled the cost proposal downwards in response to Dr. Badreg's demands for a smaller and cheaper system. Accordingly (defendants urge), although the proposal was not accepted, the blame cannot be laid at RSC's door.

I find the defendants' position and evidence on this issue to be the more persuasive. No reason or motive was shown for RSC to act against its economic self interest by sabotaging the Saudi Arabian proposal, nor have the plaintiffs proved that RSC, in fact, attempted any such sabotage.

(2) Raytheon's December 1993 Internal Review of MedTel

On December 3, 1993 an internal Raytheon meeting took place in which Raytheon's Chairman and CEO, Dennis Picard ("Picard"), questioned the RSC team about the ITS System. Mr. Picard quickly realized that RSC did not have a "specification;" that is, RSC did not know what the system's functional requirements were. Because that knowledge gap would [*21] make it difficult for MedTel to "cost" the system, Mr. Picard instructed RSC to create an "ASpecification" for the ITS System as soon as possible. Mr. Paul Tanzi was instructed to prepare the A-Specification, which would enable RSC to determine whether MedTel had a viable product that could be built on schedule and that could be costed out. Mr. Paul Tanzi was instructed to prepare the A-Specification. That much is undisputed.

What is disputed is whether the plaintiffs were told that RSC was conducting this internal review, and whether Mr. Picard instructed his subordinates, including Mr. Stevens, to put a "hold" on MedTel and to put off making any commitments on behalf of MedTel until further notice. The plaintiffs contend that a "hold" was placed on MedTel activity, and that they were never told about that or about Raytheon's ongoing internal review of the ITS System. The defendants deny that any "hold" was placed on MedTel or that they concealed that internal review from their partners.

Again, I am unpersuaded by the plaintiffs' position and evidence. The defendants' witnesses testified that

Mr. Stevens informed the partners that Raytheon was reviewing the ITS System. No reason [*22] has been shown why their testimony should not merit credit. Moreover the record shows significant efforts by MedTel and RSC to promote business during the one month period that the "hold" was supposedly in effect--efforts that are inconsistent with, and undercut, the plaintiffs' position. I find as fact that the activity at MedTel after the alleged "hold" continued at the same level as it did before.

The defendants argue that they lacked a specification because Dr. Sanders never furnished RSC the technical data on the ITS System that was needed for RSC to prepare accurate planning and budgetary estimates, to provide firm proposals when requested, and ultimately to install the ITS System for customers. After the December 3, 1993 meeting, Mr. Stevens and Mr. Tanzi approached Dr. Sanders and asked him for a technical data package. Although Stevens and Tanzi were unable to get the technical information from Dr. Sanders directly, they did obtain a partial list of generic system components from Mr. Ken Lucas at CAE-Link, n9 to whom Dr. Sanders had referred them.

> n9 CAE-Link was the firm that had designed
> and installed the so-called ITS telemedicine unit
> at MCG.

[*23]

Ultimately, Raytheon's engineers were able to complete the A-specification by January 20, 1994. Four days later, the team presented the results of their technical review at a meeting with Mr. Picard. Mr. Tanzi reported that Raytheon had enough knowledge to understand the cost structure of the basic system, and he also discussed software improvements that could be made to the system. Mr. Picard agreed that if MedTel achieved some sales of the basic system, RSC/Raytheon would consider investing additional funds for system upgrades beyond the $ 2 million funding limit.

(3) The Delay in Constructing The Texas Medical Center "Hub" Unit

The plaintiffs urge that all the partners knew that it was essential that a telemedicine unit be installed at the TMC as soon as possible, to enable MedTel to demonstrate its product and promote sales to customers. The plaintiffs further contend that when he made his A-Specification report, Mr. Tanzi told Mr. Picard that the ITS System could be built and installed as proposed with no significant value added by Raytheon. Nonetheless, plaintiffs complain, the construction of the TMC Unit was inexcusably delayed until April, 1994.

The defendants dispute [*24] that They argue that all parties agreed that the MCG (not the TMC) unit would be the demonstration unit, and that the TMC unit would not be built until after the first sale of a MedTel telemedicine system to a customer had been completed. Indeed, defendants emphasize, completing the "A-Spec" did not mean that Raytheon could then immediately build a telemedicine system because (as Mr. Tanzi explained):

> The A-spec....doesn't tell you how to build the system. It doesn't tell you what the architecture is like, or give any of the design details. It simply describes [the system] from a functional and performance objective.
>
> * * *
>
> What is missing is how are the connectors or the input or output ports, on the medical electronics, on the video conferencing equipment, on other pieces of equipment--how would they be tied together? What is missing is the experience that comes from putting a first system together, and having debugged and tested it thoroughly. 10

n10 Tr. 2149-2150.

(4) The February 15, 1994 Raytheon     [*25] Meeting

The next significant (but hotly disputed) event was a meeting among the RSC team and Raytheon senior management on February 15, 1994, to review costing for the ITS System. The plaintiffs contend that at that meeting Mr. Stevens was forced by his superiors to present misleadingly low profit percentage figures for MedTel, and that as a result Raytheon management lost interest in the venture. The defendants categorically deny that this ever happened.

Central to an understanding of this dispute is how Raytheon accounted for the profitability of its investments in joint ventures. Raytheon used two methods, depending upon whether it held a majority or a minority interest in the venture. For joint ventures in which Raytheon owned a minority interest (e.g., MedTel), Raytheon typically used the unconsolidated method, whereby its profit from the venture would be calculated upon 40% of the venture's sales. For ventures in which Raytheon owned a greater-than-50% interest, it used the consolidated method of accounting, whereby

Raytheon's profit would be calculated upon 100% of MedTel's sales. The consolidated method would result in a higher sales figure, but a lower profitability [*26] figure, than the unconsolidated method. In the case of MedTel, it appears undisputed that (i) the appropriate accounting method was the unconsolidated method under which Raytheon's projected profit percentage from the MedTel venture would be 28.7%; and (ii) under the consolidated method Raytheon's profitability percentage would be only 11.5%.

The plaintiffs contend that at the February 15, 1994 meeting, Mr. Stevens' superior, Mr. Roddy, ordered Mr. Stevens to present MedTel's profitability using the consolidated method that would show the lower profit percentage, and that Roddy overruled Mr. Stevens' objection that such a presentation would be inappropriate. Plaintiffs contend that after the presentation was made, Mr. Picard chastised Mr. Stevens and RSC for not ensuring that the venture would turn a profit of at least 20%, and directed RSC to work on increasing the profit percentage for MedTel. According to plaintiffs, Mr. Picard also instructed Mr. Stevens to add 25% to the costs of procurement Raytheon would be providing to the venture -- an instruction that would have violated RSC's contractual obligation to provide procurement at cost. Plaintiffs further contend that Mr. Stevens [*27] left the meeting in emotional turmoil because he had been unjustly criticized by Mr. Picard for profitability percentage figures that he had been forced to present and that were also inappropriate and misleading. Mr. Stevens also left the meeting convinced that Raytheon would terminate its support for MedTel.

Two days later, Mr. Stevens met with Mr. Roddy and handed him a memorandum in which he requested Mr. Roddy to relieve him of his MedTel responsibilities, and "transfer immediately all telemedicine activities to someone who will have the support and help of Senior Management...." n11 Mr. Roddy agreed to search for a replacement, but he told Mr. Stevens to go back and keep doing exactly what he had been doing until a replacement could be found. Mr. Stevens agreed.

n11 DX 231

It is claimed that as a result of these events, Mr. Stevens developed post-traumatic stress syndrome that exacerbated his heart condition. Whatever may be the cause, it is undisputed that eight months later Mr. Stevens took a medical [*28] leave of absence from Raytheon beginning in October of that year.

The defendants dispute this portrayal of the February 15th meeting events. They contend that

because RSC had only a 40% interest in the joint venture, the chart for the February 15 meeting presentation properly showed Raytheon's return on sales under the unconsolidated method. But, because Messrs. Brond and Roddy knew from past presentations that Mr. Picard also wanted to know a project's return on sales under the consolidated method, they asked Mr. Stevens to prepare a backup chart showing RSC's return on sales on that basis. At the meeting (the defendants' witnesses testified) only the "unconsolidated" sales chart was presented, but Mr. Picard, nonetheless, mentally calculated the (lower) consolidated profit figure. n12 Mr. Picard then questioned Mr. Roddy, then Mr. Brond, and finally Mr. Stevens, but was not critical of anyone in particular. Moreover, defendants say, although Mr. Picard did instruct the RSC team to go back and review all available options to increase MedTel's profitability, he did not order anyone at RSC to add any fees for the services RSC would provide to the joint venture.

> n12 The defendants contend that Mr. Stevens' Request for Transfer contained inaccurate statements, perhaps because in Mr. Brond's view, Stevens had taken Mr. Picard's comments "more personally than he should have." Tr. 1835. In particular, defendants take issue with the statement in that memorandum that at the February 15 presentation, the RSC team "couldn't discuss [the use of unconsolidated accounting for MedTel] because of the gag order on the 40% issue." There was no "gag order," defendants insist, and the profitability figures were properly presented using the unconsolidated method.

[*29]

Having considered the evidence on both sides, it is evident that Mr. Stevens became upset as a result of what occurred at the February 15, 1994 meeting, but I am not persuaded that Mr. Stevens was forced to present to Mr. Picard a misleading picture of RSC's projected profit percentage from MedTel. Plaintiffs' evidence on that point is Mr. Stevens' first deposition, which was taken in 1996. However, in later depositions of Mr. Stevens taken shortly before trial, Mr. Stevens recanted several of his earlier held views. Moreover, the totality of evidence about what occurred at the February 15 meeting is irreconcilably in conflict. That evidentiary conflict, and the absence of any credible motive Mr. Stevens' superiors might have had to order him to downplay the profit potential of the MedTel venture, leads me to conclude that the plaintiffs have not carried their burden of proof on this issue.

This is not to suggest that Mr. Picard may not have developed a negative impression of MedTel's profit potential at the February 15th meeting. Perhaps he did, but only Mr. Picard will ever know that for certain. What is important, however, is that any negative impressions Mr. Picard may have [*30] developed were not the result of any improper conduct by Mr. Stevens' superiors at RSC.

(5) Internal Transfer of Authority Over The MedTel Project

After Mr. Stevens requested relief from his MedTel responsibilities, Mr. Roddy attempted to find a replacement. Mr. Roddy's attempt was part of a more comprehensive effort within Raytheon to transfer operating responsibility for MedTel from RSC to another Raytheon division. Ultimately, Mr. Picard decided that Raytheon's Equipment Division ("ED") should have that responsibility, but that was not to occur until early July, five months later. During the search for a replacement, Mr. Stevens continued on as MedTel's General Manager until he took his extended leave of absence in October, 1994.

Meanwhile, on March 7, 1994, Mr. Roddy informed DeBakey and ITS in writing that Raytheon was "considering replacing Bill Stevens as the MedTel General Manager," and (as an internal matter), was envisioning transferring supervision over RSC's involvement to a "division-level organizational entity." n13 These matters were discussed in detail with the representatives of DeBakey and ITS at the March 10, 1994 MedTel Management Committee meeting.

> n13 DX 242.

[*31]

On July 1, 1994, Raytheon announced a transfer of the "reporting line of responsibility for MedTel. Originally, Mr. Stevens had reported directly to Mr. Roddy, then to Mr. Roddy's superior, and finally to Mr. Picard. After July 1, Mr. Stevens reported through ED, first to Mr. Tanzi, then to Mr. Dale Reis (the head of ED), and then to Mr. Picard. This new arrangement provided Mr. Picard with input about MedTel from ED, and it also gave RSC access to ED support. There was no change in RSC's legal responsibility or day-to-day support for MedTel, and at the June 9, 1994 Management Committee meeting, ITS and DeBakey did not oppose this internal transfer of reporting responsibility to ED. Mr. Stevens did tell ITS and DeBakey representatives that he had scaled back his efforts to pursue certain "teaming agreements" (i.e., strategic alliances) pending the completion of the transfer, but in all other respects

Mr. Stevens day-to-day responsibilities would remain unchanged.

The plaintiffs contend that these internal rearrangements were concealed from them, that Mr. Stevens was left solely as a figurehead with no real management authority, that Messrs. Stevens and Tanzi "dragged their feet" [*32] in seeking business for MedTel, and that Raytheon "[cast] MEDTEL adrift to be operated without an acting General Manager. n14 The record does not support these assertions. As noted, the plaintiffs were kept informed of the organizational changes within Raytheon, and (except for the teaming agreements) Mr. Stevens' day-to-day authority and responsibilities remained unchanged. Messrs. Stevens, Tanzi, and their associates continued working diligently on behalf of MedTel. They "...continued to support with budgetary estimates .. [and]...to support the building of a demonstration system at [Texas Medical Center]... [and]. ...to pursue potential customers in support of Dr. Badreg and Dr. DeBakey." n15 As Dr.

n14 Pl. Op. Posttrial Br. at 26.

n15 Tr. 1748; see also Tr. 1477, 1659-60.

DeBakey himself observed in a letter dated May 17, 1994:

> Bill [Stevens] pledged that he would continue his own personal high level of activity in the Partnership until such time as the changes were made, and, [*33] true to his word, his dedication toward the realization of the potential of MEDTEL has not wavered since the announcement on March 9. n16

(6) The Funding Reaches $ 2 Million And RSC Terminates The JV Agreement

At the March 10, 1994 MedTel Management Committee meeting, RSC's Mr. Brond reported that the initial funding of $ 2 million would be exhausted as early as June 1994. At the June 9, 1994 Management Committee meeting, the partners discussed the fact that MedTel was running out of money. Mr. Brond's notes of that meeting indicate that a "strategic issue" was how to get a "decision from Raytheon as to whether we are committed to provide added support." n17 With the benefit of hindsight that became the $ 64,000 question.

n16 DX 269. The considerable efforts that Raytheon personnel devoted to MedTel from and

after February 1994 are summarized (together with supporting trial exhibit citations) in a chart appended as Exhibit C to the Defendants' Opening Posttrial Brief. These efforts are inconsistent with the plaintiffs' attempted portrayal of the Raytheon defendants post-February 1994 strategy as essentially one of "paying lip service," "treading water" and "marking time" by doing as little as possible until they could seek to extricate themselves from the JV Agreement when their $ 2 million funding limit had been reached. [*34]

n17 DX 272.

As the MedTel funding neared the $ 2 million limit, Raytheon was evaluating its options. To assist Raytheon in that endeavor, in July 1994 Fletcher Spaght, an independent consulting firm with expertise in teleradiology and telemedicine, was retained to analyze the telemedicine market. Fletcher Spaght performed a market analysis based upon interviews of persons at twenty-one companies and organizations, and then briefed Raytheon personnel on its conclusions. Those conclusions were summarized in a July 12, 1994 internal Raytheon memorandum from Sam Tischler to David Dwelley, which reported that Fletcher Spaght had estimated the 1993 total market size at $ 30-40 million, and anticipated no significant changes in market size over the near term. Fletcher Spaght also estimated the "total U.S. available market" at $ 245 million, or $ 50 million of sales per year over five years n18 --about half of the market size ITS was allegedly touting during the pre-Agreement negotiations.

n18 DX 281 at R044971-72.

[*35]

Mr. Tischler went on to report that for RSC/Raytheon to be competitive, it needed to have a "well-designed, user friendly product, priced competitively," and a "marketing and sales force which is equipped and experienced in selling to the medical/hospital industry." n19 Pointing out that Raytheon had neither of those assets, the author went on to conclude:

n19 Id., at R044973.

I do not believe our current joint venture, with I.T.S. and DeBakey is useful. We are relying upon I.T.S. for a product, and that which they supply is deemed to be inappropriate for today's market. We are relying upon I.T.S./DeBakey for marketing assistance. They provide us with leads. but we do not have the marketing/sales force in place to turn those leads into sales.

***

**RECOMMENDATION**

***

1. At the moment, I believe MedTel does not possess either a competitive product, or an appropriate marketing/sales force.

2. A typical telemedical system consists of standard off the shelf hardware, which is [*36] tied together through unique, but not particularly complex software. I believe Raytheon will find it difficult to compete with smaller firms in this arena. We do not bring anything unique to bear on the problem. Teleradiology is a different issue. These systems call for sophisticated imaging software and hardware, an area where our expertise could be brought to bear...

3. At the moment MedTel has no outstanding proposals. I believe that a successful effort on our part to win any business will require a re-start; i.e., a different product, and a different marketing technology.

4. Although Fletcher and Spaght did not estimate the international market size, it has been my experience that international customers typically base their purchase decisions largely upon the success of U.S. based installations. MedTel's lack of any international orders tends to confirm this. Whether the total available U.S. market size estimate of $ 245 million is correct is less of a concern than the fact that systems will not be sold in quantity in this country until questions of real need, funding, and reimbursability are answered.

I believe we have a non-competitive position in an uncertain [*37] market... I recommend we terminate our activities in telemedicine. n20

n20 DX 281, at RO44973-74.

On July 15, 1994, Mr. Picard held a meeting to evaluate Raytheon's involvement in MedTel. Mr. Tanzi presented an extensive analysis at that meeting, and suggested that Raytheon should either discontinue MedTel or restart the business. Mr. Reis recommended that Raytheon discontinue MedTel. Accepting Mr. Reis's view, Mr. Picard decided that without a clear path to profitability, Raytheon should get out of the business.

On August 10, 1994, RSC noticed a MedTel Management Committee meeting be held on August 14, 1994. In his formal notice letter, Mr. Stevens stated that "RSC has determined that the financing required for the operations will, in the aggregate, exceed $ 2 million by mid-September,"and that "Raytheon feels compelled in light of the status of MedTel sales to date, to review its commitment and future investment plans." n21 At the August 14 meeting, Mr. Brond summarized the joint venture's financial [*38] status and Mr. Tanzi explained Raytheon's position. ITS and DeBakey accused Raytheon of misleading them and not performing its end of the bargain. Mr. Brond's notes of that meeting, however, reflect that DeBakey's Mr. Hofker acknowledged that from the outset Mr. Stevens had told him that he could not get more than $ 2 million without some sales. n22

n21 DX 291.

n22 Tr. 1765-66; DX 292.

On September 2, 1994, Raytheon gave formal notice that, based on Section 4.2(c), it was terminating the JV Agreement, effective in 60 days. Nonetheless, RSC offered to assist DeBakey and ITS in continuing the joint venture by supporting the Partnership's efforts through the end of 1994, subcontracting with the joint venture for integration services, and helping ITS and DeBakey to locate a replacement partner. ITS and DeBakey declined RSC's offer. n23

n23 The plaintiffs contend that at the time Raytheon notified them of its intent to withdraw from the Partnership, Greece and Saudi Arabia had already committed to purchase telemedicine units, and that RSC failed to provide support or

assistance in consummating those sales, or in following up on a sale to NASA, which had allocated $ 1 million for the purchase of a telemedicine unit. The record does not support those contentions. Moreover, although RSC did decline to bid on a telemedicine installation for the University of Cincinnati, it did that because of technical problems with, and onerous conditions imposed by, the request for quotations ("RFQ"), and because Dr. Sanders (who was working with the University as a consultant) had improperly caused RSC to receive the RFQ before its official release date.

[*39]

The plaintiffs commenced this action on April 16, 1996. The record does not disclose why plaintiffs delayed filing this lawsuit almost two years after Raytheon gave notice of its termination of the JV Agreement. n24

> n24 Although the plaintiffs' unexplained delay is hardly dispositive, it cannot help but be a factor in the Court's assessment of the credibility of the plaintiffs' highly fact-intensive claims. Why, if the plaintiffs truly had a valid legal grievance, did they wait so long to seek redress? The absence of any explanation suggests that the plaintiffs did not believe they had a legal grievance and would not have filed this lawsuit if MedTel had succeeded without RSC. When that did not happen, however, the plaintiffs changed their minds and decided to hold RSC and Raytheon responsible for the business failure, and to seek $ 51 million in damages for a venture that lasted only one year and never saw a dime in sales revenue. As discussed in Part VI, infra, similar opportunistic behavior concerns infect the credibility of the defendants' counterclaims as well.

[*40]

## II. THE PARTIES' CONTENTIONS

The plaintiffs assert six separate claims against RSC and Raytheon. Their first claim is that RSC materially breached the JV Agreement; their second is that RSC and Raytheon breached their fiduciary duties to plaintiffs; the third is that Raytheon aided and abetted RSC's breach of fiduciary duty; the fourth is that Raytheon tortiously interfered with the contract between RSC and plaintiffs; and the fifth and sixth are that RSC and Raytheon induced plaintiffs to enter into the JV Agreement either through fraudulent or negligent misrepresentations.

Although these claims are hotly contested, the disputes are largely factual and rest on issues of credibility. The applicable legal principles are not controverted.

At the heart of plaintiffs' case is their claim that the defendants breached the JV Agreement in various respects. Specifically, plaintiffs claim that RSC: (i) breached its funding obligation under Sections 5.1 and 4.2(c) of the JV Agreement; (ii) breached Sections 8.1 and 8.9 of that Agreement by usurping the roles and powers of MedTel's Management Committee and General Manager, (iii) breached Sections 7.2 and 7.3 of the JV Agreement by secretly [*41] adding a fee to the procurement costs charged to the venture; (iv) breached Section 15.1 of the Agreement by transferring its interest in MedTel; and (v) violated its implied covenant of good faith and fair dealing by secretly deciding to "pull the plug" on MedTel for the sole benefit of Raytheon, by sabotaging the venture's success, and by failing to inform plaintiffs of its intention to withdraw from the venture.

The plaintiffs' second claim, for breach of fiduciary duty, rests upon a litany of separate acts, most of which also underlie the breach of contract claims. One category of alleged fiduciary misconduct includes holding meetings of upper level Raytheon executives in late 1993 and early 1994 unbeknownst to the MedTel partners; and taking actions, also not disclosed to plaintiffs, that adversely affected the success and viability of MedTel. Another category consists of RSC allegedly taking (or failing to take) "actions... which caused MEDTEL to be unable to consummate sales," and then by using the lack of sales as justification for refusing to provide needed funding for, and ultimately withdrawing from, the Partnership. n25

> n25 Pl. Op. Posttrial Br. at 51-52. The conduct falling into this latter category includes: (i) proposing the bid to Saudi Arabia that RSC knew would be unacceptable because it included tens of millions of dollars in unnecessary peripheral communications, (ii) failing to install the TMC telemedicine unit (the "DeBakey Hub") promptly upon execution of the TV Agreement, and sending inexperienced personnel who were unable to get the unit to work properly, (iii) failing to follow up with potential customers and spurning potential strategic alliances that would have been valuable to MedTel, all without informing the partners, and (iv) refusing to provide MedTel with funding for marketing materials and software.

[*42]

The plaintiffs also assert, as their third and fourth claims, that Raytheon's conduct constituted tortious interference with the plaintiffs' contract with RSC, as well as aiding and abetting RSC in breaching its fiduciary duties to plaintiffs.

Lastly, the plaintiffs assert, as their fifth and sixth claims, that Raytheon and RSC wrongfully induced the plaintiffs to enter into the JV Agreement by outright fraud or negligent misrepresentation. The fraud is said to consist of deliberately false representations that RSC would continue to fund the venture beyond $ 2 million, and would also provide technological and project management expertise to the project. These representations included assurances that RSC would install a hub unit at the TMC promptly after signing the JV Agreement. The plaintiffs contend that they reasonably and detrimentally relied on these representations, and that but for those assurances would not have signed the JV Agreement.

Alternatively, the plaintiffs claim that if those misrepresentations were not fraudulent, then they were, at the very least, actionably negligent.

The defendants assiduously dispute all these claims, and have asserted counterclaims against [*43] ITS and DeBakey. The defendants (as counterclaimants) first contend that ITS and DeBakey respectively breached the JV Agreement by failing to deliver the ITS System and to generate sales. Second, the defendants claim that ITS fraudulently induced Raytheon and RSC to enter into the JV Agreement and to approve direct payments of $ 500,000 to ITS and $ 108,000 to Dr. Sanders, and to invest more than $ 2 million in the joint venture. The defendants seek to rescind the JV Agreement and to recover those payments.

* * *

To avoid burdening further this already lengthy Opinion, the specific contentions and opposing the claims and counterclaims are identified in the Sections of the Opinion devoted to the analysis and evaluation of those claims. To aid the reader, the Court's analysis of the claims and counterclaims is structured as follows: Part III of this Opinion addresses the plaintiffs' breach of contract claims, Part IV treats their breach of fiduciary duty claims, Part V evaluates the plaintiffs' remaining claims, and Part VI addresses the defendants' counterclaims. Because I conclude that neither side has proved any entitlement to relief under any of their claims or their counterclaims, [*44] the Court does not reach or address the issues of damages and other requested remedies.

## III. THE PLAINTIFFS' CONTRACT CLAIMS

## A. The Claim That RSC Breached Its Contract Funding Obligation

The plaintiffs first claim that RSC breached its contractual obligation to fund the venture under Sections 5.1 and 4.2(c) of the JV Agreement. As earlier noted, Section 5.1 relevantly states that:

> RSC shall provide initial financing to the ... Partnership. ...in a total amount not to exceed One Million Dollars....Subject to paragraph 4.2(c) above, RSC shall provide additional financing as the ... [Management Committee] shall determine necessary to meet the obligations of the ... Partnership.

Section 5.1 thus established RSC's obligation to provide (i) up to $ 1 million dollars of "initial financing" to the joint venture, plus (ii) such additional financing as the Management Committee determine was necessary, "subject to paragraph 4.2(c)." Paragraph 4.2(c) relevantly provides that the "[JV] Agreement may be terminated at the sole discretion of RSC if the required financing by RSC (see section 5.1 below) exceed $ 2,000,000...." RSC complied with both provisions. [*45] It provided $ 1 million in initial financing, which took the form of direct payments to ITS, DeBakey and Dr. Sanders; and it provided additional financing up to the $ 2 million total. Nothing further was required.

Plaintiffs respond by serving up an array of arguments, many of which Sections 5.1 and 4.2 do not even address. The plaintiffs also advance a new contention that was never before raised until the plaintiffs' post-trial reply brief. The newly-minted argument is that the limit of RSC's funding obligation under these two Sections was $ 3 million, not $ 2 million, based on the premise that the language "subject to paragraph 4.2(c)" in Section 5.1 limits only the "additional" financing RSC was to provide, not the $ 1 million of "initial" financing. This argument fails on procedural grounds, and also because it tortures the language of Section 4.2(c), which permits RSC to terminate the JV Agreement if "the required financing by RSC (see Section 5.1 below) exceed $ 2 million." The references in Section 4.2(c) to "Section 5.1" and to "the required financing" can only be read to mean that the $ 2 million limit applies to all of RSC's "required financing" under Section 5.1 [*46]

The plaintiffs next contend that RSC violated Section 5.1's requirement that the amount of additional financing shall be as determined by the Management Committee. The argument is that RSC and Raytheon management made the decisions about how to spend MedTel's money, and rejected outright the Management

2000 Del. Ch. LEXIS 129, *

Committee's decisions regarding the use of MedTel funds, including specifically, rejecting the Management Committee's requests for funds to purchase software, software upgrades, and marketing materials for the telemedicine system.

The argument is factually and legally unsound. It is unfounded factually, because over the course of the joint venture RSC spent more than $ 300,000 on marketing materials. As for software upgrades, the intent was for MedTel to sell the ITS System, and then purchase software upgrades from RSC after the Partnership became profitable. At various points in the joint venture the partners considered upgrades. On December 9, 1993, the Management Committee authorized $ 300,000 to install a "state of the art" system at TMC, but Mr. Tanzi later reported that the upgrades would cost just under $ 1 million over a three year period. That amount exceeded both the budget [*47] for the DeBakey hub and the balance of the monies available for financing under Section 4.2(c). Later, during the installation of the DeBakey hub, Mr. Brond signed an internal work request for $ 65,000 in initial software upgrades, but ED informed Mr. Stevens that $ 100,000 would be needed just to start the project. As the joint venture's financial situation worsened, Mr. Stevens decided to withdraw the internal work request. n26

> n26 Mr. Stevens testified:
>
> .I had limited financial resources. And if I took from [MedTel's] funding a significant amount to make changes, that might shorten our ability to get to the market in other ways in order to make proposals. to take trips for marketing. So I had to prioritize the money that was available until such time as the venture to make [a] profit; then that would be a different procedure.
>
> Stevens Dep., Vol. II at 170; see also Stevens Dep., Vol. II at 173; Stevens Dep., Vol I at 108.

The argument is also legally incorrect, because the JV Agreement authorized RSC [*48] as Managing Partner to make decisions regarding marketing materials. n27 Section 5.1 does not address these types of day-to-day decisions, and, hence, cannot support a claim for breach of contract.

> n27 Section 3.3(b) of the JV Agreement states that "With prior approval of the managing partner, the. Partnership shall bear. .costs for brochures, pamphlets, etc. for purposes of

marketing." (emphasis added). Thus, even if RSC had rejected a Management Committee request, it had the authority to do so. Plaintiffs rejoin by arguing that RSC was obligated to exercise its authority in good faith and could not withhold its approval of marketing expenses unreasonably. The rejoinder is a "non-starter," however, because there is no persuasive evidence that RSC ever rejected a Management Committee request at all, let alone in bad faith or unreasonably.

**B. The Claim That RSC Usurped The Management Committee's Authority**

The plaintiffs next claim that RSC usurped the roles of MedTel's Management Committee and [*49] General Manager. That claim rests upon Sections 8.1 and 8.9 of the JV Agreement, which provided that "the business of the. .Partnership shall be managed by the. .Management Committee." n28 The Management Committee, in turn, had the power to approve to approve RSC's appointment of a General Manager and to supervise the General Manager's activities. Subject to the supervisory powers of the Management Committee, the General Manager had ". full and complete authority and responsibility for the planning, execution, and control of all aspects of the. Partnership." n29

> n28 PX 55 at § 8.1.
>
> n29 Id. at § 8.9(a).

Plaintiffs argue that RSC breached those general corporate governance provisions in several different ways. They contend first that RSC failed to allow the Management Committee to allocate the $ 2 million as it saw fit. That claim is factually unfounded because the Management Committee allocated funds on only one occasion--$ 300,000 for the DeBakey hub--and RSC carried out the Committee's directive. [*50] n30

> n30 The plaintiffs repeat under this heading their claim about RSC's refusal to authorize payment for marketing materials. The infirmity of that claim is discussed in Part III A above.

Second, plaintiffs claim that RSC improperly spent part of MedTel's funding on internal reviews and presentations for senior Raytheon management. That argument is also unfounded. The plaintiffs' record citations relate only to payments made to develop the "A-Spec," without which Raytheon could not build a telemedicine system. MedTel did not have the technical

capability to prepare the A-Spec and would in any event have had to pay someone to develop it. Accordingly, that expense was necessarily and properly charged to the joint venture.

Third, plaintiffs claim that RSC usurped the Management Committee's authority by placing a "hold" on MedTel while Raytheon's internal reviews were pending, and by directing Mr. Stevens to curb his activities (including entering into binding agreements) on MedTel's behalf. As the Court has [*51] previously found, there was no such "hold" or other significant restriction on Mr. Stevens' day-today activities. Mr. Stevens was free to market MedTel and pursue strategic alliances to any degree he wished. Moreover, during this entire period there was significant activity on the Partnership's behalf; including preparing budgetary estimates for institutions in several states and foreign countries. That Mr. Stevens was directed to obtain his supervisor's approval before entering into binding agreements and was required to report to Raytheon on financial matters, were purely internal arrangements designed to enable Raytheon to decide what position RSC--as MedTel's managing partner--should take. Such unremarkable arrangements hardly evidence a scheme to usurp the Management Committee's authority. Finally, and in any event, there is no persuasive evidence that the level of Mr. Stevens' activity caused any harm to MedTel. n31

> n31 In one of their sillier claims, the plaintiffs charge RSC with unilaterally changing MedTel's principal place of business without notice to its partners. RSC did relocate its MedTel personnel on two occasions, but each time it notified ITS and DeBakey by facsimile, and the plaintiffs never objected to these moves. Of a similar piece is plaintiffs' claim that RSC failed promptly to inform them of Stevens' resignation. But Mr. Stevens did not resign from Raytheon or MedTel; rather, he requested a transfer of responsibility. Mr. Roddy informed ITS and DeBakey by letter dated March 7, 1994, that Raytheon was considering replacing Mr. Stevens and realigning RSC's internal reporting responsibility on MedTel matters. Those issues were discussed at Management Committee meetings held on March 10 and June 9, 1994, and neither ITS nor DeBakey ever objected to these proposed changes.

[*52]

Fourth, the plaintiffs contend that RSC violated the JV Agreement by ordering Stevens to present the (projected) profits of the joint venture calculated under the consolidated accounting method. As earlier found, there was no such order. The joint venture's profitability was presented using the unconsolidated method, as part of an internal Raytheon review meeting to enable Raytheon to decide what position RSC would take as a partner in the joint venture. Legally, how Raytheon deliberated internally was none of the plaintiffs' concern. Nothing in the JV Agreement authorized the Management Committee to dictate to Raytheon (or, for that matter, any partner) how to conduct its internal procedures.

Fifth, and finally, the plaintiffs claim that RSC caused Messrs. Stevens and Tanzi (i) to refrain from pursuing sales opportunities available to MedTel, and (ii) to rebuff or fail to follow up inquiries from strategic partners, thereby foreclosing the MedTel partners from obtaining a replacement for RSC after termination. The plaintiffs have not identified any JV Agreement provision that addresses this alleged misconduct. Moreover, neither of these claims is factually supported. The record [*53] shows that RSC pursued all sales leads for MedTel diligently, that the RSC team (including Stevens) continued to work at the same level on MedTel's behalf, and that there was no slowdown. There is no persuasive evidence that Raytheon restricted either Mr. Stevens or Mr. Tanzi from following up on inquiries from strategic partners, and nothing prevented ITS and DeBakey from finding a substitute partner for RSC after RSC withdrew. Indeed, the plaintiffs rejected RSC's offer to help them find a replacement partner.

## C. The Claim That RSC Improperly Overcharged The Joint Venture

Section 7.3 of the JV Agreement requires RSC to provide procurement and other infrastructure-type services and bill them to the joint venture at cost. The plaintiffs claim that RSC breached Section 7.3 by surreptitiously adding a fee to procurement costs charged to the venture. The credible evidence shows the contrary. Throughout the course of the joint venture RSC provided all of its services to MedTel at cost. The only evidence plaintiffs cite--two Raytheon draft budgetary estimates dated June 29 and July 15, 1994--appear to be draft proposals intended for third parties. The JV Agreement required RSC to [*54] provide procurement and related services at cost to the joint venture; proposals to third parties, n32 however, were not subject to that requirement.

> n32 There is no evidence that these documents were ever sent out to a customer.

**D. The Claim that RSC Improperly Transferred Its Partnership Interest To Raytheon's Equipment Division**

The plaintiffs next claim that the internal transfer in 1994 of RSC's responsibilities for MedTel to Raytheon's ED in 1994 violated Section 15.1 of the JV Agreement, which provided that "no .Partner at any time shall sell, assign, pledge, or otherwise transfer or attempt to sell, assign, pledge or otherwise transfer its interest in the. .Partnership at any time to a third party without the consent of the other.. partners."

This claim is also fatally flawed. No transfer of RSC's interest in the Partnership ever took place. At all times RSC remained a partner until it terminated the joint venture. There was only a change of reporting responsibility within Raytheon. Even [*55] if those arrangements constituted a "transfer," it was not to a third party, i.e., a stranger to the relationship. ED was part of the Raytheon family, and the same RSC personnel continued to handle MedTel's day-to-day activities for the Partnership. Finally, what was done was not "without the consent of the other . partners." The plaintiffs were notified of this change, discussed it at Management Committee meetings, and supported it.

**E. The Claim That The Defendants Breached Their Implied Covenant Of Good Faith And Fair Dealing**

Lastly, the plaintiffs claim that RSC violated its implied covenant of good faith and fair dealing (i) "by secretly deciding to pull the plug on MedTel for the sole benefit of Raytheon, and then sabotaging the venture's success," by withholding financial and other support, and (ii) by failing to inform Plaintiffs of its intention to withdraw from the venture, thereby damaging Plaintiffs' reputations n33 This claim, bereft of factual support, has no merit either.

n33 Pl. Op. Posttrial Br. at 46-47

[*56]

RSC did not "secretly decide" to pull the plug on MedTel. RSC deliberated, internally and privately, on what course of action to take, which it was entitled to do. And once RSC decided to exercise its termination right, it promptly informed its partners. To say that RSC did that "for the sole benefit of Raytheon" is to say nothing of significance, since RSC, although a separate entity, was a whollyowned Raytheon subsidiary that had no interest distinct from that of its parent.

In that sense RSC was Raytheon, so to argue that RSC acted for Raytheon's "sole benefit" is only to say

that RSC and Raytheon acted for their own identical benefit. In this context that argument leads nowhere, because that is precisely what Section 4.2(c) of the JV Agreement allowed RSC to do: when deciding whether or not to terminate the venture once its investment exceeded $ 2 million dollars, RSC was free to act "in its sole discretion."

For these reasons, the plaintiffs' breach of contract claims are rejected.

**IV. THE CLAIM THAT DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES OWED TO PLAINTIFFS**

The plaintiffs' second set of claims, for breach of fiduciary duty, retreads much of the same ground [*57] as their breach of contract claims, as both sets of claims arise out of the same conduct. Although in analyzing these claims I will strive to avoid repetition, given the nature of those claims, some repetition is unavoidable.

It cannot be doubted that RSC, as a partner in and as managing partner of the joint venture, owed fiduciary duties to its remaining partners, the plaintiffs. As RSC's sole shareholder, Raytheon owed fiduciary duties to RSC's partners as well. Those fiduciary duties were to act with "the utmost good faith, fairness and honesty in dealing with [the partners] with respect to the enterprise." n34 The plaintiffs contend that RSC and Raytheon breached those duties in numerous respects

n34 *J. Leo Johnson, Inc. v. Carmer, Del Sup., 38 Del. Ch. 579, 156 A.2d 499, 502 (1959)*

The fiduciary duty claims may be grouped into three categories: (i) Partnership business decisions, (ii) internal Raytheon business decisions, and (iii) claims that the defendants intentionally harmed [*58] the Partnership. These repackaged breach of contract claims do not improve when dressed up in fiduciary duty clothing.

1. Partnership Business Decisions

The claims in the first category are that RSC breached its fiduciary duties by: (i) rejecting MedTel's request for funds to develop marketing materials and software upgrades, (ii) unilaterally relocating the Partnership's offices, (iii) adding a mark-up to procurement costs, (iv) failing immediately to replace Mr. Stevens as General Manager, (v) preparing an inflated Saudi Arabian estimate, (vi) delaying the installation of the DeBakey Hub, and (vii) failing to follow up with potential customers and strategic alliances.

For the reasons previously discussed in this Court's analysis of the contract claims (see Part III, supra), most of these fiduciary claims fail for want of factual support. The underlying fact scenario on which these claims rest either never occurred or did not occur in the way plaintiffs contend. The remaining fiduciary duty claims fail because they attack internal Raytheon decisions that were legally protected matters of business judgment. Mr. Stevens' decision not to allocate MedTel's limited funds to [*59] software upgrades, but instead to "prioritize" MedTel's resources in a different way, was clearly a judgment of that character, as were the decisions to retain Mr. Stevens as MedTel's General Manager and to defer pursuing strategic alliances.

2. Internal Raytheon Business Decisions

The second category of fiduciary claims includes: (i) transferring MedTel to ED, (ii) holding secret meetings of Raytheon executives, (iii) conducting comprehensive internal reviews of MedTel and tampering with the results to distort unfavorably MedTel's level of profitability, and (iv) directing Stevens to consult with Raytheon management before committing to MedTel business. Plaintiffs contend that these actions "benefited Defendants at Plaintiffs' expense by enabling Defendants to direct their internal resources away from MEDTEL (and presumably toward other projects) while MEDTEL was left to languish in 'neutral' until RSC formally withdrew." n35

n35 Pl. Posttrial Reply Br. at 35-36.

These claims also fail. Factually, [*60] the Court has already rejected the contention that the Defendants "tampered" with the results of the internal reviews so as to distort unfavorably MedTel's level of profitability. The alleged "unilateral" transfer of MedTel to ED was discussed at Management Committee meetings and acceded to by the plaintiffs. Stevens was directed to consult with his employer, RSC, before committing MedTel to binding agreements because RSC was both a partner and the managing partner of MedTel. RSC was entitled to be consulted with in advance so that it could decide, in both capacities, how best to proceed.

But more fundamentally, these decisions were all internal to RSC and did not involve the external exercise of RSC's authority as managing partner. Therefore, the plaintiffs have no standing to challenge those decisions. Even if they did, plaintiffs have failed to overcome the business judgment rule presumption that those decisions were made independently, with due care, in good faith, and in the decisionmaker's honest belief that they were in the best interests of the enterprise. n36 Plaintiffs'

assertion that these were self-interested actions that benefited Raytheon at defendant's expense, fails [*61] for lack of proof. While these decisions may have "benefited" the defendants in some internal administrative sense, there is no persuasive evidence that this "benefit" came at the plaintiffs' expense.

n36 See *Williams v. Geier*, Del. Supr., 671 A.2d 1368, 1376 (1996).

3. Claims of Intentional Harm to MedTel

The plaintiffs' third and final set of fiduciary duty claims is that Raytheon intentionally took steps to inflict harm upon MedTel by (i) placing a secret "hold" on MedTel, (ii) failing promptly to disclose Stevens' resignation and to replace Stevens immediately as General Manager, (iii) directing Stevens and Tanzi to "drag their feet," and by (iv) prematurely "pulling the plug" on the venture. As previously found, only one of these charges is even factually supported. It is conceded that Stevens was retained as General Manager, but the plaintiffs have not established that that decision violated any duty or caused any harm. Indeed, the plaintiffs are unable to advance a plausible explanation [*62] for why Raytheon and RSC would have had any reason to harm the Partnership. As the owner of a 40% Partnership interest and as the only partner that invested money in the joint venture, RSC/Raytheon had the most to lose if the venture failed.

For these reasons, the breach of fiduciary duty claims are rejected.

## V. THE PLAINTIFFS' REMAINING CLAIMS

Lastly, the plaintiffs assert other claims, specifically, that: (a) Raytheon tortiously interfered with the JV Agreement, (b) Raytheon aided and abetted RSC's breaches of fiduciary duty, and (c) RSC and Raytheon induced the plaintiffs to enter into the JV Agreement either fraudulently or through negligent misrepresentations. Those claims must also be rejected.

### A. The Tortious Interference And Aiding And Abetting Claims

The first two of the plaintiffs' remaining claims are easily disposed of. To begin with, there can be no claim of tortious interference with the JV Agreement, because a showing of tortious interference with contract requires (among other things) that there be a breach of the contract. n37 Here, no breach of contract has been established, the Court having rejected the plaintiffs' contract claims on the merits. [*63] Second, there can be no claim that Raytheon aided and abetted a breach of RSC's fiduciary duty, because to establish aiding and

abetting the plaintiffs must show (among other things), a breach of fiduciary duty. n38 In this case the Court has also determined that RSC breached no fiduciary duty that it owed to plaintiffs.

> n37 *Cantor Fitzgerald, L P v Cantor, Del. Ch., 724 A 2d 571, 584 (1998)*
>
> n38 *In Re Santa Fe Pac Shareholder Litig., Del Supr, 669 A 2d 59, 72 (1995)*

### B. The Wrongful Inducement Claim

That leaves for disposition the claim that RSC and Raytheon induced the plaintiffs to enter into the JV Agreement either fraudulently or by negligent misrepresentation. That claim is the flip side of the defendants' counterclaims, which hurl similar causes of action against ITS and DeBakey. Specifically, the plaintiffs claim that RSC falsely represented to them that it would continue to capitalize the venture beyond $ 2 million and that it would provide technological [*64] and management expertise. The plaintiffs contend that they justifiably relied on these representations to their detriment, and that as a result they lost the opportunity to partner with other reputable companies and gain substantial profits through sales of telemedicine systems to third parties. These claims are fatally infirm for at least two reasons.

First, plaintiffs have failed to establish that the representations that form the basis of these claims were false. The plaintiffs do not--indeed they cannot--deny that the JV Agreement on its face limited RSC's funding commitment to $ 2 million. They argue, however, that although they were unhappy with this provision, they nonetheless signed the Agreement, because they relied upon representations that (they contend) RSC made to them. Those representations were that Section 4.2(c) of the JV Agreement was merely a reflection of Raytheon's internal appropriations process, and that Raytheon in fact intended to provide more than $ 2 million in funding, but Raytheon's internal appropriations procedures prohibited a formal commitment above $ 2 million at that time.

The testimony upon which the plaintiffs rely is self-serving (coming [*65] from the plaintiffs themselves), is uncorroborated by any document of record, and is ultimately unpersuasive. The strongest evidence in plaintiffs' favor is Mr. Stevens' testimony that "there was an assurance that additional monies above the $ 2 million could be and would be obtained rather easily." n39 But, Mr. Stevens also testified that neither he nor Mr. Brond had any authority to commit orally to a contribution of more than $ 2 million. n40 Thus, plaintiffs' evidence is weak, and is sharply controverted by evidence that is at least equally, if not more, persuasive. At trial RSC's Mr. Brond testified that he "clearly and unequivocally" told plaintiffs that the total limit of Raytheon's funding liability was $ 2 million, and that Mr. Stevens supported and confirmed his (Mr. Brond's) statements. n41 I find that at best the evidence on both sides is in equipoise, and that when taken as a whole, the evidence fails to persuade me of plaintiffs' factual argument.

> n39 Stevens Dep., Vol. I at 188. See also Stevens Dep., Vol. I at 31-36.
>
> n40 40 Stevens Dep., Vol. I at 188.
>
> n41 Tr. at 1708, 1710.

[*66]

Accordingly, the plaintiffs have not carried their burden of proving an actionable misrepresentation by RSC with respect to the $ 2 million funding limit.

Nor (I find) did RSC misrepresent that it would provide technological and project management expertise. RSC did make--and it did honor-- that representation. Throughout the joint venture RSC provided management expertise: it responded to inquiries, prepared proposals, arranged trips and demonstrations, tracked finances, and kept the partners informed of ongoing developments. RSC also provided technological expertise: after Raytheon learned that ITS did not deliver the ITS System, ED developed a specification for the system from the generic CAE-Link components list within weeks at a cost of $ 80,000. ED also later built and installed the demonstration telemedicine system at the TMC. There has been no showing of any false representations by RSC.

Second, a claim for fraud requires a showing that the plaintiffs acted in justifiable reliance on the purported misrepresentations. n42 Here, it is difficult for plaintiffs credibly to claim that they justifiably relied on RSC's alleged oral promise to provide more than $ 2 million [*67] in funding. The JV Agreement expressly and unambiguously permitted RSC to terminate the Agreement "in its sole discretion" once the $ 2 million limit was reached. Plaintiffs had to know that in any contested proceeding the JV Agreement would control. Indeed, after the JV Agreement was signed but before ITS's stockholders ratified it, Mr. Hartz advised his client, ITS, that the Agreement would enable RSC to take the position that it could terminate the Agreement when the $ 2 million funding limit was reached.

n42 *Stephenson v. Capano Dev., Inc., Del. Supr., 462 A.2d 1069, 1074 (1983).*

Thus, the record establishes that at the very least, the plaintiffs knew that they were subject to the very real risk that RSC would rely upon the plain language of the written Agreement to terminate the joint venture once the $ 2 million funding limit was reached. Therefore, even if (contrary to my finding) RSC did make the oral representation that the plaintiffs claim, and even if the plaintiffs did rely upon [*68] it, their reliance was not justified. If it was important for the plaintiffs to obtain a binding commitment by RSC to provide more than $ 2 million in funding, the plaintiffs should have negotiated for the specific inclusion of that obligation in the JV Agreement. Failing that, they should have refused to sign the Agreement. The plaintiffs did neither.

The claim that RSC and Raytheon wrongfully induced the plaintiffs to enter into the JV Agreement, accordingly, must fail.

* * *

For the above reasons, the plaintiffs have failed to establish by competent evidence their contract, fiduciary, and tort claims against RSC and Raytheon. That leaves for determination the defendant's counterclaims against the plaintiffs, to which I next turn.

## VI. THE DEFENDANTS' COUNTERCLAIMS

The defendants assert two counterclaims. The first is that ITS fraudulently induced RSC to enter into the JV Agreement; the second is that ITS and DBC breached the JV Agreement -- ITS, by failing to deliver the ITS System, and DBC, by failing to deliver sales. RSC and Raytheon contend that as a consequence of these wrongdoings, defendants they are entitled to have the JV Agreement rescinded and to recover restitution [*69] equal to their $ 2 million lost investment, plus consequential damages including attorneys' fees. These claims are now considered. n43

n43 The defendants argue that because Mr. Hartz and ITS filed this action with full knowledge of the defendants' clear and established right to terminate the joint venture, and are guilty of extensive and egregious frauds, the defendants are entitled to recover their attorneys fees in this action. The defendants further contend that in awarding judgment to them, the Court should disregard ITS' separate corporate existence. That latter argument, if validated, would result in judgment being entered against ITS's principals, Dr. Sanders and Mr.

Hartz who, inexplicably, were never joined as parties. Because the Court finds that the defendants are not entitled to relief on their counterclaims, it does not reach the attorneys' fee and the corporateveil-piercing issues.

### A. The Fraudulent Inducement Claim

#### 1. The Contentions

The fraudulent inducement claim, briefly summarized, [*70] is that Dr. Sanders, from his first contact with RSC, repeatedly and intentionally made representations to RSC that: (i) ITS developed, possessed and could deliver to the joint venture a state-of-the-art, fully functional and ready-for-market telemedicine system, (ii) a substantial market existed for the ITS System, (iii) ITS could deliver prompt, near term sales of that system to identifiable customers, and (iv) ITS was a viable corporation with valuable alternatives to entering into a joint venture with Raytheon.

The defendants claim that in fact none of these representations was true. Their argument runs as follows: Dr. Sanders told Mr. Stevens that he had designed and developed the ITS System, had provided it to MCG, and hence could also provide it to Raytheon. In fact, however, there was no "ITS System" in the sense of a tangible, operating configuration of telemedicine hardware and software components. As Dr. Sanders admitted in his deposition, there was no "touchable system" or "literal unit," but at most only what he described as "ITS know-how." n44

n44 "Sanders Dep. at 542-544, 418-22.

[*71]

Moreover, the system that had been installed at the MCG was one in which both MCG and CAE-Link had claimed proprietary rights. Indeed, defendants point out, MCG had previously warned Dr. Sanders that he could not claim that the MCG system was an ITS System, nor could Dr. Sanders develop it commercially without MCG's permission. MCG also had refused to give Dr. Sanders a letter crediting him with the design of the MCG System, which (defendants claim) was actually designed by CAE-Link. Defendants contend that during the contract negotiations Dr. Sanders knew all these facts, but never disclosed them to RSC.

The defendants contend that Sanders/ITS also misrepresented the size of the telemedicine market and ITS's ability to deliver near-term sales to identifiable customers. RSC's initial telemedicine market projections and the data that appeared in the MedTel business plan

were based on information provided by Drs. Sanders and Badreg. Yet, Dr. Sanders never told RSC that (i) for two years ITS had tried without success to sell the "ITS System" to virtually the same customers, and that (ii) two years earlier, Dr. Sanders had included virtually identical sales projections in ITS's own [*72] Business Plan and Company Overview, and that ITS had failed to meet those projections.

Lastly, defendants claim that Dr. Sanders (i) misrepresented ITS' status as a viable corporate entity, omitting to disclose that in fact ITS was insolvent, and (ii) told Raytheon that entities such as DEC, GTE, IBM and NASA were interested in entering into joint ventures with ITS, whereas in fact the party those entities really wanted to establish a telemedicine relationship with was MCG.

Raytheon and RSC contend that those misrepresentations were intentional and that the defendants relied upon them in entering into the JV Agreement. Defendants point specifically to their own executives' testimony that they would not have approved RSC's involvement with the joint venture had they known that there was no "existing" ITS System, or that there was no substantial telemedicine market, or that ITS had a negative net worth.

In response, the plaintiffs argue that Raytheon and RSC have failed to prove that any false statements were made, or that ITS acted with intent to deceive, or -that the defendants justifiably relied on those false statements if any in fact were made. More specifically, the plaintiffs [*73] insist that ITS never claimed to own a telemedicine system, or to have sold such a system to MCG, or to have integrated the MCG system. Nor did ITS ever claim to have the ability to "deliver" the MCG system to MedTel for demonstrations or any other purpose. Rather, plaintiffs urge, all that ITS did was claim that it designed and developed the MCG system. Plaintiffs further contend that ITS fully disclosed CAB-Link's role as the integrator of that system, and all that ITS told RSC and Raytheon was that it was capable of providing the same type of functional assistance in developing the MedTel system as it provided when developing the MCG system.

As for the size of the telemedicine market, plaintiffs concede that ITS "may have" told Raytheon that it believed there was a promising market for telemedicine and that ITS had identified customers to whom it believed it could sell its systems in the near term. Those representations, however, were "mere expressions of opinion as to probable future events," and as such cannot be deemed misrepresentations. n45 Moreover, argue plaintiffs, the defendants have failed to prove that those representations were materially false. The reason, they [*74] say, is that even if ITS had tried and failed to meet those projections, that would be irrelevant to MedTel's chances of success, because ITS lacked the financial, project management, and technological support that Raytheon would be providing to MedTel. It was therefore entirely reasonable for ITS to believe, and to represent to Raytheon, that MedTel had the potential for great success in marketing telemedicine systems.

> n45 Pl. Posttrial Reply Br. at 52 (quoting *Biasotto v Spreen, 1997 Del. Super. LEXIS 302, Del. Super., No. 96 C-04-030-WTQ, 1997 WL 527956,* at *8, Quillen, J. (July 30, 1997))

The plaintiffs further contend that RSC and Raytheon were not misled about ITS's financial circumstances. They point to Mr. Hofker's testimony that before the JV Agreement was signed, he forwarded to Mr. Stevens a Dun & Bradstreet report on ITS. That report showed that ITS was a small company with only four principals, of which the two active principals were medical doctors; and that ITS had zero sales, considerable debt, and low [*75] or negative net worth. Thus, RSC and Raytheon (through Stevens) were fully aware of ITS' size and weak financial condition at the time they entered into the JV Agreement.

Finally, the plaintiffs urge that even if ITS did make false representations, the defendants have adduced no direct evidence that ITS did so with intent to deceive, or that RSC and Raytheon justifiably relied on those representations. Regarding market projections, RSC and Raytheon knew that ITS was a small company whose principals never claimed to have conducted any telemedicine market studies. Raytheon, on the other hand, was a multinational corporation with immense resources, that was fully capable of conducting a market assessment, and that did conduct a market study informally through Mr. Stevens. n46 For that reason RSC/Raytheon could not have relied on representations by ITS about the telemedicine market, but even if RSC/Raytheon did rely, their reliance was not justified.

> n46 Stevens Dep., Vol. II at 71-75, 86.

The same conclusion [*76] is compelled, the plaintiffs argue, with respect to their representations about ITS's corporate viability and its ability to deliver a telemedicine system to MedTel. Because Mr. Stevens was aware of and reviewed the Dun & Bradstreet report which disclosed ITS's size and financial condition, that precludes any claim of justifiable reliance. Moreover, plaintiffs argue, the fact-that ITS did not integrate the

MCG system, and that the system would not be available for use by MedTel should have been no secret to Raytheon, because Dr. Sanders accompanied Raytheon representatives on an inspection of the MCG system and placed Mr. Stevens in contact with CAE-Link, which had performed the system integration.

### 2. Analysis

Having considered the multitude of arguments pressed by both sides, I conclude that the defendants have not established their fraudulent inducement claim, for two separate reasons.

First, there were no actionable misrepresentations regarding the size and viability of ITS, nor could there have been, because Mr. Stevens (and, hence, RSC and Raytheon) were aware of the material facts. During the negotiations leading to the JV Agreement, DeBakey's Mr. Frietsch obtained a [*77] Dun & Bradstreet report on ITS. Frietsch forwarded the report to DeBakey's Mr. Hofker, who then sent it to Mr. Stevens and discussed it with him. As Mr. Hofker testified:

> Frankly, we were surprised at the smallness or the size of ITS. We thought it was a more structured organization. . . . There were -- two of the prime movers were medical doctors, and while I have a great respect for medical doctors in the entrepreneurial business sense you would expect to find a businessperson with them, and my recollection is that their sales were zero dollars and that their indebtedness was considerable. They were either a low net worth, no net worth or negative net worth company and this concerned us a little bit because ..that's not what we were expecting.
>
> Q. Was that information transmitted to Mr. Stevens?
>
> A. It was transmitted and discussed by me with him. n47

n47 Tr. at 651-652.

An essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented. [*78] n48 Here, RSC and Raytheon (through Stevens) were aware of ITS's size and tenuous financial condition. That knowledge precludes any claim that they were defrauded with respect to those subjects.

n48 " *Merrill v. Crothall-American, Inc.,* *Del. Supr., 606 A.2d 96, 100 (1992)*

The defendants' other fraud counterclaims -- based upon ITS's alleged misrepresentations concerning the size of the telemedicine market and ITS's ability to deliver a telemedicine system to MedTel -- fare no better, although for a different reason. Another essential element of a fraud claim is that there be reasonable or justifiable reliance by the defrauded party, with the burden of proof resting upon the proponent of the claim (here the defendants). n49 In this case I assume (without deciding) that ITS falsely represented the size of the telemedicine market and ITS's ability to deliver a telemedicine system to MedTel. Even so, the defendants have not persuaded me that they relied justifiably upon ITS's representations concerning [*79] its ability to deliver a telemedicine system, or that they relied at all (let alone justifiably) on ITS's representations about the size of the telemedicine market.

n49 *Simons v. Cogan, Del. Supr., 549 A.2d 300, 304 (1988)*

Addressing these claims in reverse order, it is manifest that Raytheon, a multinational corporation, had ample resources to conduct a study of the size of the telemedicine market. And before entering into what for Raytheon would be an entirely new business, it is reasonable to suppose that a firm of that size and sophistication would perform such a market study, to determine whether the potential rewards of entering that new business outweighed the financial risk. Indeed, RSC/Raytheon did perform a study of sorts, albeit informally through Mr. Stevens, who collected market information from ITS, from an Arthur D. Little study, from media articles, and from DeBakey, Massachusetts General Hospital, MCG, and local Massachusetts and Rhode Island medical centers. n50 Thus, the [*80] market-related information supplied by ITS was only one component of a larger mix of information upon which defendants relied. That fact makes it difficult for defendants to carry their burden of proving that they relied upon--and were misled by--only one single informational component--the supplied by ITS.

n50 Stevens Dep., Vol. I at 76, 72-75.

But even if RSC/Raytheon did rely upon ITS's market information, their reliance was not justified. The

indisputable fact, and this claim's fundamental flaw, is that the due diligence that RSC/Raytheon performed in 1993 was inadequate, as evidenced by the Fletcher Spaght market study that Raytheon commissioned one year later. That market study revealed that the size of the telemedicine market was far smaller than RSC/Raytheon had initially concluded. By asserting their fraud counterclaim, the defendants are seeking, in effect, to shift the cost of their inadequate due diligence to the plaintiffs. The defendants attempt to achieve that result by arguing that they were [*81] entitled to rely exclusively upon what ITS told them. That argument conveniently ignores the fact that the defendants did not rely solely on ITS 's representations, but, instead had performed due diligence (however perfunctory) on their own. Besides attempting (counterfactually) to narrow the universe of their "reliance" information to that provided by ITS, the defendants also insist that their reliance was justified, because "RSC limited its risk by limiting its commitment to $ 2 million . Given the level of financial commitment, it made little economic sense to do more than rely on the representations of the seemingly trustworthy partners." n51

n51 Raytheon's Posttrial Reply Br., at 24-25.

That argument turns logic and common sense on its head, because the consequence of RSC having "limited its risk" is the precise opposite of what RSC contends. RSC could have performed an adequate market study before executing the JV Agreement, but it did not. Instead, RSC/Raytheon made a cost-benefit analysis, and apparently [*82] decided that a less-than-careful job of due diligence would suffice, because their financial risk was limited to $ 2 million. RSC/Raytheon were free to make that economic choice, but it must live with its consequences. RSC/Raytheon cannot shift those consequences to a nonconsenting third party. To say it differently, RSC/Raytheon cannot enjoy the benefit of limiting its risk of loss to $ 2 million, yet be permitted to avoid the accompanying burden, by shifting that entire risk to the plaintiffs on a theory that RSC/Raytheon "justifiably relied" on what ITS told them. To the extent it can truthfully be argued that the defendants relied at all upon ITS's representations concerning market size, their reliance was not justified.

The fraud claim that is based on ITS's representation about its ability to deliver the "ITS System" installed at MCG, must be rejected for the same reason. Raytheon's Mr. Brond testified that RSC normally performs due diligence on third parties before entering into agreements with them. In this connection Mr. Stevens did perform some due diligence by (inter alia) visiting MCG on

several occasions. Because two critical premises of the joint venture arrangement [*83] were that (i) an "ITS System" actually existed, and (2) ITS owned the system and could lawfully transfer it to MedTel, reasonable due diligence would have included, at a minimum, an effort to obtain and inspect the evidence (including pertinent documents) that would validate those premises. There is no claim or showing that Mr. Stevens or anyone else at RSC/Raytheon sought access to that evidence.

n52 Tr. at 1779-80.

Alternatively, absent careful due diligence, RSC/Raytheon should have formalized RSC's representations by insisting that they be expressed and included in the JV Agreement as contractual representations and warranties. That omission was especially significant here, because RSC/Raytheon's knowledge of ITS's shaky financial condition, of the small size of ITS's organization and its lack of in-house technical capability, should have alerted RSC/Raytheon to the need for reliable assurance on that score. Because RSC/Raytheon did not do that or conduct adequate due diligence on these subjects, it has [*84] not established that its reliance on ITS's representations was justified.

In reaching these conclusions, I considered two other factors. I have already alluded to the first--the absence of any express provision in the JV Agreement that would have protected RSC/Raytheon against misrepresentations. If it was truly important that RSC/Raytheon be assured that ITS had, in fact, a functioning telemedicine system that ITS owned and could lawfully transfer to MedTel, it would have been reasonable--indeed, customary--for RSC/Raytheon to insist that that assurance be expressed as representations and warranties in the JV Agreement. The absence of such contract protections suggests that RSC/Raytheon did not believe that it needed them, presumably because they had performed their own due diligence and were willing to accept the risk that their due diligence might later turn out to be inadequate.

The second factor is RSC/Raytheon's own conduct, which is inconsistent with their claim--amplified by the decibel level of the rhetoric in their briefs--that they were victims of a heinous fraud. If that were truly the case, then one would expect RSC/Raytheon, as plaintiffs, to have sued on their [*85] fraud claim promptly after learning what they contend were the true facts. They did not. Instead, they asserted fraud as a counterclaim long afterwards, in response to the plaintiffs' own delayed filing of this action. Again, the logical inference is that but for the plaintiffs' bringing this lawsuit, no counterclaim would have been filed. That inference

becomes stronger when one considers the two possible scenarios that would shed light on RSC/Raytheon's delay. The first would require us to suppose that RSC/Raytheon knew they had been grievously defrauded, yet would have been content to sit by indefinitely, in stoic silence as wounded fraud victims, but for the plaintiffs' happenstance filing of this lawsuit, which stirred the defendants to act. Such passive reluctance to right so egregious a wrong seems incongruous for a corporate colossus that has achieved such success in an economic environment as competitive as ours. The second, more plausible, scenario is that RSC/Raytheon was unable to conclude that the plaintiffs had defrauded them, but nonetheless asserted the fraud counterclaim as a litigation tactic when it became clear that they would be put to the cost and risk of [*86] defending this lawsuit.

Whatever may be the explanation, the defendants have failed to prove the element of justifiable reliance. For these reasons the defendants' counterclaim for fraud is rejected.

### B. The Breach of Contract Claim

RSC also claims that both ITS and DeBakey are liable for breach of the JV Agreement--ITS by failing to deliver the ITS System, and DeBakey, for failing to deliver sales. Neither claim, in my view, has merit.

### 1. The Claim Against ITS

The claim against ITS is grounded upon what defendants contend was ITS's contract obligation to deliver to the joint venture "the configuration of telemedicine systems developed and/or used by ITS as of July 31, 1993..." n53 The difficulty with this argument is that the quoted contract language does not require ITS to "deliver" these telemedicine systems. All it requires is that "during the term of [the JV] Agreement, the partners... will endeavor to obtain contracts for the [Partnership] to provide telemedicine capabilities, using the configuration of telemedicine systems developed and/or used by ITS as of July 31, 1993... ." n54 The defendants do not point to any other contract provision as a source [*87] of the obligation that they claim was breached, nor do they rely upon an oral agreement as that source.

n53 JV Agreement, PX 55, at § 3.3 (a).

n54 Id. (Emphasis added).

While the defendants may indeed have come away from the contract negotiations with the view that ITS had that obligation, they did not see fit to create it in the JV Agreement. The only obligation imposed by that portion of the Agreement upon which defendants rely is that "the partners individually and collectively" would "endeavor to obtain contracts" to sell MedTel's telemedicine system, based on the configuration previously developed or used by ITS for the MCG. There is no evidence that ITS did not "endeavor" to do that. Accordingly, the contract claim against ITS fails.

### 2. The Claim Against DeBakey

Of the 285 pages of posttrial briefs, the argument supporting the defendants' contract claim against DeBakey occupies one short paragraph:

> Separate and independent of ITS, [DeBakey] breached the JV Agreement by [*88] failing to deliver any sales to the Partnership. Like ITS, [DeBakey] represented in the JV Agreement that it possessed "unique knowledge and sources of knowledge concerning medical facilities and other potential users... which can contribute to and benefit substantially from the business of telemedicine." DX177 at 1. [DeBakey] made clear during the parties' extensive discussions and negotiations that it possessed exclusive contracts that could deliver immediate sales to the Partnership [citation omitted] Again, no sales were obtained. [citation omitted] n55

n55 Def. Posttrial Reply Br. at 112.

A cursory reading of the JV Agreement shows why the defendants have so little to say in support of this claim: nowhere does the JV Agreement expressly obligate DeBakey--or any other partner-- to achieve (i) any sales (ii) in any specific dollar amount. Indeed, the language upon which defendants rely is excerpted from one of the Agreement's six "Whereas" recitals. That language does not appear in any of the [*89] substantive, obligation-creating provisions, nor is it designated as a contract representation or warranty.

If the defendants thought it essential to obligate DeBakey and/or ITS to deliver sales, the way to accomplish that would have been to insert into the JV Agreement an express requirement that DeBakey achieve a specified level of sales on or before a date certain. No such requirement appears in the Agreement. The only arguably relevant provision that does appear is the above-quoted language that "the partners individually and collectively... will endeavor to obtain contracts for the [Partnership]." n56 Thus, although DeBakey may

2000 Del. Ch. LEXIS 129, *

have represented during the negotiations that it had agreements with third parties that might translate into immediate sales, the parties chose not to convert that representation into an enforceable promise. Instead, all they did was require all partners to "endeavor" to make sales of the described telemedicine units.

n56 JV Agreement, PX 55, at § 3.3 (a).

Because it is based [*90] upon a contract obligation that did not exist, the contract counterclaim against DeBakey fails.

## VII. CONCLUSION

For the reasons previously discussed, the Court concludes that none of the parties' claims and counterclaims have merit. Accordingly, judgment will be entered against the plaintiffs, and in favor of the defendants, on the plaintiffs' claims; and judgment will be entered against the defendants, and in favor of the plaintiffs, on the defendants' counterclaims. An order implementing these determinations is enclosed herewith.

## ORDER

For the reasons set forth in this Court's Opinion of even date, it is hereby ORDERED, DECREED, and ADJUDGED this 25th day of August, 2000 as follows:

1. Judgment is entered in favor of the defendants, and against the plaintiffs, on each and all of the plaintiffs' claims.

2. Judgment is entered in favor of the plaintiffs, and against the defendants, on each and all of the defendants' counterclaims.

3. Each party shall bear its own costs.

# EXHIBIT B

LEXSEE 1988 U.S. DIST. LEXIS 1497

**Algernon Blair Group, Inc. and Algernon Blair Services Corp. v. F. Bruce Corneal, Jr. Corneal Development Company Corneal/Alden Limited Partnership and Charles T. Cudlip**

**Civil Action No. 86-4465**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1988 U.S. Dist. LEXIS 1497*

**February 18, 1988, Decided**

**COUNSEL:** [*1]

Mark C. Schultz, Esq., Stanley M. Joffe, Esq., by: Benjamin E. Zuckerman, Esq., for Plaintiffs.

Kevin R. Reitz, by: James G. Rosenberg, Esq., for Defendants.

**OPINIONBY:**

McGLYNN

**OPINION:**

MEMORANDUM OF DECISION

McGLYNN, J.

Plaintiffs Algernon Blair ("Algernon Blair") and defendants Corneal ("Corneal") entered into a joint venture to acquire, manage and develope the Alden Park Manor Apartments. Plaintiffs had a 70 % interest and defendants 30 %. The partners had a parting of the ways and entered into a settlement agreement which contained a "buy-sell" clause. Thereafter, the defendants sold the building, used the proceeds to meet their obligations under the settlement agreement and also retained a handsome profit.

Thereafter, the plaintiffs brought this action claiming fraud and breaches of fiduciary duties by defendants in the usurpation of a partnership opportunity. Defendants contend that there was no fraud and because the parties were in an adversarial position after the execution of the settlement agreement, they had no obligation to apprise plaintiffs of the opportunity to sell the project.

The matter was tried to the court without a jury. Upon consideration of the evidence and the briefs and arguments [*2] of counsel, the court makes the following.

FINDINGS OF FACT

1. Algernon Blair Group, Inc., a Delaware corporation, and Algernon Blair Services Corp., an Alabama corporation (collectively "Algernon Blair"), are citizens of Alabama engaged in real estate construction and management activities.

2. F. Bruce Corneal, Jr. is an individual doing business in Washington, D.C. Corneal Development Company is a sole proprietorship owned by Mr. Corneal and located in Washington, D.C. Corneal/Alden Limited Partnership is a limited partnership of which Mr. Corneal is the sole general partner. The Corneal group is engaged in the real estate construction and management business, specializing in historic rehabilitation projects.

3. The following entities shall be referred to collectively as "Hudson": Hudson Equities, Inc., a New Jersey corporation controlled by Bennett Kaplan and Ephraim Hasenfeld; and Eastview Realty, a New Jersey general partnership controlled by Mr. Kaplan and Mr. Hasenfeld.

1988 U.S. Dist. LEXIS 1497, *

4. In July and August 1984, Algernon Blair Services Corp. and the Corneal Development Company formed the Corneal -- Blair Joint Venture ("Joint Venture") to acquire and renovate the Alden Park Apartments ("Alden [*3] Park"), an historic apartment complex located in the Germantown section of Philadelphia. The original partners were later replaced by the Corneal/Alden Limited Partnership and Algernon Blair Group, Inc., respectively.

5. Under a letter agreement dated July 16, 1984 (the "partnership Agreement"), Algernon Blair had a 70 % share of the Joint Venture and the Corneal Group held 30 %. Pursuant to this agreement Algernon Blair loaned the Joint Venture $ 5,000,000 to purchase Alden Park and to fund management and renovation of the project. A handwritten addendum to the Partnership Agreement, dated August 21, 1984, provided that "[a]ll significant decisions regarding the [Alden Park] property shall require consent of both parties."

6. During 1985 a fundamental rift formed in the partnership. The Corneal group wanted to develop Alden Park and remain associated with the project. Algernon Blair, on the other hand, wanted to develop and sell the property.

7. The partners had significantly different views regarding the profitability of the project. Algernon Blair believed that development expenses would be much greater than the Corneal group's projections, and believed that the income-producing [*4] potential of the property was substantially lower than the Corneal Group had estimated.

8. Also during 1985, Algernon Blair developed a lack of confidence in Mr. Corneal personally, as well as a high level of dissatisfaction with the terms of the Partnership Agreement. Specifically, Algernon Blair became increasingly frustrated with the requirement that all significant decisions regarding the property required joint consent.

9. During 1985, the relationship between the partners deteriorated to a point where Algernon Blair believed it was impossible to advance the project with Corneal as its partner.

10. In the Summer and Fall of 1985, Algernon Blair told the Corneal group that they were no longer enthusiastic about developing Alden Park, and suggested that the Corneal group buy out Algernon Blair's share in the Joint Venture for $ 6.5 million. Algernon Blair understood that the Corneal group itself did not have the resources to produce such purchase monies, and therefore invited the Corneal group to undertake a search for a new partner.

11. In the Fall of 1985, the Corneal group made active efforts to find a new partner, and presented two offers to buy out Algernon Blair's share in [*5] the Joint Venture. Both offers were rejected by Algernon Blair.

12. In November 1985, Algernon Blair brought suit against the Corneal group for payments due on a $ 1,000,000 loan given Corneal by the Joint Venture in 1984. In addition, Algernon Blair filed a mortgage foreclosure action against the Joint Venture itself for payments due in connection with a mortgage held by Algernon Blair on Alden Park.

13. The November 1985 lawsuits were designed to remove the Corneal group from the Joint Venture and to bring the partnership relationship between Algernon Blair and the Corneal group to an end.

14. Ultimately, the 1985 lawsuits and all outstanding disputes between Algernon Blair and the Corneal group were resolved in a Settlement Agreement executed on January 21, 1986 (the "Settlement Agreement").

15. Under the Settlement Agreement, Mr. Corneal or his nominee was granted an option to purchase Algernon Blair's 70 % interest in the Joint Venture for a fixed cash price of $ 6.2 million.

16. If the Corneal group failed to exercise this option within the time prescribed by the Settlement Agreement, however, the Corneal group would become obligated to sell its 30 % interest to Algernon [*6] Blair for one dollar, together with forgiveness of a $ 1 million note outstanding to Algernon Blair.

17. Under the Settlement Agreement, the Corneal group was given a 120-day period (the "option period"), until May 21, 1986, to obtain the $ 6.2 million necessary to exercise its option. If the Corneal group failed to produce funds by the May 21 deadline, its interest in the Joint Venture would be lost.

18. The Settlement Agreement contained no provision or mechanism for altering the valuations it placed on the partners' respective shares during the interim period following its execution on January 21, 1986 through closing.

19. Paragraph 16 of the Settlement Agreement provided as follows:

16. Entire Agreement

This Agreement, including the Exhibits attached hereto, sets forth the final and entire agreement between the parties hereto with respect to the resolution of all disputes between them and is intended to be an integration of all prior negotiations and understandings with respect thereto. All parties and their representatives

or agents shall not be bound by any terms, conditions, statements, warranties, or representations, oral or written, expressed or implied, not set forth [*7] or incorporated herein. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all parties. No waiver of any of the provisions of this Agreement shall be valid unless the same is in writing and is signed by the party against which it is sought to be enforced.

20. On January 21, 1986 and thereafter, Algernon Blair knew that the Corneal group did not itself have funds sufficient to exercise the purchase option under the Settlement Agreement, and that the Corneal group needed to locate a source of such funds.

21. The Settlement Agreement placed no limitation upon the source of funds to be used by the Corneal group to exercise its option. It did not require the source of funds to be a lender or new partner of the Corneal group.

22. The Settlement Agreement contained no provision obligating the Corneal group to retain an equity ownership interest in Alden Park following acquisition of Blair's 70 % interest in the joint venture.

23. The Settlement Agreement contained no provision prohibiting or limiting the Corneal group's ability to dispose of all or part of the Joint Venture interest in the property following acquisition of Algernon Blair's [*8] 70 % share.

24. After execution of the Settlement Agreement on January 21, 1986, the Corneal group made numerous, simultaneous efforts to obtain the $ 6.2 million required to exercise its purchase option in time for the May 21, 1986 deadline. The Corneal group made a substantial effort to secure interim loan financing through Standard Federal Savings & Loan Association ("Standard Federal") sufficient to fund the purchase option. In addition, the Corneal group attempted to secure a permanent loan from Puller Mortgage Associates, Inc. ("Puller"). In connection with these efforts, the Corneal group paid application fees of $ 25,000 to Standard Federal and $ 25,000 to Puller. The Corneal group devoted substantial time and expense to providing the necessary information and loan documentation to both lenders.

25. During the option period, the Corneal group also searched actively for a new partner to form a new joint venture to develop Alden Park. The Corneal group approached numerous persons and entities as prospective partners, including Investment Services, Inc., the Nordheimer Group, JCS Diamond Associates, Liberty Mutual Co., Federal Housing Corp., Asher Sky and John Mason.

26. In addition, [*9] Hudson first approached the Corneal group during the option period and expressed an interest in purchasing Alden Park. The Corneal group, however, attempted to persuade Hudson to form a partnership to develop the property.

27. The Corneal group did not inform Algernon Blair of its contacts or negotiations with the Hudson defendants at any time before June 2, 1986.

28. As May 21, 1986 approached, it became evident to the Corneal group that Standard Federal would not close on its loan commitment by that deadline. On or about May 21, 1986, an extension of time under the Settlement Agreement was negotiated at arms length between Algernon Blair and the Corneal group. Under the terms of the extension agreement, the Corneal group paid $ 300,000 for an extension until June 2, 1986 to exercise its purchase option. It was agreed that half of the $ 300,000 would be credited toward the $ 6.2 million purchase price if the Corneal group succeeded in exercising its purchase option in time. If the Corneal group failed, however, the entire $ 300,000 would be forfeited.

29. In a letter agreement granting the extension, the parties stipulated that the remaining provisions of the Settlement Agreement [*10] would "remain in full force and effect."

30. On June 2, 1986, a closing was held between the Corneal group and Algernon Blair pursuant to the Settlement Agreement. Algernon Blair was paid $ 6,050,000 in cash, which, together with the $ 150,000 credit from the extension fee, constituted the full $ 6.2 million purchase price due of the Settlement Agreement. In exchange, Algernon Blair assigned its 70 % interest in the Joint Venture to the Corneal group.

31. Following the acquisition of Algernon Blair's 70 % interest in the Joint Venture, the Corneal group caused the Joint Venture to assign all of the Joint Venture's partnership interest in Alden Park Associates, Ltd. ("APAL") to Hudson.

32. The Corneal group still owns and controls the Corneal-Blair Joint Venture, including the 70 % share of the Joint Venture purchased from Algernon Blair.

33. No negotiations of any kind between the Corneal group and Hudson began until after the Settlement Agreement was executed on January 21, 1986. Hudson first visited the Alden Park property on January 23, 1986.

34. Mr. Corneal and representatives of the Hudson group met for the first time on February 10, 1986. At that meeting Mr. Corneal expressed [*11] his interest in finding a joint venture partner for the Corneal group. Hudson stated that they were interested only in

discussing a purchase of the property from the Corneal group. The Corneal group and Hudson reached no agreement regarding either a joint venture transaction or a sale of Alden Park at the February 10, 1986 meeting.

35. After the February 10, 1986 meeting, Hudson made four successive written purchase offers to the Corneal group in the period of February 13, 1986 through April 4, 1986. None of these offers was accepted by the Corneal group. Indeed, the Corneal group did not respond to any of the four offers.

36. Throughout the option period under the Settlement Agreement, it was Corneal's desire and preference to retain an ownership interest and development role in Alden Park. The Corneal group continued throughout the option period to pursue loan funding from Standard Federal and Puller, and continued to pursue prospective partners other than Hudson.

37. In late April or early May 1986, Hudson represented to the Corneal group that Hudson was prepared to discuss a joint venture arrangement. The principals of the two groups met on May 8, 1986, and signed a letter of [*12] intent providing that the Corneal group would sell all of its interest in Alden Park (after acquiring Algernon Blair's 70 % share in the Joint Venture) to Hudson. The letter of intent provided that the Corneal group would thereafter be entitled to a 6 % investment tax credit in the Alden Park project and a 5 % interest in future profits.

38. At the May 8, 1986 meeting, Hudson represented to the Corneal group that Hudson was willing to go to closing by May 21, 1986, in time for the Corneal group's deadline with Algernon Blair. Hudson stated to the Corneal group that they had sufficient financial resources to consummate a closing by that date. Paragraph 10 of the letter of intent reflected Hudson's ability to close "no later than May 21, 1986."

39. The letter of intent further provided that, in order for its terms to be effective, a definitive sales agreement had to be executed no later than May 14, 1986 and a deposit of $ 1 million of $ 500,000 would be paid by Hudson to the Corneal group at that time. Corneal and the Hudson group failed to reach, or even draft, a definitive sales agreement by May 14, 1986 and no deposit was paid by Hudson.

40. During the option period, Mr Corneal [*13] viewed the negotiations with Hudson as a back-up or safety net in the event that arrangements for a loan through s=Standard Federal or Puller could not be concluded under Algernon Blair's deadline, or the deadline could not be extended.

41. Throughout May of 1986, the Corneal group continued to work with Standard Federal to obtain loan

financing sufficient to purchase Algernon Blair's 70 % interest in the Joint Venture. On or about May 16, 1986, Standard Federal informed Mr. Corneal that it was not prepared to close by May 21, 1986, asserting that further loan documentation was necessary.

42. Mr. Corneal attempted to persuade Standard Federal to close by the May 21 deadline and, when that proved impossible, to convince Standard Federal to close within a short time thereafter. Standard Federal assured Mr. Corneal that it could reach closing no later than June 2, 1986.

43. As set forth at 28-29 above, the Corneal group negotiated an extension of time with Algernon Blair until June 2, 1986 in which to exercise its purchase option.

44. During the period between May 21, 1986 and June 2, 1986m it became increasingly apparent to the Corneal group that Standard Federal would not be prepared [*14] to close by the new deadline of June 2. The Corneal group attempted to obtain a further extension from Blair, but was unsuccessful. During this period, negotiations between the Corneal group and Hudson were intensified.

45. Two closings were held on June 2, 1986. First, the Corneal group performed under the Settlement Agreement and closed with Algernon Blair. Second, the Corneal group and Hudson agreed to an incomplete closing, which they called an "interim closing", which solidified the transaction between Hudson and Corneal to the point where Hudson agreed to supply funds sufficient for the Corneal group to exercise its option to purchase Algernon Blair's share of the Joint Venture.

46. The Corneal group continued to engage in negotiations with Hudson into the day of June 2, 1986, and ultimately reached agreement on June 2 that the Corneal group would sell all of the Joint Venture's partnership interest in APAL to Hudson. During these negotiations, Hudson insisted that they would no longer agree to include the Corneal group as a limited partner in the project. The Corneal group ultimately agreed to those terms.

47. Representatives of Algernon Blair were present on June 2, 1986, [*15] in a separate room, while negotiations between the Corneal group and Hudson proceeded.

48. On June 2, 1986, after the basic terms of the transaction between Hudson and the Corneal group has been orally agreed upon, Hudson insisted that Algernon Blair be informed that Hudson was purchasing the Alden Park property. Hudson took the position that they would not go forward with the transaction unless Algernon Blair was so informed. The Corneal group held the view

that such disclosure was not necessary, but assented to Hudson's request that such disclosure be made.

49. In the mid-afternoon of June 2, 1986, Bennett Kaplan, one of Hudson's partners, entered the Algernon Blair conference room together with his partner Ephraim Hasenfeld, his lawyers, Henry Sill Bryans and Vince Maltese, as well as Edward F. Beatty, Jr., William A. Duerk, and others. Also present were representatives of Algernon Blair, including James M. Adams, III, Stephen Boston, and Aaron Jay Beyer. At this meeting, Bennett Kaplan announced that Hudson and the Corneal group had reached an agreement under which Hudson would be the new owner of the property.

50. In response to this announcement, Algernon Blair's president, James [*16] M. Adams, III, stated that Algernon Blair did not care what the deal was between the Corneal group and Hudson "as long as the money is green."

51. Algernon Blair's representatives and lawyers made no inquiry at any time throughout June 2, 1986 regarding the Hudson-Corneal transaction.

52. The final terms of the sale agreement between Hudson and the Corneal group were not concluded until November 26, 1986.

DISCUSSION

Except for the findings contained in paragraphs 49 and 50, the historical facts cited above are essentially undisputed. Plaintiffs contend that at the June 2, 1986 meeting they were advised only that Hudson was buying Algernon Blair's 70 % interest, and there is evidence that supports their contention. On the other hand, the Corneal defendants contend that there was a full disclosure by Bennett Kaplan, one of the principals in Hudson, specifically that they were buying 100 % of Alden Park, and there is evidence to support this contention. Although I am not convinced that a resolution of this conflict in the testimony would be controlling, both sides laid great emphasis on the impact of this event on their respective positions. After thorough evaluation of the evidence [*17] against the background of the interests of the witness in the outcome of the case, their demeanor on the witness stand and the witness' ability to recall the events, I have resolved the conflict in favor of the defendants. I credited the testimony of the person who made the disclosure as well as that of his attorney who insisted on the disclosure despite the protest of the Corneal group. I am also convinced that the Algernon Blair Group were so pleased to get their money and to bring the matter to a conclusion that they were unconcerned about the terms and conditions of the agreement between Hudson and Corneal. Algernon Blair concedes that they did not ask either the Hudson

representatives or the Corneal representatives about the purchase price.

The issue in this case is whether Algernon Blair is entitled to share in the profits of the sale of Alden Park to Hudson. Plaintiff contends that under the familiar rules governing the operation of a partnership, Corneal had a fiduciary duty to act for the benefit of the joint venture and not gain an advantage at the expense of Algernon Blair. The defendant argues that the settlement agreement of January 21, 1985 significantly altered the [*18] relationship of the parties and that the buy-sell clause placed them in an arms-length posture each free to pursue its own interest.

I am in accord with the defendants' position. The settlement agreement established the price at which one side or the other would be brought out. Whether the value of the partnership interest increased or decreased after that point is immaterial because the price had been fixed. Corneal tried to get financing in order to buy out Algernon Blair and when that failed he sought other partners and when that failed he raised the money to buy out Algernon Blair by agreeing to sell the principal asset to Hudson which, in turn, supplied the money to buy out Algernon Blair. Algernon Blair got exactly what it bargained for.

I could agree with plaintiff's position if there were a committed purchaser waiting in the wings at the time the settlement agreement was executed. But that was not the case here. There had been prospective buyers who looked at the property but there was no offer until Hudson made a series of four offers between February 13, 1986 through April 4, 1988, none of which was accepted by Corneal.

There is no duty to disclose matters affecting the value [*19] of the assets once the buy out price has been determined since it would serve no purpose. See *Kaufmann v. Kaufmann, 222 Pa. 58 70 A. 956 (1908)* In *Graham v. Stratton, 339 F.2d 1004 (7th Cir. 1964),* the court stated at 1008:

that [the partnership agreement] permitted whichever partner who survived to purchase the deceased partner's interest on stated terms and conditions which resulted in a right to effect such purchase for a sum less than actual value of the interest does not subject such agreement to attack a breach of the relation of trust and confidence which exists between partners.

The court held that where a partnership agreement gave the surviving partner an option to purchase a deceased partner's share determined by a fixed formula the surviving partner had no duty to inform the deceased

partner's representatives of ongoing negotiations with a third party.

Similarly in *Patrick v. Bowman, 149 U.S. 411 (1893)*. The operating partner of a mine in Leadville, Colorado entered into an agreement on July 16, 1882 to purchase the interest of his partner who was then residing in Wisconsin. Less than a month later, that is, on August 13, 1882, "pay mineral" was found [*20] which greatly enhanced the value of the mine. The fact was not disclosed to the selling partner at any time prior to the closing on October 19, 1882. In an action by the selling partner to rescind the transaction for fraud and breach of fiduciary duty, the court, in mandating a dismissal of the complaint, held that there was no obligation to inform his partner of the discovery of the ore. *149 U.S. at 426*.

I am persuaded that the principle enunciated in these cases is controlling here and that Corneal was under no obligation to disclose his negotiations with Hudson.

It is also notable that the parties conducted themselves in an adversarial manner. For example, Algernon Blair insisted on the payment of $300,000 for a ten day extension of the May 21, 1986 contract, albeit with $150,000 being credited against the purchase price. For an additional 30 day extension Algernon Blair wanted one million dollars.

Of further significance is Algernon Blair's acknowledgement that had it known of the Hudson interest, it would not have granted the extension to Corneal and then would "have exercised its purchase option and would have received all of the Hudson proceeds", (Plaintiff's Supplemental [*21] Trial Memorandum pp. 17-18), thus exercising its option to buy which would foreclose Corneal from participating in the profits from the Hudson deal - the very thing that Blair contends Corneal cannot do. That is precisely what motivated Corneal in withholding the information. This demonstrates beyond peradventure that with respect to the rights and obligations of the parties under the settlement agreement, they were adversaries and neither had any fiduciary duty with respect to the other.

Plaintiff's fraud claim must also fail since I have found that after January 21, 1986 there was no duty on the part of Corneal to disclose to Algernon Blair the steps it was taking in order to obtain the wherewithal to buy out Algernon Blair's interest, no fraud can be based on such non-disclosure.

Algernon Blair's contention that it was led to believe that the purchase of its interest would be financed by a loan and not by a sale of the assets does not amount to fraud because the manner in which the money was raised is immaterial. Algernon Blair failed to establish any material misrepresentation or omission upon which it

relied and certainly not by clear and convincing evidence. In any event, by [*22] June 2, 1986 at the closing, Algernon Blair knew that a purchaser was supplying the money and not a lender.

In the final analysis, if Algernon Blair wanted to participate in the rise in the value of the assets between the time of the Settlement Agreement and the expiration of Corneal's option, it could have done so by writing such terms into the agreement. It did not, and understandably so because they had lost their enthusiasm for the project, were less than optimistic about its prospects and wanted to get their money out without any further risk. They bargained for and obtained a fixed price which more than covered their investment. They got what they wanted. I can find no basis for rescinding the January 21st Settlement Agreement, or for allowing Algernon Blair to participate in the profits of the sale of Alden Park to Hudson.

Accordingly, I arrive at the following

CONCLUSIONS OF LAW

1. Under Pennsylvania's Uniform Partnership Act, the "rights and duties of the partners in relation to the partnership [are] subject to any agreement between them." *59 Pa. C.S.A. § 331* (Purdon Supp. 1986). Agreement between partners, as modified or revised from time to time, are the "law of the [*23] partnership." *Boland v. Daly, 455 Pa. 467, 472, 318 A.2d 329, 332 (1974), O'Donnell v. McLoughlin, 386 Pa. 187, 191, 125 A.2d 370, 372 (1956)*

2. The Settlement Agreement between the Corneal group and Algernon Blair dated January 21, 1986 was a valid and enforceable contract which superseded the Partnership Agreement and controlled the rights and duties of Algernon Blair and the Corneal group in relation to their partnership, See *Wathen v. Brown, 200 Pa. Super. 620, 625, 189 A.2d 900, 902 (1963)*.

3. The Settlement Agreement reflected the intention of Algernon Blair and the Corneal group to terminate their partnership forever. As such, the Settlement Agreement effected a dissolution of the Corneal-Blair partnership. See *Girard Bank v. Haley, 460 Pa. 237, 243, 332 A.2d 443. 446-47 (1975)* (dissolution occurs when partners agree that they will end their relationship or when any partner unilaterally expresses an intent to end the relationship

4. The Settlement Agreement further fixed the terms of the wind-up of the partnership relationship as of the date of its execution, including a fixed determination of the relative values of the partnership shares held by Algernon [*24] Blair and the Corneal group.

5. The Settlement Agreement was a fully integrated document and stated the entire and exclusive agreement of the parties with respect to dissolution and wind-up of their partnership.

6. The Corneal group's fixed price right to purchase Algernon Blair's partnership interest was valid and enforceable regardless of an increase in the market value of the partnership property which was the subject of the purchase option. *Kaufman v. Kaufman, 222 Pa. 58, 70 A. 956 (1908), Stoner Estate, 73 D. &C. 2d 82 (Leb. Co. 1974), Mumma v. Hinkle, 73 Dauph. 189, 196 (1958)*

7. The Corneal group had no fiduciary duty to Algernon Blair to disclose matters affecting the value of Alden Park that arose after the Settlement Agreement was executed on January 21, 1986. Consequently, the Corneal group had no duty to disclose to Algernon Blair its knowledge of Hudson's interest in purchasing Alden Park. *Patrick v. Bowman, 149 U.S. 411, 420 (1892), Graham v. Stratton, 339 F.2d 1004, 1008* (7th Cir, 1964).

8. Algernon Blair was in fact apprised on June 2, 1986 of the nature of the transaction between the Corneal group and Hudson. Algernon Blair thereafter accepted [*25] performance by the Corneal group under the Settlement Agreement. Accordingly, Algernon Blair has waived any claim it might have possessed that the Corneal group breached a duty to disclose its transaction with Hudson. See *Heath v. Van Sickle, 241 N.W. 195, 196 (Mich. 1932), Davis v. Green, 193 P.2d 1003, 1004 (Or. 1948)*

9. To prevail on its claim for common law fraud, plaintiff must prove (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result. *Timco Engineering, Inc. v. Rex & Co., 603 F.Supp. 925, 930 (E.D. Pa. 1985)*

10. Plaintiffs bear the burden of proving their fraud allegations by "clear, precise and undubitable" evidence. *Mancini v. Morrow, 312 Pa. Super. 192, 458 A.2d 580, 584 (1983)*

11. Nondisclosure of information material to a business transaction is not fraudulent absent an affirmative duty to disclose in light of all the circumstances. *Hirsch v. Silberstein, 424 Pa. 352, 227 A.2d 638, 639 (1967), American Metal Fabricators Co. v. Goldman* [*26] *, 227 Pa. Super. 284, 323 A.2d 891, 894 (1974), City of Harrisburg v. Bradford Trust Co., 621 F.Supp. 463. 473 (M.D. Pa. 1985)*

12. A purchaser of real estate ordinarily has no duty to disclose to his seller knowledge of facts or possible business opportunities materially affecting the value of the property to be sold. *Guaranty Safe Deposit & Trust Co. v. Liebold, 207 Pa. 399, 51 A. 951 (1904)*

13. Defendants are not liable for fraud because: (1) All representations made by the Corneal group and its representatives to Algernon Blair were true; (2) The Corneal group had no duty to disclose negotiations with Hudson following execution of the Settlement Agreement; (3) Any alleged misrepresentations or omissions were not material because Blair had no right to insist upon a specific source of funding for the exercise of the Corneal group's option; (4) Any alleged misrepresentations or omissions were not material because the Corneal group was free to dispose of Alden Park after acquisition of Algernon Blair's 70% interest in the Joint Venture; and (5) Algernon Blair waived any objection it may have had to the Corneal group's performance under the Settlement Agreement when Algernon [*27] Blair accepted the option payment of $ 6.2 million after being informed that the entire Alden Park property would be sold to Hudson.

14. The court has jurisdiction over the parties and the subject matter of this action.

15. The defendants are entitled to judgment in their favor and against the plaintiffs.

ORDER

AND NOW, this 18th day of FEBRUARY, 1988, in accordance with the findings of fact and conclusions of law filed herewith, it is

ORDERED

that JUDGMENT is entered in favor of the defendants and against the plaintiffs.

# EXHIBIT C

LEXSEE 1996 DEL. CH. LEXIS 92

Ward v. Fox & Lazo, et al.

Civil Action No. 13582

COURT OF CHANCERY OF DELAWARE, SUSSEX

*1996 Del. Ch. LEXIS 92*

March 30, 1996, Date Submitted
July 8, 1996, Date Decided

SUBSEQUENT HISTORY: [*1]

Released for Publication by the Court July 29, 1996.

DISPOSITION:

Defendants' motion for summary judgment Granted.

LexisNexis(R) Headnotes

COUNSEL:

James W. Semple, Esquire, Morris, James, Hitchens, Wilmington, DE.

Michael P. Maguire, Esquire, Wilmington, DE.

Richard A. DiLiberto, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

JUDGES: WILLIAM B. CHANDLER III, VICE-CHANCELLOR.

OPINIONBY: WILLIAM B. CHANDLER III

OPINION:

Defendants Gloria Hildebrand, Fox & Lazo, Inc. and Barry A. Crozier move for summary judgment in this action for rescission and damages arising from the sale of a house located at 2708 Doris Drive in Wilmington, Delaware. Plaintiffs James and Barbara Ward filed an amended complaint with this Court on December 21, 1994, alleging that the owner, Francis C. Crozier and the real estate agent, Hildebrand, knew that the basement of the house had a serious water problem and failed to

disclose this to plaintiffs. Plaintiffs also allege that defendants knew that the front walls of the basement had serious structural problems which defendants hid from plaintiffs.

Plaintiffs also have commenced a similar lawsuit against these parties, as well as plaintiffs' home inspector, in the Superior Court. Defendants [*2] moved to dismiss the Superior Court action, contending that the dispute was subject to arbitration under the contract of sale. Plaintiffs brought this action in the Court of Chancery in an effort to prevent the arbitration from going forward as well as to seek rescission and restitutionary damages. The Superior Court dismissed the plaintiffs' action there on January 23, 1996.

The amended complaint, as well as certain documents and deposition testimony supplied to the Court in connection with the pending summary judgment motions, provides the factual background. The property in question is a 25 year old house that belonged to Francis Crozier and his wife. After his wife's death, Crozier lived alone in the property for a number of years. Because of age and declining health, Crozier was forced to move into a nursing home. His nephew, Barry Crozier, assisted Crozier making arrangements to sell the property once it became clear that Francis Crozier would never be able to return to it.

Barry Crozier knew very little about the house, and his uncle's poor health made it impossible for him to provide much information about the property. As a result, Barry Crozier did not provide an owner's [*3] disclosure statement to any of the real estate agents involved.

Initially, Remax Realty listed the house at a price of $ 125,000. In October 1992, Steve Shindo offered to buy

1996 Del. Ch. LEXIS 92, *

the house for $ 120,000, contingent upon the successful completion of a home inspection. Shindo hired Clayton Ridings of Brandywine Home Inspections to perform the inspection. Ridings' investigation revealed that the basement had extensive dampness. Ridings cautioned Shindo to "have an engineer check wall bow [and] pillar cracks in front and left side basement wall." (See October 15, 1992, Inspection Report, Def. Crozier's Op. Brf., Exh. C).

In light of the inspection, Shindo sought a reduction in the purchase price. The sale eventually fell through and no further offers were made on the property with Remax Realty as broker.

Eventually, Barry Crozier retained Fox & Lazo, another real estate firm, to sell the property. The listing agreement again noted that because of the owner's age and health, the seller did not execute a seller's disclosure and information statement for residential property. The listing agreement indicated clearly that the property was being sold "as is." (See August 21, 1993, Property [*4] Description Statement, Def. Crozier's Op. Brf., Exh. D).

Fox & Lazo selected Hildebrand as the sales agent for the property. During her first walk through of the property with Barry Crozier, Hildebrand commented about the mildew and water stains on the basement walls. (See September 21, 1995, Hildebrand Dep. at 10). Barry Crozier informed Hildebrand that the basement drainage had backed up once and that a plumbing contractor performed maintenance to correct the problem. Id at 10; see also August 4, 1995, Crozier Dep. at 52-53.

Plaintiffs contacted Fox & Lazo to arrange to view the property. Hildebrand showed the property to plaintiffs, including the basement area. Plaintiffs noticed fans in the basement area and expressed concerns about possible moisture problems. (See James Ward Dep. at 19). Hildebrand told the plaintiffs that there had been some flooding due to a backed up sewer. (See Hildebrand Dep. at 11; James Ward Dep. at 19-20). Plaintiffs allege that Hildebrand also told them that the basement was "dry as a desert." (See Barbara Ward Dep. at 95-140; James Ward Dep. at 24). Hildebrand, however, denies ever telling the plaintiffs that the basement was [*5] dry. (See Hildebrand Dep. at 11)

Following several inspections of the property, the plaintiffs entered into an agreement of sale on September 25, 1993. (See Agreement of Sale, Def. Crozier's Op. Brf., Exh. H). The agreement set the sale price at $ 111,000 and included a home inspection addendum. The addendum allowed plaintiffs to hire a home inspector to investigate the property and determine if there were any major defects. Additionally, paragraph 13 of the sales agreement provided as follows:

Buyer has inspected the property and has agreed to purchase the property in its present condition unless otherwise specified in this Agreement. Buyer and Seller agree that they have read and fully understand this Agreement . . . and that they do not rely on written or oral representation or statement not expressly written in this Agreement . . . . Buyer acknowledges that Buyer is not purchasing the property on any representation or statement of fact or opinion . . . made by Seller, Broker, cooperating broker, salesperson, or any agent or employee of any of them. Furthermore, this Agreement shall not be amended except in writing signed by Buyer and Seller.

See 1993 [*6] Agreement of Sale, Crozier's Op. Brf., Exh. H at P 13. After signing the sales agreement, plaintiffs contacted Brandywine Home inspections, Inc., to arrange for an inspection of the Crozier house. As it turns out, plaintiffs hired the same inspection company and inspector that had previously inspected the property for Shindo. When plaintiffs arranged the inspection appointment, they told Brandywine Homes that their adult son and daughter would meet the home inspector at the property and they specifically requested that the home inspector pay particular attention to the damp basement and a hole in the back yard. (See September 21, 1995, Ridings Dep. at 19.)

Three days after plaintiffs signed the sales agreement, Clayton Ridings, the individual who previously inspected the property for Brandywine Homes, conducted an inspection of the Crozier house for plaintiffs. Plaintiffs' adult children were present. They accompanied Ridings as he made the inspection. Ridings told plaintiffs' children that he had inspected the property before and, in his opinion, the cracks and moisture problems in the basement "had obviously gotten worse from the time he had been there for his last inspection." [*7] Ridings and the plaintiffs' children saw fans and dehumidifiers in the basement. Paint on the basement walls showed signs of heavy moisture penetration which was consistent with the overall dampness in the basement.

Plaintiffs arrived at the house as Ridings was writing up his inspection results. Ridings mentioned to plaintiffs that he had inspected the property before. Both plaintiffs were given a completed inspection report that detailed the condition of the house. Ridings' report indicated that "basement dampness" was present and extensive and also provided a summary of major defects of the property. On

one part of the report, Ridings advised plaintiffs "to have a contractor check front [basement] wall cracks/moisture." (See Brandywine Home Inspection Rpt., Crozier's Op. Brf., Exh. K, dated September 28, 1993).

After receiving the inspection report, plaintiffs accompanied Ridings down into the basement to see firsthand the defects he had described. According to Ridings, plaintiffs were shown the visible moisture and structural cracks in the basement. As recalled by plaintiffs, however, Ridings down played any potential water problems.

Plaintiffs followed Ridings' advice [*8] and hired a contractor to determine the scope and nature of the cracks and moisture problem in the basement. The contractor that plaintiffs hired, however, never showed up for the scheduled appointment. Plaintiffs did not try to reschedule the contractor; nor did they make arrangements to have another contractor assess the damage as Ridings had specifically recommended. Moreover, plaintiffs did not exercise their right under the home inspection addendum agreement to require Crozier to remedy the basement defects or to declare the agreement of sale null and void. Instead, plaintiffs went forward with settlement on the house in November 1993.

After the settlement, plaintiffs began renovations on the house and its surrounding landscape. They removed several trees that surrounded the house. Shortly thereafter, plaintiffs experienced severe water leakage problems in the basement. Plaintiffs insist that these problems existed before the sale of the property and that they were not aware of them.

The gist of plaintiffs' complaint is that Hildebrand fraudulently and negligently misrepresented the condition of the sewage and water leakage problems in the Crozier house basement. Plfs' Amended [*9] Compl. at PP 19-29. Plaintiffs insist that these problems existed before the sale of the house and that they had no idea that the defects were so serious. They contend that Hildebrand had a duty under the agreement of sale and in accordance with the implied covenants of good faith and fair dealing, to provide them with true and accurate information regarding the condition of the basement. Plaintiffs argue that Hildebrand minimized the basement problems, describing it as "dry as a desert," and that they relied upon her representations. Plaintiffs also contend that Fox & Lazo, the real estate firm that employs Hildebrand and Barry Crozier, as attorney-in-fact for his uncle, n1 are vicariously libel for Hildebrand's fraudulent and negligent misrepresentations.

n1 Francis Crozier, the owner of the house, died on October 15, 1995. Barry Crozier is currently the personal representative of his uncle's estate.

The Court will grant summary judgment only where the pleadings and the uncontroverted allegations demonstrate [*10] that there is an absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Nash v. Connell, Del. Ch., 34 Del. Ch. 20, 99 A.2d 242 (1953).* Summary judgment is employed to avoid a useless trial where there is no issue of material fact. *H. & S. Manufacturing Co. v. Benjamin F. Rich Co., Del. Ch., 39 Del. Ch. 380, 164 A.2d 447 (1960).* Facts adduced under oath by the movant which remain uncontroverted by the other side must be assumed to be true. *Tanzer v. International General Indus., Del. Ch., 402 A.2d 382 (1979).*

In Delaware the requirements for a successful claim of negligent misrepresentation are (1) a pecuniary duty to provide accurate information, (2) supplying false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information. *Wolf v. Magness Construction Co., Del. Ch., C.A. No. 13004, 1995 Del. Ch. LEXIS 122, *4,* Chandler, V.C. (Sept. 11, 1995). The elements of a claim for common law fraud are the same except that the defendant must also know or believe the information was false or proceeded in reckless disregard of the truth. See *Stephenson [*11] v. Capano Development Inc., Del. Supr., 462 A.2d 1069, 1074 (1983).*

Under either legal theory, fraudulent misrepresentation or negligent misrepresentation, plaintiffs must demonstrate that they justifiably or reasonably relied upon the defendant's statements. *Lock v. Schreppler, Del. Super., 426 A.2d 856, 863 (1981).* Thus, the recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or if its falsity is obvious to him. See *Restatement (Second) Torts § 541.* A party is chargeable with the knowledge of what may be reasonably found if they make an investigation. See *Lock v. Schreppler, Del. Super., 426 A.2d 856, 862 (1981), Stidham v. Kinnamon, Del. Super., C.A. No. 86 C-AP-18. 1988 Del. Super. LEXIS 483,* Ridgely, P.J. (Dec. 29, 1988), Let. Op. at 7 (finding no duty to disclose defects that plaintiffs could have inspected before settlement).

In this case, plaintiffs allege that they relied on statements by Hildebrand that the basement had no water problems and was "dry as a desert." In addition, plaintiffs insist that Ridings, their home inspector, minimized the basement problems when he showed them the cracks and

dampness during his inspection [*12] tour. Finally, plaintiffs argue that Hildebrand and Barry Crozier had a duty to provide them with a copy of the earlier Ridings report which also identified water damage and cracks in the Crozier basement.

The allegations of the complaint and the undisputed testimony of record contradict plaintiffs' claim that they justifiably relied upon false information, whether the false information was supplied by Hildebrand or Ridings. It is incontrovertible that plaintiffs were fully aware that the basement walls were severely cracked with plainly visible water damage and dampness. Plaintiffs knew these conditions existed because they inspected the basement themselves. Plaintiffs do not deny they specifically instructed Ridings to investigate the damp basement. During the inspection, Ridings showed the plaintiffs the cracks in the basement walls and the extensive moisture that was present. Ridings' report, which plaintiffs reviewed, noted the presence of extensive dampness in the basement. Ridings' report also listed other major defects, including structural cracks and moisture in the basement walls. Of course, Ridings' knowledge concerning the scope of the defects in the basement, as agent [*13] for plaintiffs, is imputed to them. *Lang v Koziarz, Del. Ch., C.A. No. 1120, 1989 Del. Ch. LEXIS 44, *3-4, Berger, V.C. (1989).* Accordingly, plaintiffs could not have relied on alleged misrepresentations by Hildebrand, as these purported conversations and statements all preceded the inspection by Ridings. Earlier statements by Hildebrand were obviously false in light of plaintiffs' own inspection of the basement and Ridings' clear report identifying extensive water damage and cracks in the basement. That plaintiffs must have appreciated the warnings in Ridings' report is confirmed by the fact that they followed his recommendation to hire a contractor to assess the potential repairs that would be needed in the basement area. That contractor failed to appear at the appointed time, but plaintiffs made no further effort to assess the scope of the known defects in the basement area. In fact, plaintiffs admit that had they brought in a contractor to conduct an inspection, as they originally planned to do, they probably would not have purchased the house. (See Barbara Ward Dep. at 315).

Plaintiffs' argument that either Hildebrand or Barry Crozier should have provided them with a copy of the first [*14] inspection report performed by Ridings misses the mark. Ridings' uncontradicted testimony is that he informed plaintiffs that he had inspected the basement once before and that its condition had "gotten worse" since the earlier inspection. Thus, had plaintiffs been provided with the first report, they might have legitimately been misled concerning the severity of the conditions in the basement.

Finally, when plaintiffs executed the agreement to purchase the house, they acknowledged that they were not relying on any oral representations made by the broker, Fox & Lazo, or its agents as to the condition of the house. As the agreement provided, "Buyer acknowledges that Buyer is not purchasing the property based on any representation or statement of fact or opinion . . . made by Seller, Broker, cooperating broker, sales person or any agent or employee of any of them." See Sales Agreement, P 13. Thus, plaintiffs cannot contend that they relied on the sales agent's alleged fraudulent or negligent misrepresentations of the basement's condition.

The uncontroverted evidence and allegations in this case clearly demonstrate that plaintiffs knew of the preexisting water problems in the basement [*15] of the Crozier house. Armed with this knowledge, they could have obtained expert advice concerning the extent of the damage to the basement before proceeding to settlement. For whatever reason, they chose to go forward without that information. Consequently, as a matter of law, plaintiffs cannot show that they justifiably relied on any alleged misrepresentations concerning the basement's condition because it would have been obvious to plaintiffs that any such representations were simply not true. Cf. *Sipple v Kaye, Del. Super., C.A. No 83 C-01-1-CV, 1995 Del. Super. LEXIS 452, *3,* Del Pesco, J. (Oct. 30, 1995) (finding that, as a matter of law, plaintiff could not have reasonably relied on statements she knew were untrue). The record clearly demonstrates that plaintiffs were aware of the basement conditions as a result of their own numerous inspections and the inspection of the professional home investigator they hired. As a matter of law, therefore, plaintiffs cannot prevail on claims of negligent or fraudulent misrepresentation.

For all of these reasons, defendants' motion for summary judgment is Granted.

IT IS SO ORDERED.

William B. Chandler, III

**ORDER**

AND NOW TO WIT, this 8th [*16] day of July, 1996, the Motion for Summary Judgment of Defendants Gloria Hildebrand and Fox & Lazo, Inc., and Plaintiffs' Opposition thereto, having been duly considered;

IT IS HEREBY ORDERED that the Motion for Summary Judgment of Defendants Gloria Hildebrand and Fox & Lazo, Inc. is granted.

William B. Chandler, III

Vice Chancellor Chandler

DATED: 7/8/96

Case 1:05-cv-00071-KAJ     Document 13-2     Filed 04/14/2005     Page 38 of 38

Page 5

1996 Del. Ch. LEXIS 92, *

**ORDER**

AND NOW TO WIT, this 8th day of July, 1996, Defendant Barry A. Crozier's Motion for Summary Judgment and Plaintiffs' Opposition thereto having been duly considered;

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is hereby granted

William B. Chandler, III

Vice Chancellor Chandler

Date: 7/8/96