# EXHIBIT D

LEXSEE 1999 DEL. SUPER. LEXIS 8

**T.P. INC. OF DELAWARE, t/a Pet Village, a Delaware Corporation, Plaintiff, v. J & D's PETS, INC., a Delaware Corporation, JOAN AIVALOTIS and DARYL AIVALOTIS, Individually, Defendants.**

**C.A. No. 98C-01-205-WTQ**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1999 Del. Super. LEXIS 8*

**December 30, 1998, Submitted**
**February 26, 1999, Decided**

**SUBSEQUENT HISTORY:** [*1]

March 2, 1999, Date Revised. Released for Publication by the Court March 12, 1999.

**DISPOSITION:**

Judgment entered in favor of the defendants on all claims.

**LexisNexis(R) Headnotes**

**COUNSEL:** Beth D. Savitz, Esquire, Biggs & Battaglia, Wilmington, Delaware; Attorney for Plaintiff.

Andrew G. Ahern, III, Esquire, Joseph W. Benson, P.A., Wilmington, Delaware; Attorney for Defendants.

**JUDGES:** STEPHEN P. LAMB, Vice Chancellor. * * Sitting by designation pursuant to Article IV Section 13 of the Delaware Constitution.

**OPINIONBY:** STEPHEN P. LAMB

**OPINION:**

MEMORANDUM OPINION

I. INTRODUCTION

This action arises out of the November 21, 1995 contract for the purchase and sale of a business operated as a pet store known as Pet Village, located in Branmar Plaza, Wilmington, Delaware. The transaction was structured as the sale and purchase of all of the assets "directly or indirectly in connection with" Pet Village. The complaint was filed January 22, 1998, alleging fraud (Count I), fraudulent concealment (Count II), fraud by omission (Count III), constructive fraud (Count IV), breach of contract (Count V), and breach of warranty (Count VI). The factual allegations of wrongdoing are common to all the counts and consist principally of a charge that, [*2] during the course of negotiations, the defendants misrepresented the earning power of the business.

The issue of liability was tried to the court, sitting by designation pursuant to Del. Const., art. IV, § 13(2). For the following reasons, I conclude that judgment must be entered in favor of the defendants on all issues.

II. FACTS

Defendants Daryl Aivalotis ("Aivalotis") and Joan Aivalotis ("Mrs. Aivalotis") were the sole stockholders of corporate defendant J & D's Pets, Inc., a Delaware corporation. Mrs. Aivalotis was not active in the management or operations of the business, nor did she participate in the negotiation of the transaction at issue. During the relevant period, J & D's Pets carried on its pet shop operations in two locations, a store located in Branmar Plaza and, on weekends, the Farmers Market on Dupont Highway in New Castle, Delaware. In prior years, J & D's Pets had also conducted operations at other locations. J & D's Pets conducted all of its business through a single corporate entity and did not maintain separate tax or accounting records for the different locations.

In the summer of 1995, Aivalotis decided to sell the Branmar Plaza operation and, thus, [*3] caused J & D's

Pets to list Pet Village for sale with Joseph Amato ("Amato"), a business broker with Amato & Associates. Aivalotis did not offer to sell J & D's Pets as a whole, because he intended to continue business operations at the Farmers Market.

To begin the sale process, Aivalotis furnished Amato information about gross sales, costs of goods sold and itemized expenses at the Branmar Plaza operation, from which Amato prepared a Pet Village pro forma cash flow statement for 1994 reflecting $ 188,733 in free cash flow, i.e. "Cash Flow before Debt Service." Based on this information and other considerations, Aivalotis and Amato agreed to list Pet Village for sale at $ 200,000. Amato & Associates listed Pet Village as a "Business Opportunity" in its classified advertisement in the Wilmington New Journal.

In August 1995, Donald C. Bobish ("Bobish") and Sidney G. Maffett ("Maffett") (together "Purchasers") saw the advertisement, which reads as follows: "Pet Store-est bus. w/$ 640k gross and $ 180k net, financing avail. # 2836."

Purchasers thereupon contacted a representative of Amato & Associates, and were furnished with selected financial information. On August 14, 1995, [*4] Maffett sent a "letter of intent" to Amato & Associates, together with a $ 5,000 check to be held in escrow as earnest money. In his letter, Maffett said he would have his attorney "start work on a contract" and also expressed interest in having his "Certified Public Accountant review the financial data of the corporation." Maffett also proposed a closing on the purchase within 45 days of August 14, 1995. Ultimately, Purchasers formed plaintiff, T.P., Inc. of Delaware, to serve as their acquisition vehicle. Purchasers each own 50% of the common stock of plaintiff corporation.

On August 25, 1995, Maffett's accountant, Thomas J. Collins, C.P.A. ("Collins"), wrote to him, advising that the transaction was not worth pursuing at the suggested purchase price ($ 200,000). Rather, Collins told Maffett, "Based on present earnings and potential, I suggest that you look at this further if the selling price is in the range of $ 40,000 to $ 65,000. The present asking price is unrealistically inflated." Referring to the lack of accounting records for the Branmar operation on a stand-alone basis, Collins also warned Maffett that "an attempt to segregate income and expenses between or among locations [*5] can be most time consuming." Purchasers ignored this advice and pursued the Pet Village opportunity further.

At some point during the ensuing discussions, Amato & Associates gave Purchasers other pro formas, showing different estimates of free cash flow. One, dated August 24, 1995, shows only $ 132,819. Another, dated

October 10, 1995, shows $ 177,189. A notation on the latter shows that it was faxed to Collins, although the record does not reveal any further advice from him about the transaction. The final estimate made by Aivalotis, furnished to the Purchasers shortly before the final contract was signed, shows free cash flow of $ 166,686.

The first draft of a contract contained in the record bears a printed date of September 28, 1995 and reflects an initial offering price of $ 150,000. A series of other drafts of the contract are found in the record, dated between October 11, 1995 and November 15, 1995. In these drafts, the proposed purchase price varied from $ 175,000 or $ 180,000 (October 11) to $ 150,000 (November 15). The final contract, dated November 21, 1995, contained a purchase price of $ 180,000.

Sometime after the September 28 draft was first typed Purchasers [*6] decided to add language to the draft providing, "Seller warrants the business had a Net Profit of $ 180,000.00 for 1994." This language (hereinafter referred to as the "Net Profit Clause") was inserted at the end of paragraph 7 ("Access to Information"), a section generally describing Purchasers' right to conduct their due diligence review during the period leading up to closing. Aivalotis agreed to the inclusion of this language, but final agreement on the contract was not reached at this time.

Pursuant to paragraph 7, J & D's Pets was required to give Purchasers full access "to the business premises and the right of inspection, of all the assets, properties, books and records, directly or indirectly related to the business operation." Paragraph 7 also required that J & D's Pets furnish Purchasers "with all such information as [they] may reasonably require." Finally, paragraph 7 provided that, "in the event the books and records are not as stated, [Purchasers] may declare the agreement null and void and all deposit monies will be returned to [Purchasers] and the parties shall have no further liability or responsibility to one another."

The Net Profit Clause appeared in [*7] the two drafts bearing the printed date of October 11, 1995, but not in later versions of the contract. The draft bearing the printed date of November 15, 1995 was prepared by Amato from one of the October 11th drafts. His handwritten notations on the prior draft (October 11th) reflect various changes, including the elimination of paragraph 7 in its entirety. The final contract, bearing the printed date of November 21, 1995, does not contain the Net Profit Clause, nor any of the other language relating to due diligence found in paragraph 7 of the early drafts.

The transaction closed on or about December 11, 1995, at the offices of Purchasers' attorney. Bobish was late for the closing and did not take the time to read the documents. Maffett was also at the closing and testified

that he read though the documents before signing them. Both Bobish and Maffett testified that they were unaware of the deletion of paragraph 7 and the Net Profit Clause from either the November 15th draft or the final contract.

The evidence at trial was that Amato decided to take paragraph 7 and the Net Profit Clause out of the contract after it became clear from Purchasers' due diligence and discussions among [*8] the parties that Aivalotis could no longer support the $ 180,000 figure. Aivalotis did not recall specifically instructing Amato to delete the Net Profit Clause. However, he did recall that sometime in early November, before the final contract was signed, he and Amato reached the conclusion that the $ 180,000 figure was too high. As Aivalotis testified:

> I think there was a time when we were at one fifty, one sixty. I mean, we were bouncing back and forth in numbers; and, you know, I finally got to the point where I said, well, you know, wherever the number falls, it falls.

Amato testified that he deleted the Net Profit Clause language from the contract at this time because its inaccuracy was then known to all the parties and, thus, it no longer "pertained."

Importantly, the record is unequivocal that neither of the Purchasers believed that the Net Profit Clause was accurate. Maffett "felt it [the correct free cash flow amount] was somewhere around 120,000." Bobish testified that his estimate was between $ 120,000 and $ 180,000, "depending on assumptions." Indeed, Maffett quite candidly testified that the reason why he "was very adamant in wanting the handwritten [*9] paragraph left in" was that he "knew that 180,000 just wasn't there." He wanted the Net Profit Clause precisely because he did not believe that it was true. Bobish's testimony is, on the whole, to the same effect.

Finally, the trial testimony and record shows clearly that the Purchasers were given wide-ranging access to Pet Village and its books and records during the extended due diligence period. Nothing suggests the Aivalotis or J & D's Pets ever refused a request for information, hid information, or purposefully provided inaccurate or misleading information. A central point of contention at trial concerned Purchasers' access to J & D's Pets' 1994 federal tax return. But it is conceded that this return was not available until after the closing and that it was Purchasers who insisted on closing the transaction before the 1994 tax return was available because they wanted to own the business for the Christmas season.

III. DISCUSSION

At the center of this controversy is the series of estimates of free cash flow, made by Aivalotis or based on information developed by him during the course of the four month negotiation among the parties to the transaction at issue. It is based on these [*10] pro forma estimates and the related written representation of $ 180,000 in net profits secured by the Purchasers during the early stages of the negotiations, that plaintiff pursues its claims for fraud, breach of contract and breach of warranty. For the reasons explained below, I conclude that each of these claims must be rejected.

A. Fraud

The record is irrefutably clear that the Purchasers never regarded these cash flow projections as accurate. Indeed, they actively disbelieved them. The record is just as clear that Aivalotis acted honestly in his efforts to create these estimates but was stymied by the inherent difficulty of the task of creating, without the help of his accountants, a stand-alone financial statement for a business that he had always operated as a part of a larger organization. In the end, he too concluded that the Branmar Plaza operation did not generate the amount of free cash flow he once believed. Thus, by the end of the negotiations, Aivalotis estimated free cash flow at only $ 166,685.

As the plaintiff all but conceded in post-trial briefing and argument, the record in this matter does not support any of the claims of fraud asserted in Counts I to [*11] IV of the complaint. These claims all must fail, among other reasons, because the record conclusively establishes that neither the Purchasers nor the plaintiff corporation reasonably relied on any misstatement of fact made by Aivalotis. Fraud, in all its permutations, has the requirement that the plaintiff must have justifiably relied upon the representation (generally, one of fact) at issue. See Gaffin v. Teledyne, Inc., Del. Supr., 611 A.2d 467, 472 (1992). In this context, it is hornbook law that the plaintiff must rely upon the truthfulness of the representation at issue. See 37 Am. Jur. 2d § 226 (1968) ("It follows that in any fraud case, in order to secure relief, the complaining party must honestly confide in the representations or, as has been said, must reasonably believe them to be true. The law will not permit one to predicate damage upon statements which he does not believe to be true, for if he knows that they are false, it cannot truthfully be said that he is deceived by them"). The record is conclusive in showing Purchasers' lack of reliance on the truth of the free cash flow estimates. Indeed, Maffett's testimony is that he "relied" on the Net Profit [*12] Clause precisely because he did not believe it to be accurate.

B. Breach of Contract

Count V of the complaint claimed a breach of the defendants' contractual obligation to "make full and accurate disclosure about all aspects of the subject business available to plaintiff for due diligence purposes." Plaintiff does not press this claim in its post-trial briefing and argument; moreover, the record does not support a finding that the defendants failed in any respect to provide Purchasers with access to information they sought during the due diligence period. I also note that plaintiff makes no argument that the due diligence provisions found in paragraph 7 of the early drafts of the contract were intended to survive the closing of the transaction. n1 On the contrary, the plain meaning of these provisions was to provide the Purchasers with, (i) a right of access to due diligence material before closing, and (ii) a right to withdraw from the agreement before closing in the event their due diligence showed that "the books and records are not as stated."

n1 I presume that the contractual provisions at issue in Count V were those contained in paragraph 7 of the early drafts of the contract (other than the Net Profit Clause) pertaining to the conduct of due diligence. Those provisions were first deleted from the contract in the draft dated November 15, 1995, signed by the Purchasers after their due diligence was substantially complete.

C. Breach of Warranty

What remains are plaintiffs contract claims predicated on the Net Profit Clause. These are, alternatively, [*13] that the Net Profit Clause is a part of the contract between the parties, or that the omission of that provision from the contract was the result of a mutual mistake by the parties that requires this Court to reform the contract to include the Net Profit Clause.

1. The Terms of the Contract

The final contract signed by the parties, by its terms, purports to be a fully integrated agreement. Paragraph 7 reads as follows:

Entire Agreement. This Agreement and any agreement referred to herein represents the entire, full and complete Agreement between the Buyer and Seller and the subject matter hereof, and supersedes [*14] all prior agreements, no other representations, oral or otherwise, have induced the Seller to execute this Agreement. There are no other agreements between the parties not

embodied or referred to herein, which are of any force or effect with reference to this agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless set forth in writing and executed by the party to be bound.

This language appeared in each draft of the contract, and there is no question that the parties intended the final contract to reflect the totality of their agreement. In the circumstances, the law clearly precludes a finding that the Net Profit Clause is an additional term of the contract. *See* Restatement (Second) of Contracts § 216(1) (1981) [hereinafter Restatement] ("Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that the agreement was completely integrated."). Moreover, evidence that the parties agreed to the inclusion of the Net Profit Clause in various drafts of the contract, does not establish that the contract is not a fully integrated contract, as that [*15] term was neither "agreed to for separate consideration," nor one that "in the circumstances might naturally be omitted from the writing." Restatement, § 216(2). On the contrary, the only evidence of the existence of any agreement about the Net Profit Clause is its inclusion in early drafts of the contract. Those early drafts were specifically superceded by the final integrated contract and there is nothing to suggest that the parties ever agreed to deal with the Net Profit Clause through a separate writing.

2. Reformation of the Contract

Finally, plaintiff argues that the circumstances surrounding the omission of the Net Profit Clause from the final contract are such as to support the reformation of the contract to include that clause as a term. n2

n2 I will assume, without deciding, that in an action for money damages, the Superior Court has the power, under *10 Del. C. § 542(c)*, to reform a written contract upon which suit is brought.

It is true that evidence of agreements and [*16] negotiations prior to the adoption of a fully integrated contract are admissible to establish grounds for granting or denying the remedy of reformation. *See* Restatement, § 214(e). Nevertheless, the law of this State is clear that where reformation of a written contract is sought on grounds of mutual mistake, "it must be shown by evidence that is clear, convincing and free from doubt that the instrument sought to be reformed does not,

1999 Del. Super. LEXIS 8, *

because of mutual mistake, properly record all of the material provisions of a prior, definite and specific oral agreement made by the parties." *Roos v. Roos, Del. Ch., 42 Del. Ch. 40, 203 A.2d 140, 142 (1964). See also Collins v. Burke, Del. Supr., 418 A.2d 999, 1002 (1980), James River-Pennington, Inc. v. CRSS Capital, Inc., 1995 Del. Ch. LEXIS 22,* *19-20, Del.Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995).

The evidence of record does not support the plaintiffs claim for reformation. The parties did, at one time, agree to the inclusion of the Net Profit Clause in the draft contract. About this, there is no dispute. Nevertheless, it is also indisputable that by the time the November 15th draft was prepared, none of the parties believed that Pet [*17] Village produced $ 180,000 in free cash flow in 1994 or any other year. At that time, Aivalotis' latest cash flow estimate was approximately $ 167,000. Even this amount was substantially higher than what Maffett thought was the correct figure *(i.e.,* $ 120,000).

In the circumstances, the record does not support the conclusion that Aivalotis intended that the final contract would include the Net Profit Clause. He could not recall, in his testimony, specifically instructing Amato to remove that clause from the contract. But he did recall concluding that the $ 180,000 was too high and determining that "wherever the number falls, it falls." Amato's testimony, while not detailed, strongly supports the conclusion that the Net Profit Clause was not removed from the contract by mistake, but because the $ 180,000 figure could not be supported and, thus, the clause no longer "pertained."

Purchasers' testimony that they acted on the belief that the Net Profit Clause was in the final written contract also is lacking in credibility for several reasons. First, by the time they signed the final contract, they knew Aivalotis was estimating free cash flow at a level materially lower than [*18] $ 180,000. With this

knowledge, they could not reasonably have believed that Aivalotis would agree to include a clause in the final contract warranting the presence of $ 180,000 in free cash flow. Second, Purchasers offer no plausible explanation why they failed to note the deletion of the Net Profit Clause from either the November 15th draft or the final contract. The complete agreement is only eight pages long and contains only 15 paragraphs.

Finally, I conclude that it would work a substantial injustice to accept the Purchasers' position that they should be able to rely on a "warranty" that neither they nor Aivalotis believed to be true. They did not buy Pet Village believing that it would generate $ 180,000 in free cash flow. In the circumstances, neither the facts nor the law of this case suggests any reason why Purchasers should be able to sue for damages because it did not, in fact, do so.

IV. CONCLUSION

For all the foregoing reasons, judgment will be entered in favor of the defendants on all claims. n3 Counsel for the defendants should promptly submit a form of order on notice.

> n3 I also conclude that all claims against Mrs. Aivalotis should be dismissed for the additional reason that she did not participate in the negotiation of the transaction and signed the contract only in her capacity as an officer of J & D's Pets. Similarly, Aivalotis cannot be held personally liable on any contract-based claim, as he is not, individually, a party to the contract.

[*19]

Stephen P. Lamb

Vice Chancellor (Sitting by Designation)

# EXHIBIT E

LEXSEE 1998 DEL. SUPER. LEXIS 476

**Dominic Scarfo, Levinia Scarfo, Carmine Scarfo, and Karen E. Scarfo v. Charles H. McDonald, Jr., and Fox & Lazo, Inc.**

**C.A. No. 96C-10-264-VAB**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1998 Del. Super. LEXIS 476*

**December 2, 1998, Nonjury Trial Held**
**December 3, 1998, Decided**

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court January 27, 1999.

**DISPOSITION:**

JUDGMENT ENTERED FOR DEFENDANTS.

**LexisNexis(R) Headnotes**

**COUNSEL:** John H. Benge, Jr., Esquire, Wilmington, DE.

Louis J. Rizzo, Jr., Esquire, Reger & Rizzo, Wilmington, DE.

**JUDGES:** WILLIAM T. QUILLEN, JUDGE.

**OPINIONBY:** WILLIAM T. QUILLEN

**OPINION:**

*Letter Opinion and Order after Nonjury Trial*

This will be a somewhat capsule opinion. By way of dictum, let me speak first, in reverse order, about damages. I was troubled by the damage evidence in this case and, as both Judge and trier of fact, I would have great difficulty in finding that the loss of bargain here approaches a quarter of a million dollars. I have not had to think it through. But I do not think you can weigh the loss of bargain (the value of the purchase, with C-2 land including and beyond a 200 foot depth up to 2.42 acres over the value of the purchase with C-2 land limited to a 200 foot depth, whatever such commercial acreage proved to be), by a pro rata per acre allocation of price for C-2 land. The methodology strikes me as too theoretical for the practicalities of this situation including the existing C-2 frontage in both scenarios on both lots, the special exception availability, the value [*2] of the residence as a residence, and other potential prospects for the property. The focus of the evidence was to me too narrow for the facts and circumstances of the case and I simply do not believe, even if Plaintiffs' liability theory of the case were accepted in toto, that loss of bargain damages would be anywhere near the amount alleged. How I would have handled that expert evidence in a jury context if Mr. Rizzo had made the same motion for judgment as a matter of law for failure of proof on damages is, fortunately for me, an issue I do not have to decide. I make this comment only to note that I do not think there is anywhere near as much dollarwise in issue as the Plaintiffs allege.

It is clear that the Plaintiff Dominic Scarfo acted for all the Plaintiffs in this matter and all the Plaintiffs' legal and factual positions must rest on Dominic Scarfo's position. When I refer to the Plaintiffs, the actor is Dominic Scarfo. The Plaintiffs here have chosen to go to settlement and sue for loss of bargain damages for misrepresentation. In analyzing the liability portion of the case, I accept the parameters of the case as structured by the Plaintiffs. The elements of a traditional [*3] claim for misrepresentation as a tort (deceit) include a false representation, scienter, intention to induce reliance, justifiable reliance, and damage. In contract law, however, the standard is generally less, it usually being sufficient that a false representation was made and that it is justifiably relied upon. This is not a case where a false misrepresentation was made in the written contract itself.

Indeed the written contract, Plaintiffs' Exhibit 2 and Defendants' Exhibit 12, at paragraph 13, disclaims the very type of representations relied on in this lawsuit. In this case, the Plaintiffs are claiming a false representation induced the March 14, 1995 contractual transaction. Without considering the contract disclaimer in this context of negligent misrepresentation, I will decide the case as one of negligent misrepresentation.

I turn to the false representation, or rather to the three allegations of false representation argued by the Plaintiffs at the close of evidence. As to the sign, roughly illustrated by Plaintiffs' Exhibit 10, although I find it ambiguous, it does not, standing alone, justify reliance in the half million dollar transaction for a representation that the state [*4] of the zoning includes 2.42 acres of C-2 land. It is designed to attract the initial attention of the buyer, to encourage him to explore further and has a mere catch-line puffing tone to get the attention of passing vehicular traffic. It is an invitation to explore and nothing more, and no reasonable person would rely on it for accuracy of zoning detail, it being facially ambiguous in its generality. As to the alleged oral representation of Defendant Charles H. McDonald, Jr., in my capacity as finder of fact, I find Mr. McDonald, on February 14, 1995 and February 24, 1995, did not make any oral representations that the property contained 2.42 acres of C-2 land. This leaves the flyer, Plaintiffs' Exhibit 1, which does include a false representation, to wit "Zoning: C-2, 2.42 Acres." The 2.42 acre figure comes from the commonly used total acreage in Lot 1 of the two lot package. Lot 1 in fact includes R-2 land as well as C-2 land. It is possible that this misrepresentation could be reinforced by the ambiguous sign and by some comment by Mr. McDonald during the initial telephone conversation of January 17, 1995, but such reinforcement adds little in the way of substance. The gist of the [*5] misrepresentation in this case is the flyer.

Having identified the misrepresentation from the flyer, perhaps aided slightly by the other evidence, two other factual conclusions seem clear. First, a representation that 2.42 acres of land on Route 40 are zoned C-2 is a material representation. Second, there is no hint in the evidence to justify the conclusion that the representation was intentional, made with intent to deceive or made with reckless disregard as to its truth. Rather, there was a descriptive mistake made in the flyer, which at most was the product of negligence, and the ambiguity in the sign description of the property and any comment during the January 17, 1995 telephone conversation similarly can rise to no more aggravated conduct than simple negligence. And the same can be said of the representations together. Thus, the Court finds there was early on a negligent misrepresentation of a material fact, i.e., the C-2 portion of the land was 2.42 acres.

The question comes down to this: Was there "a pecuniary loss caused by justifiable reliance upon the false information?" See Ward v. Fox & Lazo, 1996 Del. Ch. LEXIS 92, Del. Ch., C.A. No. 13582, 1996 WL 422336, Chandler, V.C. (July 8, 1996). [*6] The answer to this question, based on the evidence in the case, in my judgment as the trier of fact, is clearly no. There was no justifiable reliance. Indeed, the false representation was effectively repudiated almost immediately.

First, Dominic Scarfo by background was a reasonable and indeed a relatively sophisticated buyer, certainly sophisticated enough to know that C-2 zoning was important to the development of the property. Second, a reasonable buyer would not rely on Plaintiffs' Exhibit 1, the flyer, for either acreage or zoning information. Third, as early as January 17, 1995, Dominic Scarfo discussed the significance of C-2 zoning with Mr. McDonald (Defendants' Exhibit 2). Fourth, Plaintiffs received the two large zoning maps (Defendants' Exhibits 17A and 17B) and a property description document (Defendants' Exhibit 5) on February 14, 1995 which clearly showed the mixed zoning on both Lots 1 and 2 and listed the acreage of Lot 1 as 2.223 acres (without area reserved for future street) (Defendants' Exhibit 17A) and the commonly used total acreage for Lot 1, 2.42 acres (Defendants' Exhibit 5). Fifth, in walking the property on February 14, 1995 and February 24, 1995, the Plaintiffs [*7] were told that the C-2 zoning ended before the residence on Lot 1 and the Plaintiffs understood the residence was on Lot 1. Sixth, from the documents and visually from walking the property, the Plaintiffs knew the C-2 zoning only went back 200 feet from Route 40. Seventh, among the documents received by Plaintiffs on February 24, 1995 was a letter relating to the septic system which showed Lot 1 as "40% R-2 and 60% C-2" (Defendants' Exhibit 7). Eighth, as early as February 28, 1995, the Plaintiffs made any contract contingent on obtaining "all necessary permits to build on parcel # 1, within C-2 zoning" (Defendants' Exhibit 11, Addendum 3).

While it may be that the Plaintiffs were surprised by the 1.42 acre figure for C-2 land in early May (which may actually be inaccurate somewhat on the low side if both lots are considered), they had known for a long time that the 2.42 acre figure for C-2 land was false and they had the ready means to discover the true zoning acreage. Indeed, the 60% figure in the septic system letter was approximately accurate and gave an essentially correct representation.

There is no question that the Plaintiffs understood well that the C-2 zoning only went [*8] back 200 feet

1998 Del. Super. LEXIS 476, *

from Route 40, that Lot 1 was commonly referred to as a 2.42 acre lot, that a substantial portion of Lot 1 was zoned R-2, that the residence was in the R-2 portion of Lot 1, and that Plaintiffs' commercial development, exclusive of plans permitted by the special exception, must be planned only for the C-2 portion of Lot 1. In short, there is no question that Plaintiffs understood, no later than February 14, 1995, there could not be 2.42 acres of C-2 land and they could not justifiably rely on any prior false representations to that effect. Their asserted reliance on any prior representation is beyond the bounds of reason and not justifiable. There is no basis for abatement in the contract price.

Judgment is accordingly entered in favor of the Defendants. IT IS SO ORDERED.

William T. Quillen

# EXHIBIT F

LEXSEE 2004 U.S. DIST. LEXIS 4952

In Re: STUDENT FINANCE CORPORATION, Debtor. STUDENT FINANCE CORPORATION, Plaintiff, v. ROYAL INDEMNITY CO., Defendant.

Civil Action No. 03-507 JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 4952*

March 23, 2004, Decided

**PRIOR HISTORY:** [*1] Chapter 11, Bankruptcy Case No. 02-11620, Adversary Proceeding No. No. 02-6803 LK.

**DISPOSITION:** Defendant's motion to dismiss granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** L. Jason Cornell, Esquire of FOX ROTHSCHILD LLP, Wilmington, Delaware.

Of Counsel: Hal Baume, Esquire of FOX ROTHSCHILD LLP, Lawrenceville, New Jersey.

David A. Gradwohl, Esquire, Andrew W. Bonekemper, Esquire, and Anthony P. DeMichele, Esquire of FOX ROTHSCHILD LLP, Lansdale, Pennsylvania, Attorneys for Plaintiff/Debtor Student Finance Corporation.

Lawrence C. Ashby, Esquire, Philip Trainer, Jr., Esquire, and Gregory A. Taylor, Esquire of ASHBY & GEDDES, Wilmington, Delaware. Of Counsel: Michael H. Barr, Esquire, Peter D. Wolfson, Esquire, and Kenneth J. Pfaehler, Esquire of SONNENSCHEIN NATH & ROSENTHAL, New York, New York.

Alan S. Gilbert, Esquire of SONNENCHEIN NATH & ROSENTHAL, Chicago, Illinois, Attorneys for Defendant Royal Indemnity Company.

**JUDGES:** JOSEPH [*2] J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:** Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is Defendant Royal Indemnity Company's ("Royal") Motion To Dismiss. (D.I. 6.) n1 For the reasons set forth below, the Court will grant in part and deny in part Royal's Motion.

> n1 The docket item numbers referenced herein are the docket items in the adversary proceeding Student Finance Corporation v. Royal Indemnity Co., Adversary Proceeding Number 02-06803 LK.

**BACKGROUND**

This is an adversary proceeding arising from the Chapter 11 bankruptcy filing In re Student Finance Corporation. The parties to this adversary proceeding stipulated to the withdrawal of the reference to the bankruptcy court, which was granted by Chief Judge Robinson. The instant action was subsequently assigned to this Court.

Student Finance Corporation ("SFC") engages in the origination and purchasing of student loans, primarily for truck driving school students. [*3] n2 SFC, along with its affiliates, obtained funds to purchase and originate student loans from warehouse lines of credit provided by the Wilmington Trust Co. and PNC Bank. Once SFC exhausted these warehouse lines of credit, SFC and its affiliates packaged loans it purchased or originated into portfolios and sold them on the secondary market (the "securitizations") to financial institutions or insurance

Case 1:05-cv-00071-KAJ    Document 13-3    Filed 04/14/2005    Page 13 of 33

Page 2
2004 U.S. Dist. LEXIS 4952, *

companies. To continue selling its portfolios on the secondary market, SFC required credit risk insurance which it obtained from AIG. In 1999, AIG discontinued this line of insurance. Thereafter, SFC obtained credit risk insurance from Royal.

> n2 As the instant motion is a motion to dismiss, the Court has taken the facts from SFC's Complaint.

Royal continued to provide SFC with credit risk insurance for its securitizations through November of 2001. In December of 2001, SFC alleges that Royal verbally agreed to issue it one more credit risk insurance policy. In February of 2002, Royal was told by its parent company [*4] to discontinue issuing credit risk insurance. Royal subsequently announced that it was exiting the credit risk insurance business; however, SFC alleges that Royal assured it that Royal would issue one last policy. SFC alleges that Royal later stated that it would only consider doing so if SFC executed two promissory notes (the "Notes") whereby SFC agreed to borrow approximately twelve million dollars from Royal that would be used to make forbearance payments to Wells Fargo, who was the trustee of the securitizations. All the proceeds of the Notes went directly to Wells Fargo.

SFC alleges that after it complied with Royal's request Royal never issued SFC the credit risk insurance policy as promised. SFC alleges that, in reliance on Royal's promises, it continued to approve and fund student loans. In its Complaint (D.I. 1), SFC asserts six claims against Royal. This is Royal's Motion to Dismiss Counts I and II pursuant to *Rule 9(b)* and Counts I-VI pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.*

## STANDARDS OF REVIEW

### I. *Rule 9(b)*

*Rule 9(b)* requires a party alleging fraud or mistake to plead with particularity the circumstances [*5] constituting its claims. *Fed. R. Civ. P. 9(b)*. The intent behind *Rule 9(b)* is to give defendants notice of the claims against them and to reduce the number of frivolous actions. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).* *Rule 9(b)* does not require the recitation of "every material detail of the fraud such as date, location and time[; however,] plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller Ctr. Props. Secs.*

*Litig., 311 F.3d 198, 216 (3d Cir. 2002)* (quoting *In re Nice Sys., 135 F. Supp. 2d 551, 557 (D. N.J. 2001)).*

## II. *Rule 12(b)(6)*

A motion to dismiss tests the legal sufficiency of the complaint. *Conley v. Gibson, 355 U.S. 41, 45, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* In reviewing a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure,* courts "must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000)* [*6] A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts that would entitle him or her to relief. *Id.*

## DISCUSSION

### I. Whether SFC Has Pled With Particularity Fraud And Negligent Misrepresentation

Royal contends that Counts I, negligent misrepresentation, and II, fraud, of SFC's Complaint should be dismissed because SFC has failed to plead these claims with particularity as required by *Rule 9(b)*. Royal contends that SFC's Complaint does not identify the speaker of the alleged misrepresentations nor, with one exception, to whom the false statements were made. Royal also contends that SFC asserts only generalized and conclusory descriptions of misrepresentations made by Royal. SFC responds that the *Rule 9(b)* standard is generous in the Third Circuit and that its allegations of fraud and negligent misrepresentation satisfy *Rule 9(b)*'s requirements. In addition, SFC requests, in the event the Court agrees with Royal, that it be granted leave to amend its Complaint.

After reviewing the Complaint in light of the *Rule 9(b)* standards recited above, the Court concludes that SFC has failed to satisfy the pleading requirements of [*7] *Rule 9(b).* Nowhere in its Complaint does SFC identify the speaker of Royal's alleged misrepresentations. This is a failure to satisfy the particularity requirements of *Rule 9(b).* See *Klein v. Gen. Nutrition Co., Inc., 186 F.3d 338, 345 (3d Cir. 1999)*(stating that *Rule 9(b)* "requires, at a minimum, that the plaintiff identify the speaker of the fraudulent statements.") Although SFC contends that, according to *Brown v. SAP America, Inc., 1999 U.S. Dist. LEXIS 15525, 1999 WL 803888 (D. Del. Sept. 13, 1999),* a plaintiff need not identify the speaker of the alleged misrepresentation to satisfy *Rule 9(b)*'s requirements, to the extent Brown's holding conflicts with *Klein v. General Nutrition Co., Inc.,* the Court declines to extend *Brown* to the facts in this case. See also *FDIC v. Bathgate, 27 F.3d 850, 876 (3d Cir. 1994)*(holding that a

failure to identify the speaker of alleged misrepresentations amounted to a failure to satisfy *Rule 9(b)*); *Liafail, Inc v Learning 2000, Inc , 2002 U.S. Dist. LEXIS 22620, 2002 WL 31667861, at \*4 (D Del Nov 25, 2002)*

The Court also concludes that SFC's allegations of material omissions fail to satisfy *Rule 9(b)*'s pleading requirements [\*8] SFC bases, in part, its fraud and negligent misrepresentation claims on material omissions by Royal, yet never identifies what facts withheld by Royal induced SFC to act. Moreover, although courts cannot expect plaintiffs to have access to information sufficient to satisfy a detailed application of *Rule 9(b)* in all cases, in the instant case, SFC does not contend that information it needs to satisfy *Rule 9(b)*'s particularity requirements is exclusively within Royal's control. See *FDIC, 27 F 3d at 876* Therefore, SFC has given the Court no reason to relax "the normally rigorous particularity rule" based upon lack of knowledge or control. *Burlington, 114 F 3d at 1418.* Accordingly, to the extent Counts I and II of SFC's Complaint are based on material omissions by Royal, the Court concludes that SFC has failed to satisfy *Rule 9(b)*. n3

> n3 Royal also contends that *Brug v The Enstar Group, Inc , 755 F. Supp. 1247 (D Del. 1991)*, and *Brown v The Buschman Co , 2002 U.S. Dist. LEXIS 4087, 2002 WL 389139 (D Del 2002)*, compel the Court to dismiss Counts I and II of SFC's Complaint for failure to adequately plead scienter Because the Court concludes that *Brug* and *Brown* are distinguishable from the facts in this case, the Court disagrees. The plaintiffs in Brug and Brown made only general averments, without any supporting facts, of intent or scienter. *Brug, 755 F Supp at 1254-55*; *Brown, 2002 U.S. Dist. LEXIS 4087, 2002 WL 389139, at \*8.* Therefore, the *Brug* and *Brown* courts concluded that they had no choice but to dismiss the plaintiffs' claims. In this case, however, SFC has identified facts by which the Court infers intent. In paragraphs 31 and 33 of its Complaint (D.I. 1), SFC alleges that Royal indicated that it would extend additional credit risk insurance following its announcement that it was leaving the credit risk insurance business if SFC would agree to borrow money from Royal to be used in making forbearance payments to Wells Fargo SFC alleges that it complied with Royal's condition, but that Royal never extended additional credit risk insurance The Court concludes that these facts are sufficient by which to infer intent or scienter

[\*9]

In sum, the Court concludes that Counts I and II of SFC's Complaint fail to satisfy the pleading requirements of *Rule 9(b)*. n4

> n4 In its reply brief (D.I. 18), Royal contends for the first time that all of SFC's claims are based on allegations of fraud, and therefore, if the Court finds that SFC has failed to properly plead Counts I and II, then all of SFC's claims must be dismissed. Without addressing the merits of Royal's arguments, the Court concludes that Royal is not entitled to dismissal of the remaining claims of SFC's Complaint on *Rule 9(b)* grounds.
>
> Rule 7.1.3 of the Local Rules for the District of Delaware ("Local Rule 7.1.3") provides that "the party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." D Del. L.R. 7.1.3(c)(2). The practice of reserving arguments for reply briefs "amounts to impermissible 'sandbagging.'" *Rockwell Techs LLC v Spectra-Physics Lasers, Inc , 2002 U.S. Dist LEXIS 5180, 2002 WL 531555 (D Del March 26, 2002)*(quoting *Jordan v Bellinger, 2000 U.S. Dist LEXIS 19233, \*18 (D Del April 28, 2000))* By waiting until its reply brief to assert that all of SFC's claims should be dismissed pursuant to *Rule 9(b)*, Royal has violated Local Rule 7.1.3. Accordingly, the Court rejects Royal's attempt to dismiss SFC's remaining claims under *Rule 9(b)*.

[\*10]

## II. Whether Counts I-VI State A Claim Upon Which Relief May Be Granted

A Counts I And II, Negligent Misrepresentation And Fraud

Under Delaware law, to state a claim of common law fraud a plaintiff must plead: 1) a false representation made by the defendant, usually one of fact; 2) the defendant's knowledge or belief that the statement was false; 3) an intent to induce the plaintiff to act; 4) the plaintiff's justifiable reliance upon the representation; and 5) damage to the plaintiff as a result. *Stephenson v Capano Dev , Inc , 462 A 2d 1069, 1074 (Del 1983)* The only difference between an action for fraud and negligent misrepresentation is that, with a claim of negligent misrepresentation, the plaintiff need not plead that the defendant knew or believed that his or her statement was false or that he or she proceeded in a

reckless disregard for the truth. Id. By its Motion, Royal seeks to dismiss Counts I and II for failure to plead elements 1, 4, and 5.

### 1. Statement Of A Material Fact

Royal contends that SFC has not adequately pled the existence of a material fact because the statements SFC alleges were false or negligent concern future [*11] undertakings. (D.I. 7 at 8.) SFC responds that the Court should not be persuaded by Royal's arguments because a claim for fraud may be based upon statements of future results.

Under Delaware law, "opinions and statements as to probable future results are not generally fraudulent even though they relate to material matters." *Esso Standard Oil Co. v. Cunningham, 35 Del. Ch. 210, 114 A.2d 380, 383 (Del. Ch. 1955)*; *Craft v. Bariglio, 1984 Del. Ch. LEXIS 421, 1984 WL 8207, at *8 (Del. Ch. March 1, 1984)*. Applying this principle and the *Rule 12(b)(6)* standard of review to the allegations in SFC's Complaint, the Court concludes that it would be premature to dismiss Counts I and II for failure to plead a material fact.

In its Complaint, SFC alleges that after Royal made a public announcement that it was leaving the credit risk insurance business, "Royal continued to represent to SFC that one more policy would be issued to SFC." (D.I. 1 at P 31) (emphasis added). Further, SFC alleges that Royal contacted SFC's CEO and "told him that Royal would consider providing credit risk insurance for another securitization if SFC agreed to borrow money from Royal to be used to make 'forbearance [*12] payments' to Wells Fargo." Id. at P 33. Taken as true, SFC's assertions constitute more than mere "opinions and statements as to probable future results." See *Esso Standard, 114 A.2d at 383*. Thus, the Court concludes that the combined effect on SFC of Royal's statements of intent to issue a new policy suffice, for the purposes of this Motion, to plead the existence of misstatements or negligent misrepresentations made to induce SFC to borrow money from Royal.

### 2. Justifiable Reliance

Royal contends that SFC has not pled justifiable reliance because, in the circumstances of this case, a reasonable person would not have relied upon a verbal commitment that Royal would issue an additional credit risk insurance policy. In response, SFC contends that its reliance upon Royal's misrepresentations was justifiable because, unlike the precedent relied upon by Royal, in this case there was no written agreement between the parties that made Royal's oral assurances unworthy of SFC's reliance.

Delaware courts follow the Restatement's definition of justifiable reliance. See *Lock v. Schreppler, 426 A.2d 856, 863 (Del. Super. 1981)*, superceded by statute [*13] in part on other grounds as stated in, *Amato & Stella Assoc. v. Florida North Inv., Ltd., 678 F. Supp. 445, 448 (D. Del. 1988)*. In order to plead justifiable reliance based on a statement of intention, a plaintiff must allege facts demonstrating that "the intention is material and the recipient has reason to believe that it will be carried out." *Restatement (Second) of Torts § 544 (1977)*. Applying these standards to SFC's Complaint, the Court concludes that SFC has adequately pled justifiable reliance in order to survive dismissal.

Royal directs the Court to *Debakey Corp. v. Raytheon Service Co., 2000 Del. Ch. LEXIS 129, 2000 WL 1273317 (Del. Ch. Aug. 25, 2000)*, for support of its contention that SFC failed to adequately plead justifiable reliance. n5 In Debakey, the plaintiff sued for fraudulent inducement because of an oral promise by defendants that they would provide funding in excess of $ 2 million to the parties' joint venture. *2000 Del. Ch. LEXIS 129, 2000 WL 1273317, at *22*. A subsequent written contract, however, stated that the defendants had the right to unilaterally decide not to extend funding once the $ 2 million limit was reached. [*14] Id. Once the $ 2 million limit was reached, the defendants declined to extend the plaintiffs additional funding. Id.

n5 Royal does not contest that the statements at issue are material.

Following a bench trial, the Debakey court concluded that the written contract precluded the plaintiff from establishing justifiable reliance. Id. The court reasoned that reliance on the defendants' prior oral representations that they would provide funding in excess of $ 2 million when a subsequent express contract "unambiguously" permitted the defendants to terminate the joint venture "once the $ 2 million funding limit was reached" was unreasonable. Id.

The Court concludes that *Debakey* is both factually and procedurally distinguishable from the instant case. Here, unlike *Debakey*, there is no express contract that would make SFC's reliance on Royal's oral representations unjustifiable. Further, the *Debakey* court reached its conclusions after a bench trial and post-trial briefing, clearly not [*15] subject to the liberal *12(b)(6)* standard of review. When reviewing SFC's Complaint under the correct standard of review, the Court concludes that SFC has adequately pled justifiable reliance. As noted above, SFC alleges that Royal made two statements to it indicating Royal's intent to issue a new credit risk insurance policy. (D.I. 1 at P 31, 33.) Further,

SFC alleges that Royal made these two representations following Royal's public announcement that it was exiting the credit risk insurance business (D.I. 1 at P 29), thereby justifying SFC's belief that Royal would issue one more policy despite its announcement.

Based on these allegations, the Court cannot conclude that SFC could prove no set of facts establishing justifiable reliance. See *Langford, 235 F.3d at 47.* Accordingly, the Court will deny Royal's Motion to Dismiss Counts I and II for failure to plead justifiable reliance.

### 3. Damages

The Court is not persuaded by Royal's contention that SFC has failed to plead damages as a result of Royal's allegedly fraudulent and negligent misrepresentations. In paragraph 36, SFC alleges that it borrowed over $ 12 million from Royal "that provided no benefit to SFC. [*16] " (D.I. 1.) Further, in paragraph 45, SFC alleges that based on Royal's misrepresentations, Royal continued to receive pecuniary benefits that it was not entitled to from SFC's business. Id. Based on these allegations, the Court concludes that SFC has pled damages that are a consequence of Royal's alleged misrepresentations and false statements.

### 4. Duty To Speak

Royal also contends that SFC has failed to state a claim of fraud or negligent misrepresentation because, to the extent SFC bases Counts I and II on material omissions by Royal, SFC has not alleged that Royal had a duty to speak. In Delaware, a duty to speak may arise from circumstances other than a fiduciary or confidential relationship. See *Matthews Office Designs, Inc. v. Taub Invs., 1994 Del. LEXIS 182,* [reported in full-text format at] *647 A.2d 382* (Del. 1993) (relying on the *Restatement (Second) of Torts § 551(2)* (1976) for the circumstances in which a duty to speak may arise). In relevant part, the *Restatement (Second) of Torts § 551* provides that a party to a business transaction has a duty to exercise reasonable care to disclose: 1) information known due to the existence of [*17] a confidential or fiduciary relationship; 2) information that if undisclosed will cause its partial statements of facts to be misleading; or 3) facts basic to the transaction "if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Id.; see also *Mentis v. Delaware Am. Life Ins. Co., 1999 Del. Super. LEXIS 419, 1999 WL 744430 (Del. Super. July 28, 1999)* (holding that a duty to speak may arise from a pre-existing relationship between the parties or from a partial disclosure of facts that requires further disclosure to prevent a misleading impression) (citations omitted).

Royal moves to dismiss Counts I and II only on the basis that SFC has not alleged the existence of a confidential or fiduciary relationship between the parties. Therefore, the Court will deny Royal's Motion because Royal has not established, under all the circumstances articulated by *Section 551 of the Restatement (Second) of Torts,* that SFC has failed to plead facts sufficient to establish a duty [*18] to speak.

### B. Count III, Breach of the Duty Of Good Faith And Fair Dealing

Royal contends that Count III of SFC's Complaint, breach of the duty of good faith and fair dealing, should be dismissed because there was no contract by which a covenant of good faith and fair dealing may be implied. In response, SFC contends that it has alleged facts sufficient to support its breach of the duty of good faith and fair dealing claim because the case Royal relies upon implied a covenant of good faith and fair dealing before the execution of any written contract. Further, SFC contends that part of its good faith and fair dealing claim involves actions that took place after the Notes were executed.

Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward the other party with respect to their contract. *Katz v. Oak Indus. Inc., 508 A.2d 873, 880 (Del. Ch. 1986)*(citing *Restatement (Second) of Contracts, § 205 (1981)*) A party must "act reasonably to fulfill the intent of the parties to the agreement." *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC, 832 A.2d 116, 128 (Del. Ch. 2003)* [*19] (quoting *Kelly v. McKesson HBOC, Inc., 2002 Del. Super. LEXIS 39, 2002 WL 88939 at *10 (Del. Super. Jan. 16, 2002)).* Applying these principles to the allegations in SFC's Complaint, the Court will grant Royal's Motion to Dismiss SFC's claim for breach of the duty of good faith and fair dealing.

SFC contends that it has sufficiently alleged a claim for breach of the duty of good faith and fair dealing because it alleged in its Complaint that "at the time the parties negotiated the Notes, SFC reasonably expected Royal to issue the new policy based on Royal's misrepresentations and omissions." (D.I. 14 at 21.) SFC alleges that its reasonable expectations are based upon Royal's representations to SFC's CEO that Royal would consider providing additional credit risk insurance for another securitization if SFC executed the Notes that Royal would use to make forbearance payments to Wells Fargo. (D.I. 1 at P 33.) SFC further alleges that it executed the Notes requested by Royal, but that Royal never fulfilled its promise to issue a new credit risk insurance policy. Id. at P 59-60.

The Court concludes that SFC's allegations are complaints about Royal's bad faith in bargaining or

negotiation, and [*20] therefore, do not fall within the scope of the duty of good faith and fair dealing in contracts. See *Restatement (Second) of Contracts § 205 comment (c) (1981).* "The duty of good faith is ... not imposed on parties until they have reached agreement and does not bind them during their earlier negotiations." E. Allen Farnsworth, 2 Farnsworth on Contracts § 7.17 (2d ed. 2001). SFC's allegations involve contract invalidating claims dealing with fraudulent inducement or fraud, not breach of the duty of good faith and fair dealing. Accordingly, the Court will grant Royal's Motion to Dismiss Count III of SFC's Complaint for failure to state a claim upon which relief may be granted on grounds of breach of the duty of good faith and fair dealing.

C. Count IV, Unjust Enrichment

Royal contends that Count IV, unjust enrichment, should be dismissed because payment of the loan proceeds was carried out as contemplated by the parties. Further, Royal contends that because unjust enrichment is a quasi-contract claim, it is not available when, as here, an express contract covers the same subject matter. SFC responds that it has sufficiently pled [*21] an action for unjust enrichment because actions for unjust enrichment are permitted when the validity of a contract is challenged, as in the instant case.

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Total Care Physicians, P.A. v O'Hara, 798 A.2d 1043, 1056 (Del. Super. 2001)*(quoting *Fleer Corp. v Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988)).* "'The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.'" *Id* (quoting *Jackson Nat'l Life Ins. Co. v Kennedy, 741 A.2d 377, 393 (Del. Ch. 1993).* Applying these principles to the facts alleged in SFC's Complaint, the Court concludes that SFC has adequately alleged facts in support of its unjust enrichment claim to survive Royal's Motion to Dismiss.

The Court is not persuaded by Royal's contention that SFC may not maintain a claim for unjust enrichment [*22] because the parties executed documents, i.e. the Notes, providing for payment to Wells Fargo. Although the Court agrees with the general contract principle cited by Royal, in this case, SFC alleges that the Notes should be rescinded because of fraudulent statements and omissions made by Royal. Therefore, accepting SFC's factual allegations, the Court concludes that SFC's unjust enrichment claim must survive the instant motion

because if the Notes are rescinded due to fraudulent conduct or omissions, there is no valid contract that would preclude SFC's unjust enrichment theory.

Further, the Court rejects Royal's assertion that SFC has failed to allege that Royal received any unjust retention of a benefit. Royal contends that because the parties specifically contemplated that the proceeds from the Notes would be paid to Wells Fargo, SFC cannot now complain of any unfairness that may have resulted from that agreement. SFC is not, however, merely complaining that Wells Fargo received the benefit of the proceeds of the Notes; instead, SFC asserts that Royal was unjustly enriched because Royal induced SFC to act by making promises Royal never intended to keep. Accordingly, the Court will [*23] deny Royal's Motion to Dismiss Count IV.

D. Counts V, Rescission, and VI, Declaratory Judgment

Royal contends that Counts V, rescission, and VI, declaratory judgment, should be dismissed because these claims are based upon previous paragraphs in the Complaint that are defective for reasons it stated with respect to Counts I-IV. The Court disagrees.

Delaware law recognizes fraudulent inducement as one means by which a party may rescind an agreement. *Norton v Poplos, 443 A.2d 1, 4 (Del. 1982).* The elements of fraudulent inducement are 1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result. *Lord v Souder, 748 A.2d 393, 402 (Del. 2000)* (citing *Stephenson, 462 A.2d at 1074*

The Court concludes that SFC has alleged facts sufficient to support its claim for rescission due to fraudulent inducement. In its Complaint, SFC alleges that Royal knew that representations and omissions it made to SFC were false, that [*24] it acted reasonably in reliance on these representations, and that it was injured. (D.I. 1 at P 30-36.) These allegations support a claim for rescission due to fraudulent inducement. n6

> n6 As noted above, the Court has concluded that SFC's Complaint, for the purposes of the *Rule 12(b)(6)* Motion, alleges a material fact, justifiable reliance, and the damages elements of an action for fraud.

The Court also concludes that SFC has alleged facts sufficient to support its declaratory judgment claim.

2004 U.S. Dist. LEXIS 4952, *

Count VI of SFC's Complaint asserts that SFC is entitled to a declaratory judgment that the Notes are null and void because it was fraudulently induced into their execution. As the Court has concluded, SFC has alleged facts adequate to support a claim for fraudulent inducement, and therefore, the Court will deny Royal's Motion to Dismiss Count VI of SFC's Complaint.

### CONCLUSION

For the reasons discussed, the Court concludes that Counts I and II of SFC's Complaint do not satisfy *Rule 9(b)*'s pleading requirements, [*25] and therefore, must be dismissed. Further, the Court concludes that Count III of SFC's Complaint must be dismissed pursuant to *Rule 12(b)(6)*. The Court also concludes that Counts I, II, and IV-VI state a claim for which relief may be granted.

An Order consistent with this Opinion will be entered.

### ORDER

At Wilmington, this 23rd day of March, 2004, for the reasons discussed in the Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that:

1) Royal Indemnity Co.'s ("Royal") Motion to Dismiss (D.I. 6) Counts I and II of Student Finance Corporation's ("SFC") Complaint pursuant to *Rule 9(b)* is **GRANTED;**

2) Royal's Motion to Dismiss (D.I. 6), pursuant to *Rule 12(b)(6)*, with respect to:

a) Count III of SFC's Complaint is **GRANTED;**

b) Counts I, II, IV-VI of SFC's Complaint is **DENIED.**

3) SFC shall file an Amended Complaint within twenty (20) days of this Order.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

# EXHIBIT G

LEXSEE 1993 DEL. SUPER. LEXIS 436

**Wilmington Trust Company v. The Aetna Casualty and Surety Company and The Standard Fire Insurance Company**

**Civil Action No. 90C-JA-71-1-CV**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1993 Del. Super. LEXIS 436*

**October 26, 1993, Submitted
December 9, 1993, Decided**

**SUBSEQUENT HISTORY:** [*1]

As Revised December 13, 1993.

**COUNSEL:**

Gary W. Aber, Esq., Heiman, Aber & Goldlust, First Federal Plaza, Suite 600, P.O. Box 1675, Wilmington, DE 19899, Attorney for Aetna Casualty & Surety Company.

Matthew J. Lynch, Jr., Esq., 1110 N. Market Street, Rodney Square North, Wilmington, DE 19890, Attorney for Wilmington Trust Company.

**JUDGES:** BALICK

**OPINIONBY:** BERNARD BALICK

**OPINION:**

**OPINION AND ORDER**

This is Aetna's motion for judgment notwithstanding the jury's verdict in favor of Wilmington Trust. The claim arose from the failure of a shipment of gold coins mailed by Wilmington Trust to reach its intended destination.

Aetna issued a Mail Insurance Policy to Wilmington Trust covering shipments on or after July 1, 1988. The policy covered loss of bullion, platinum and other precious metals shipped by "Registered Mail" up to $ 100,000 per shipping package. Wilmington Trust obtained excess coverage from Illinois Insurance Exchange for an additional $ 150,000 per package.

Coverage under the excess policy was contingent upon recovery from the primary insurer.

Wilmington Trust wanted to determine whether it would be feasible to send precious metals by Express Mail. In August 1988, Shelley Dolan, a Precious Metals Account [*2] Specialist, met with a post office official to obtain information on Express Mail. According to the notes Ms. Dolan took at that meeting, the postal employee explained that Express Mail operates similarly to Registered Mail. Ms. Dolan testified that the postal employee told her that Express Mail packages were "registered." Although Ms. Dolan's notes indicate that the tracking of packages is the same for the two services, this is not accurate. Registered Mail is more secure because packages are signed for every time they change hands. Express Mail packages, on the other hand, are signed for only when brought to the Post Office and delivered to the recipient.

Ms. Dolan asked Thomas Molitor, Corporate Insurance Manager for Wilmington Trust, whether Express Mail shipments of precious metals were covered by the Aetna policy. Mr. Molitor was unable to answer Ms. Dolan's question. He told her to call Jane Selner, an employee in Aetna's Bond Department, which handles policies issued to financial institutions. Ms. Dolan testified that Ms. Selner informed her that Express Mail shipments of precious metals would be covered if a receipt is issued by the Post Office so that the package could [*3] be tracked.

Ms. Selner, however, testified that the question of Express Mail shipments of precious metals was not addressed in her conversation with Ms. Dolan.

1993 Del. Super. LEXIS 436, *

According to Ms. Selner, the conversation was entirely about record keeping procedures and reporting requirements under the policy. Neither Ms. Dolan nor Ms. Selner made a record of their telephone conversation.

After Ms. Dolan reported her findings to Mark Donaldson, the Depository Manager for the Precious Metals Department, he sent a handwritten memorandum dated August 12, 1988 to Mr. Molitor asking, "Does our insurance carrier cover P/M shipments done by the U.S.P.S. Overnight Express Delivery method, subject to the $ 100,000 - value limit?" Mr. Molitor replied, "Yes!! P.S. Registered Mail, restricted receipt, etc." After receiving a copy of this note, Ms. Dolan called the postal employee to confirm that Express Mail had special handling like Registered Mail. Believing that Express Mail shipments of precious metals were therefore covered by the Aetna policy, Wilmington Trust began offering the service to its customers in September 1988.

In November 1988, Mr. Donaldson met with Ms. Selner. Mr. Donaldson testified that [*4] the purpose of this meeting was to discuss an increase in the amount of the coverage and to verify that Wilmington Trust's Express and Registered Mail record-keeping procedures met Aetna's requirements. He testified that he gave Ms. Selner a copy of Wilmington Trust's registered mail logs. Because Express Mail was not recorded in the bank's logs, he also provided a copy of the Express Mail document that was required to be attached to each package sent. According to Mr. Donaldson, Ms. Selner assured him that Wilmington Trust's record-keeping procedures complied with the terms of Aetna's policy. Mr. Donaldson also testified that Ms. Selner was made aware that Wilmington Trust was sending precious metals by Express Mail and did not object.

Ms. Selner testified that Express Mail was not discussed in the meeting and she did not receive an Express Mail document from Mr. Donaldson. Ms. Selner wrote a memo to file, dated November 28, 1988, on the "Wilmington Trust Mail Policy Meeting," stating that an increase in policy limits for precious metals was discussed and registered mail records were reviewed. A copy of the registered mail log is attached to the memo.

After the November meeting, [*5] Mr. Molitor asked Alexander Easler, the insurance broker who obtained the original policy, to obtain broadened coverage from Aetna. Mr. Easler testified that he discussed with Ms. Selner the possibility of an Express Mail endorsement for precious metals. Because Express Mail is not as secure as Registered Mail, Ms. Selner maintained that

precious metals would be covered only when shipped by Registered Mail.

On December 15, 1988, Aetna issued an Express Mail Endorsement. The endorsement provided that the term "Registered Mail" would include United States Postal Service Express Mail for Negotiable and Non-Negotiable Securities. However, no change was made with respect to precious metals.

In May 1989, Wilmington Trust shipped $ 191,215 worth of gold coins by Express Mail. The shipment was lost. Wilmington Trust filed a claim with Aetna. Aetna denied coverage. Because Aetna, as the primary carrier, denied coverage, the claim for excess coverage was also denied.

At trial, Aetna argued that the discussions that occurred before the Express Mail Endorsement was issued are barred by the parol evidence rule and that the policy's clear restriction of coverage to shipments by Registered [*6] Mail may not be enlarged by estoppel. However, these contentions relate to contract claims that Wilmington Trust did not pursue. At this stage, we need only consider the contentions that relate to the claim of negligent misrepresentation.

Aetna argues that the claim of negligent misrepresentation is barred by the "economic loss doctrine." The Supreme Court of Delaware has recently ruled that one may not recover in tort when a defective product has not caused personal injury or damage to other property. *Danforth v. Acorn Structures, Inc., Del. Supr., 608 A.2d 1194 (1992).* Aetna relies upon a formulation of the doctrine as generally prohibiting recovery of economic losses under a tort theory, with a number of limited exceptions. See *Gerdes v. John Hancock Mut. Life Ins. Co., 712 F. Supp. 692 (N.D. Ill. 1989).* Gerdes recognizes an exception for claims of negligent misrepresentation against defendants who are in the business of supplying information for the guidance of others in their business relation with third parties. Gerdes at 696. Gerdes reasons that an insurance policy is a noninformational product and any [*7] information provided would merely be incidental to the sale of the product. Gerdes at 700. Thus, an insurance company may not be liable to its insured for negligent misrepresentation.

Wilmington Trust's claim was presented to the jury under *Restatement (Second) of Torts § 552 (1976).* I did not become aware that a recent Superior Court opinion adopted Gerdes' restrictions on the scope of the tort until after posttrial briefing was completed. See Danforth v. Acorn Structures, Inc., Del. Super., C.A. No. 90C-JN-30,

Herlihy, J. (Nov. 22, 1991). In its posttrial brief, Aetna relied on the Supreme Court's decision in *Employers' Liability Assurance Corp. Ltd. v. Madric, Del. Supr., 54 Del. 593, 183 A.2d 182 (1962)*. Although the Superior Court's opinion in Madric cited the Restatement (First) § 552, the court expressly based its decision on estoppel. *Employers' Liability Assurance Corp. v. Madric, Del. Supr., 54 Del. 146, 174 A.2d 809, 813 (1961)*. The Supreme Court did not mention the Restatement. Madric therefore cannot be considered as a decision by the Supreme Court on the applicability of the Restatement to a claim of negligent [*8] misrepresentation against an insurance company. In any event, if Judge Herlihy's opinion in Danforth controls and the reasoning of Gerdes is followed, Aetna's motion must be granted.

Wilmington Trust argues that Gerdes' statement of Illinois law is mistaken. See Robert A. Borich, Jr., Comment, Negligent Misrepresentation in Illinois: The First District Expands Its Scope Beyond Defendants in the Business of Supplying Information, *22 J. Marshall L. Rev. 753 (1989)*. Borich argues that Gerdes follows Illinois cases that were based on Restatement (First), which included restrictions on the scope of the tort that were removed in Restatement (Second).

Wilmington Trust argues that Delaware should follow the carefully crafted rule of the Restatement (Second). See Comment, Negligent Misrepresentation in Missouri: Tooling Up for the Tort of the Eighties, *50 Mo. L. Rev. 877, 892 (1985)*. Many states have held insurance companies liable to policy holders for negligent misrepresentation of coverage. According to Aetna, at least twenty-three states follow the Restatement. In view of the well settled policy of departing from strict contract [*9] rules in disputes between insurance companies and their customers, a rule that restricts the right of an insured to recover from an insurance company for negligent misrepresentation seems anomalous.

The Supreme Court of Delaware has not extended the economic loss doctrine beyond claims against suppliers of defective goods. Nor has the Supreme Court addressed Superior Court's adoption of the Illinois restrictions on the tort of negligent misrepresentation. *Danforth, 608 A.2d at 1195 n. 2*. However, it is not necessary to address these issues in this case. Because I have come to the conclusion that Aetna would be entitled to judgment notwithstanding the verdict even if the Supreme Court adopts the *Restatement of Torts (Second) § 552* without the Illinois restrictions, I will rule upon an alternative ground.

There was a serious question in this case whether Wilmington Trust's belief that shipments of precious

metals by Express Mail were covered was the result of a misrepresentation by Aetna or a misunderstanding within Wilmington Trust. There was confusion about the differences between Registered and Express Mail. Whether Aetna misrepresented that shipments [*10] by Express Mail were covered and whether Wilmington Trust could justifiably rely on such a misrepresentation in the face of the original policy language were questions for the jury. The jury was instructed:

> In determining whether plaintiff justifiably relied upon information supplied by defendant, you should consider all of the surrounding circumstances, including all of the dealings and communications between the parties and the language of the policy. An insured may not rely upon an interpretation placed upon a policy that is patently absurd, but may rely upon an interpretation that is plausible, although legally incorrect, provided that the interpretation is not in patent or clear conflict with the terms of the policy.

This instruction is taken from a case involving a claim of estoppel. *Mutual Benefit Life Ins. Co. of Newark, N.J. v. Bailey, Del. Supr., 55 Del. 215, 190 A.2d 757, 760 (1963)*. However, the same rule applies to a claim of negligent misrepresentation. *Flamme v. Wolf Ins. Agency, 239 Neb. 465, 476 N.W.2d 802, 807 (Neb. 1991)*.

Although the language of the original policy provides coverage for shipments of precious metals when [*11] shipped by Registered Mail, in view of the similarities between Registered and Express Mail and the omission of any specific provision in the policy on Express Mail, a jury could rationally conclude that Wilmington Trust was justified in relying on an assurance by an agent of Aetna that shipments by Express Mail would also be covered.

However, the issuance of the endorsement significantly changed the circumstances with respect to the issue of justifiable reliance. Soon after the discussions on whether shipments by Express Mail would be covered, Aetna issued an Express Mail Endorsement. Unlike the original policy, which was silent on the matter, the endorsement expressly limited the items that could be shipped by Express Mail. Precious metals were not included. Because the endorsement expressly stated which Express Mail shipments would be covered, Wilmington Trust could no longer assume that Express Mail would generally satisfy the policy's requirement of Registered Mail. I hold as a matter of law that a

1993 Del. Super. LEXIS 436, *

commercial customer like Wilmington Trust was not justified in continuing to rely on earlier representations after the issuance of the endorsement.

For these reasons, it is **ORDERED** [*12]  that Aetna's motion for judgment notwithstanding the verdict is **GRANTED.**

BERNARD BALICK

# EXHIBIT H

LEXSEE 2004 U.S. DIST. LEXIS 25963

THE U.S. SMALL BUSINESS ADMINISTRATION As Receiver for Acorn
Technology Fund, L.P., Plaintiff, v. PROGRESS BANK, Defendant/Third-Party
Plaintiff, v. SOVEREIGN BANK, N.A., Third-Party Defendant.

CIVIL ACTION NO. 03-3461

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2004 U.S. Dist. LEXIS 25963*

**December 22, 2004, Decided**

**DISPOSITION:** [*1] Sovereign's Motion to Dismiss was granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For THE U.S. SMALL BUSINESS ADMINISTRATION AS RECEIVER FOR ACORN TECHNOLOGY FUND, L.P., Plaintiff: PATRICK K. MCCOYD, POST AND SCHELL, P.C., PHILADELPHIA, PA; ROBERT J. TOY, TRACEY RUSSELL SERAYDARIAN, POST & SCHELL, P.C., PHILA., PA; THOMAS W. RIGBY, U.S. SMALL BUSINESS ADMIN, WASHINGTON, DC.

For PROGRESS BANK, ThirdParty Plaintiff: PATRICK K. MCCOYD, POST AND SCHELL, P.C., PHILADELPHIA, PA; WILLIAM J. CLEMENTS, KLEHR HARRISON, PHILADELPHIA, PA.

For SOVEREIGN BANK, N.A., ThirdParty Defendant: BONNIE RAE GOLUB, SANDRA G. TORGET, WEIR & PARTNERS, LLP, PHILADELPHIA, PA; WALTER WEIR, JR., PILOT AIR FREIGHT CORPORATION, PHILADELPHIA, PA.

**JUDGES:** James T. Giles, C.J.

**OPINIONBY:** James T. Giles

**OPINION:**

 MEMORANDUM

Giles, C.J.

## I. Introduction

 On April 26, 2004, Progress Bank ("Progress") n1, the third-party plaintiff, filed an amended complaint against third-party defendant Sovereign Bank ("Sovereign") alleging: (1) breach of contractual indemnification, (2) breach of the implied covenant of good faith and fair dealing, (3) fraudulent inducement, (4) indemnification, (5) contribution, and (6) unjust [*2] enrichment. Before the court is Sovereign's Motion to Dismiss Progress' Amended Third-Party Complaint in its entirety pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons that follow, Sovereign's Motion to Dismiss is granted in part and denied in part.

>   n1 Since the institution of this action, Progress Bank was acquired by Fleet Bank which was then subsequently acquired by Bank of America. For clarification purposes the third-party plaintiff will be referred to as "Progress" throughout the opinion.

## II. Background

 On or about October 5, 2001, Progress entered into a Loan Purchase Agreement (the "LP Agreement") with Main Street Bank ("Main Street") (Pl.'s Am. Third-Party Compl. P6.) The LP Agreement was part of a larger transaction, covered by a Purchase and Assumption Agreement ("P&A Agreement"), by which Progress purchased certain assets and deposits from Main Street relating to the activities at its Lambertville, New Jersey

branch office. (Pl.'s Am. Third-Party Compl. P8.) One of the loans Progress [*3] purchased was a loan styled as a line of credit to Princeton Technology Management, L.L.C. (the "PTM loan") (Pl.'s Am. Third-Party Compl. P9.) Progress also acquired a two million dollar ($ 2,000,000) Certificate of Deposit, originally purchased by Acorn Technology Fund, L.P. (the "Acorn CD") as collateral for the PTM loan. (Pl.'s Am. Third-Party Compl. P10-11.) On or about June 3, 2002, Progress drew upon the Acorn CD to pay-off the PTM loan. (Pl.'s Am. Third-Party Compl. P23.)

On January 7, 2003 the United States commenced an action before this court against Acorn Technology Fund, L.P. ("Acorn"). On January 17, 2003 this court appointed the Small Business Administration ("SBA") as Receiver for Acorn for the purpose of pursuing any and all claims or causes of action available to Acorn. The SBA commenced an action against Progress on June 3, 2003 to recover the proceeds from the Acorn CD alleging that the underlying transactions between Main Street and Acorn relating to the PTM loan and the Acorn CD were illegal and fraudulent. (Pl.'s Am. Third-Party Compl. P28.) The SBA alleged that the use of Acorn funds to purchase the Acorn CD as collateral for the PTM loan (1) violated § 6.2 [*4] of Acorn's Limited Partnership Agreement, which prohibited Acorn's general partners from guarantying the debts of another person or entity without the consent of the limited partners and (2) violated federal law by not receiving the SBA's approval prior to securing third-party debt. (Pl.'s Am. Third-Party Compl. Ex. 3 PP22-25, 26-32.) The SBA alleged that Progress knew or should have known that the PTM loan and the Acorn CD transactions were illegal and fraudulent because (1) Main Street was furnished a copy of the Acorn Limited Partnership Agreement and (2) Main Street, through its employee Mr. Morrow, failed to disclose the Acorn CD as a direct or contingent liability of Acorn on an October 31, 2000 Account Verification Form (Pl.'s Am. Third-Party Compl. Ex. 3 PP21, 35-36.) Third-party defendant Sovereign is successor-in-interest to Main Street.

On July 3, 2003, Progress' counsel notified Sovereign regarding the aforementioned action filed by the SBA against Progress. (Pl.'s Am. Third-Party Compl. P49.) Progress then requested that Sovereign agree to be substituted for Progress in the pending action. (Pl.'s Am. Third-Party Compl. P52.) Sovereign responded that it was investigating [*5] the allegations relating to the PTM loan and Acorn CD. The parties entered into a court-approved Joint Stipulation with the SBA to protect Progress' right to join Sovereign as a third-party defendant (Pl.'s Am. Third-Party Compl. P53-54.) When Sovereign did not respond, Progress filed a third-party complaint against Sovereign on November 13, 2003

(Pl.'s Am. Third-Party Compl. P55.) On or about March 5, 2004 Progress entered into open settlement negotiations with the SBA. (Pl.'s Am. Third-Party Compl. P58.) Progress informed Sovereign of the settlement negotiations and invited Sovereign to participate. (Pl.'s Am. Third-Party Compl. P59.) Sovereign's counsel informed Progress that it had no intention of participating in, or funding, the settlement efforts between Progress and the SBA. (Pl.'s Am. Third-Party Compl. P60.) On March 8, 2004 Progress made an opening offer of settlement to the SBA with copies forwarded to Sovereign. (Pl.'s Am. Third-Party Compl. P61.) On April 7, 2004 Progress informed the court, as well as Sovereign, that it had reached a settlement in principle with the SBA. (Pl.'s Am. Third-Party Compl. P62.)

### III. Standard for Motion to Dismiss

Dismissal of [*6] a complaint pursuant to *Rule 12(b)(6)* is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*. The court must accept all of plaintiff's allegations as true and draw all reasonable inferences therefrom. See *Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969)* ("the material allegations of complaint are taken as admitted"); *Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993)* ("at all times in reviewing a motion to dismiss we must 'accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom.'" (quoting *Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990))).

### IV. Discussion

A. Breach of Express Contractual Indemnity

In Count I of its Amended Third-Party Complaint entitled "Breach of Contract," Progress alleges that Sovereign breached its contractual obligations to Progress by failing to indemnify and hold Progress harmless pursuant to the parties' P&A Agreement (Pl.'s Am. Third-Party Compl. P68-70.) [*7] Sovereign avers in its Motion to Dismiss that the indemnity provision of the P&A Agreement does not cover Progress' claims. (Third-Party Def.'s Mot. To Dismiss at 10.) The court disagrees.

Claims for contractual indemnity follow the well-settled principles of contract interpretation. *Ratti v. Wheeling Pittsburgh Steel Corp., 2000 PA Super 239, 758 A.2d 695, 702 (Pa. Super. Ct. 2000)* Interpretation begins with the plain language of the written agreement and the principle that words must be given their ordinary

meaning. *Eichelman v. Nationwide Ins. Co., 551 Pa. 558, 711 A.2d 1006, 1008 (Pa. 1998); Atlantic Refining Co. v. Wyoming Nat'l Bank, 51 A.2d 719, 723 (Pa. 1947); Biase v. Congress Fin. Corp. (In re Tops Appliance City, Inc.), 372 F.3d 510, 514 (3d Cir. 2004); In re Kaplan, 143 F.3d 807, 816 (3d Cir. 1995)*. The purpose of contract interpretation is to give effect to the intention of the parties if expressed in clear and unambiguous terms. *Standard Venetian Blind Co. v. American Empire Ins. Co., 503 Pa. 300, 469 A.2d 563, 566 (Pa. 1983); Brotherton Constr. Co. v. Patterson-Emerson-Comstock, Inc., 406 Pa. 400, 178 A.2d 696, 697 (Pa. 1962); Gleason v. Northwest Mortgage, Inc., 243 F.3d 130, 138-39 (3d Cir. 2001)*; [*8] *Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1139 (3d Cir. 1995)*. The parties' intention is deemed to be embodied in the writing itself and when the words are clear and unambiguous the intent is to be gleaned exclusively from the express language of the agreement. *Delaware County v. Delaware County Prison Employees Independent Union, 552 Pa. 184, 713 A.2d 1135, 1137 (Pa. 1998)*.

Section 1.11 of the P&A Agreement, entitled "Indemnification," provides for indemnification between Sovereign ("the Seller") and Progress ("the Buyer"). Section 1.11(a) states:

> Seller shall indemnify, hold harmless and defend Purchaser from and against all losses and liabilities, including reasonable legal fees and expenses, arising out of any actions, suits or proceedings commenced prior to the Effective Date . . .; and Seller shall indemnify, hold harmless and defend Purchaser from and against all losses and liabilities, including reasonable legal fees and expenses, arising out of any actions, suits or proceedings commenced on or after the Effective Date but which relate to operations at the Branches prior to the Effective Date. Seller agrees further to defend,   [*9]   indemnify and hold harmless Purchaser from and against all claims, losses, liabilities (including reasonable legal fees and expenses) and obligations resulting from any material breach of any agreement, representation or warranty made by Seller in this Agreement . . . (emphasis added).

Section 1.11(c) defines the procedure the parties should follow in the event a claim for indemnification is made. Section 1.11(c) provides:

> A claim for indemnification under Sections 1.11(a) or 1.11(b) of this Agreement may be made by the claiming party by giving written notice thereof to the other party. Promptly after receipt by either party of notice of the assertion of any claim or the commencement of any action, suit or proceeding with respect to which a claim for indemnification will be made under this Agreement such party (the "Indemnified Party") shall give written notice thereof to the other party (the "Indemnitor") and will thereafter keep the Indemnitor reasonably informed with respect thereto, provided that failure of the Indemnified Party to give the Indemnitor prompt notice as provided herein shall not relieve the Indemnitor of its obligations hereunder except to the extent,   [*10]   if any, it shall have been materially prejudiced thereby.

The actions of Sovereign's predecessor Main Street involving the purchase of the Acorn CD and its use as collateral for the PTM loan are clearly covered by the language of § 1.11(a) "relating to the operations" of the Lambertville Branch. Working with customers to purchase certificates of deposits or qualify for loans represent two of the fundamental operations of any bank. Furthermore, Progress has sufficiently established that it complied with the requirements set forth in § 1.11(c) regarding proper notice of a claim for indemnification. Progress promptly notified Sovereign of the SBA's claims relating to the PTM loan and the Acorn CD and continued to communicate with Sovereign regarding its position that Sovereign was the primary wrongdoer in regards to these transactions and its request for indemnification and/or the substitution of Sovereign as the defendant in the action between the SBA and Progress. The express language of section 1.11(a) of the P&A Agreement covers the conduct at issue and Progress has sufficiently established that it informed Sovereign of the underlying grounds for its indemnification claim and [*11] kept it reasonably informed of the development of the case with the SBA and the ensuing settlement efforts. Therefore, the court finds that Progress has sufficiently alleged a claim for express contractual indemnity. Accordingly, Sovereign's motion to dismiss is denied as to that claim.

B. Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count I of its Amended Third-Party Complaint, Progress also asserts a claim against Sovereign for breach of the implied covenant of goof faith and fair dealing. (Pl.'s Am. Third-Party Compl. P71.) Sovereign submits in its Motion to Dismiss that Progress is barred by Pennsylvania law from asserting an independent

action for breach of the implied covenant of good faith and fair dealing, given the existence of Progress' breach of contract claim. (Third-Party Def.'s Mot. To Dismiss at 7.) The court agrees with Sovereign.

Pennsylvania courts have adopted § 205 of the Restatement (Second) of Contracts which provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981); Creeger Brick & Bldg Supply Inc. v. Mid-State Bank & Trust Co., 385 Pa. Super. 30, 560 A.2d 151, 153 (Pa. Super. Ct. 1989); [*12] Somers v. Somers, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992); Killian v. McCulloch, 850 F. Supp. 1239, 1250 (E.D. Pa. 1994). The purpose of implying the duty of good faith and fair dealing is to "to allow enforcement of the contract terms in a manner that is consistent with the parties' reasonable expectations." Killian, 850 F. Supp. at 1250. Pennsylvania courts have determined that the duty of good faith is not implied where "a plaintiff has an independent cause of action to vindicate the same rights with respect to which the plaintiff invokes the duty of good faith." Agrecycle, Inc. v. City of Pittsburgh, 783 A.2d 863, 867 (Pa. Commw. Ct. 2001). See also Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 701-02 (3d Cir. 1993) (finding that under Pennsylvania law the plaintiff could not maintain a separate cause of action for an implied duty of good faith and fair dealing where the implied claim was identical to, and therefore covered, by another cause of action in the same case). Therefore, a plaintiff cannot seek to recover from a defendant on a separate theory of breach of implied duty of [*13] good faith and fair dealing while maintaining an action for breach of contract, which includes that duty. See JHE, Inc. v. Southeastern Pennsylvania Transp. Auth., No. 1790 Nov. Term 2001, 2002 WL 1018941 at *7 (Pa. Com. Pl. May 17, 2002) (holding that "a breach of the covenant of good faith is nothing more than a breach of contract claim and that separate causes of action cannot be maintained for each, even in the alternative."); Allstate Transp. Co., Inc. v. Southeastern Pennsylvania Transp. Auth., No. Civ. A. 97-1482, 2000 WL 329015 at *18-19 (E.D. Pa. Mar. 27, 2000) (finding that "there can be no implied covenant as to any matter specifically covered by the written contract between the parties."); McHale v. NuEnergy Group, 2002 U.S. Dist. LEXIS 3307, No. Civ. A. 01-4111, 2002 WL 321797 at *8 (E.D. Pa. Feb. 27, 2002) (determining that "Pennsylvania law would not recognize a claim for breach of covenant of good faith and fair dealing as an independent cause of action separate from the breach of contract claim since the actions forming the basis of the breach of contract claim are essentially the same as the actions forming the basis of the bad faith claim.") As [*14] the third circuit has explained, "the covenant of good faith and fair

dealing 'involve[s] an implied duty to bring about a condition or to exercise discretion in a reasonable way'" so that "implied covenants and any express terms of a contract are necessarily mutually exclusive-one can invoke 'implied' terms only when there are no express terms in the contract relating to the particular issue." USX Corp. v. Prime Leasing Inc., 988 F.2d 433, 438 (3d Cir. 1993) (emphasis in original).

Progress has failed to establish that its claim for breach of the implied covenant of good faith and fair dealing is distinct and separate from its claim for breach of contract. First, both allegations are contained in the same count, which generally sets forth Progress' contention that Sovereign breached the contractual obligations set forth in the P&A Agreement. Second, Progress has not adequately pled a separate claim for breach of the implied covenant of good faith and fair dealing. It states that Sovereign's actions and inactions were "also" in breach of the implied covenant implicit in the P&A Agreement. (Pl.'s Third-Party Am. Compl. P71.) The court concludes that there exists [*15] no separate basis for the breach of implied covenant of good faith and fair dealing. It is not present in the Third-Party Complaint or the response to the Motion to Dismiss. More importantly, the parties contract constitutes the entire agreement between them.

C. Fraud

Progress has asserted a claim for fraudulent inducement in Count II of its Amended-Third Party Complaint against Sovereign. (Pl.'s Am. Third-Party Compl. P74-86.) In moving to dismiss this Count, Sovereign argues that Progress has failed to establish the necessary elements of fraudulent inducement or, in the alternative, that Progress' claim is barred by either the economic loss doctrine, the gist of the action doctrine, or the two-year statute of limitations applicable to tort actions in Pennsylvania. (Third-Party Def.'s Mot. To Dismiss at 12-20.) The court finds that Progress has sufficiently alleged a claim for fraudulent inducement and that its claim is not barred.

1. Fraudulent Inducement

Fraud is a generic term covering "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by [*16] speech or silence, word of mouth, or look or gesture." Moser v. DeSetta, 527 Pa. 157, 589 A.2d 679, 682 (Pa. 1991); Frowen v. Blank, 493 Pa. 137, 425 A.2d 412, 415 (Pa. 1981). In Pennsylvania, the tort of fraudulent inducement n2 requires:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994).

n2 Also referred to as "intentional misrepresentation."

Pennsylvania courts have consistently held that the concealment of a material fact by a defendant amounts "to a culpable misrepresentation no less than does an intentional false statement." *Moser,* 589 A.2d at 682. See also *De Joseph v. Zambelli,* 392 Pa. 24, 139 A.2d 644, 647 (Pa. 1958) [*17] (holding that "fraud arises where the misrepresentation is knowingly false, where there is a concealment calculated to deceive, or where there is a non-privileged failure to disclose."). While silence is insufficient to constitute actionable fraud, if the party has a duty to speak, concealment or non-disclosure of a material fact constitutes fraudulent misrepresentation. See *Sewak v. Lockhart,* 699 A.2d 755, 759 (Pa. Super. Ct. 1997) (holding that "mere silence without a duty to speak will not constitute fraud."); *Smith v. Renaut,* 387 Pa. Super. 299, 564 A.2d 188, 192 (Pa. Super. Ct. 1989) (same). Such a duty arises, for example, "as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party" leaving the parties without equal knowledge of and access to material facts. *City of Rome v. Glanton,* 958 F. Supp. 1026, 1038 (E.D. Pa. 1997). A misrepresentation is material "when it is of such a character, that if it has not been made the transaction would not have been entered into." *De Joseph,* 139 A.2d at 647.

Progress has sufficiently alleged the requisite elements to establish [*18] fraudulent inducement at this stage in the litigation. Progress' claim is essentially that Main Street, Sovereign's predecessor-in-interest, intentionally concealed material facts concerning the extension of the Acorn CD and its use as collateral for the PTM loan for the purpose of inducing Progress to accept these instruments as part of the larger transaction between the parties. Specifically, Progress has noted the absence of the Account Verification Form as potential evidence of Main Street's intention to deceive. Furthermore, it is reasonable to conclude that it was material to the transaction that Progress believed that in accepting the PTM loan and the Acorn CD that it was receiving legal transactions of marketable value. Progress' reliance on Main Street's assertions, contained, for example, in their representations and warranties to the effect that the loan and CD were legal and binding, cannot be said, as a matter of law, to be unreasonable. Progress has pled sufficient facts for a jury to determine that it was fraudulently induced by Main Street to purchase and assume liability for the PTM loan and the Acorn CD.

*2. Economic Loss Doctrine*

The economic loss doctrine is [*19] a judicially created bar to recovery under tort for purely economic harm. *New York State Electric & Gas Corp. v. Westinghouse Electric Corp.,* 654 A.2d 919, 925, 387 Pa. Super. 537 (Pa. Super. Ct. 1989). The economic loss doctrine precludes recovery for purely economic harm in actions based on negligence or strict liability. Id. The Pennsylvania Supreme Court, however, has not determined whether the economic loss doctrine extends to claims based on intentional tortious conduct. See *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 670, 674-76 (3d Cir. 2002) (finding that "the law in Pennsylvania with respect to the application of the economic loss doctrine to intentional fraud actions remains unsettled, and the district court opinions interpreting Pennsylvania law on the point provide little guidance.").

However, the emerging trend in lower Pennsylvania courts and in other jurisdictions has been to permit purely economic recovery in causes of action for intentional fraud. *Id.* at 676. Many such courts have found that claims for intentional fraudulent conduct are an exception to the economic loss doctrine and no Pennsylvania court has found that the doctrine precludes [*20] recovery in the face of a claim for intentional wrongdoing. See *David Pflumm Paving & Excavating, Inc. v. Foundation Serv. Co., F.T.,* 2003 PA Super 41, 816 A.2d 1164, 1171 n.2 (Pa. Super. Ct. 2003) (nothing that "there are no Pennsylvania Supreme Court or Superior Court cases that indicate that the economic loss doctrine bars a claim for fraudulent misrepresentation"); *Aikens v. Baltimore & Ohio R.R. Co.,* 348 Pa. Super. 17, 501 A.2d 277, 278 (Pa. Super. Ct. 1985) (holding that claims for intentional wrongdoing are an exception to the economic loss doctrine); *New Hope Books, Inc. v. Datavision Prologix, Inc.,* No. 01741 July Term 2001, 2003 WL 21672991 at *6 n.8 (Pa. Com. Pl. June 24, 2003) (same); *Oppenheimer v. York Int'l,* No. 4348 March Term 2002, 2002 WL 31409949 at *2 (Pa. Com. Pl. Oct. 25, 2002) (same); *Zwiercan v. GMC,* 58 Pa. D. & C.4th 251, No. 3235 June Term 1999, 2002 WL 31053838 at *6 (Pa. Com. Pl. Sept. 11, 2002) (same); WorldWideWeb Network Corp. v. Entrade, Inc., No. 3839 Dec. Term 2001, 2002 WL 1472336 at *3 (Pa.

2004 U.S. Dist. LEXIS 25963, *

Com. Pl. June 20, 2002) (same); *JHE, Inc., 2002 WL 1018941* at *7 (same); Paola [*21] Amico v. Radius Communications, No. 1793 Jan. Term 2000, *2001 WL 1807924* at *3 (Pa. Com. Pl. Jan. 9, 2001) (same); *First Republic Bank v. Brand, 50 Pa. D. & C.4th 329, No. 147 Aug. Term 2000, 2000 WL 33394627 at *5 (Pa. Com. Pl. Dec. 19, 2000)* (same).

This court, following the third circuit, finds the reasoning expressed by the Michigan Court of Appeals on this subject to be of significant guidance:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely--which normally would constitute grounds for invoking the economic loss doctrine--but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. *Huron Tool & Eng'g Co. v. Precision Consulting Servs., 532 N.W.2d 541, 545, 209 Mich. App. 365 (Mich. Ct. App. 1995)* (quoted in *Werwinski, 286 F.3d at 676*).

In its Third-Party Complaint Progress has sufficiently alleged that it was fraudulently induced by Main Street to purchase the PTM loan and the Acorn CD as part of the larger transaction between the parties. Progress' theory that Main Street intentionally [*22] concealed material information regarding the purchase and use of the loan and the CD is sufficient to maintain a claim for fraudulent inducement.

### 3. *Gist of the Action Doctrine*

Like the economic loss doctrine, the "gist of the action" doctrine is designed to maintain a conceptual distinction between the laws of contracts and torts. *Freestone v. New England Log Homes, 2003 PA Super 24, 819 A.2d 550, 554 (Pa. Super. Ct. 2003)*. The purpose of the doctrine is to prevent a plaintiff from re-casting breach of contract claims as tort actions by merely alleging that the conduct in question was done wantonly. Id.; *Pittsburgh Constr. Co. v. Griffith, 2003 PA Super 374, 834 A.2d 572, 581 (Pa. Super. Ct. 2003)*; *Phico Ins. Co. v. Presbyterian Medical Servs. Corp., 663 A.2d 753, 757, 444 Pa. Super. 221 (Pa. Super. Ct. 1995)*. To determine whether the plaintiff has sufficiently alleged a tort, as opposed to a contract claim, Pennsylvania courts look to see whether the "gist," or gravamen, of the alleged conduct sounds in contract or tort. *Freestone, 819 A.2d at 554*. In making this determination, courts have determined whether (1) the contract is collateral to, rather than intertwined [*23]

with, the tortious conduct; (2) the alleged conduct concerned the performance of the contract; or (3) the parties obligations are defined by the terms of the contract or the larger social policies embodied in the law of torts. See, e.g., *Pittsburgh Constr., 834 A.2d at 582* (holding that "a breach of contract may give rise to an actionable tort where the wrong ascribed to the defendant is the gist of the action, the contract being collateral."); *Etoll, Inc. v. Elias/Savion Adver., Inc., 2002 PA Super 347, 811 A.2d 10, 19 (Pa. Super. Ct. 2002)* (determining that Pennsylvania case law concerning the gist of the action doctrine "turn[s] on the question of whether the fraud concerned the performance of contractual duties."); *Air Products & Chem., Inc. v. Eaton Metal Products Co., 256 F. Supp. 2d 329, 341 (E.D. Pa. 2003)* (looking to the issue of social policy to determine whether the claim is contractual or tortious in nature). When applying these principles to allegations of fraudulent inducement, courts have reasoned that fraud in the inducement claims will generally not be covered by the gist of the action doctrine because fraud to induce a person to enter [*24] a contract is generally collateral to, rather than intertwined, with the terms of the contract thus implicating social policy concerns against fraud which are external to the contractual obligations of the parties. *Etoll, Inc., 811 A.2d at 17; Air Products, 256 F. Supp. 2d at 341*.

Progress alleges that Main Street intentionally concealed material information regarding the particulars of the PTM loan and the Acorn CD prior to the finalization of the contract between the parties. Progress has specifically alleged that vital documentation was withheld during the parties' due diligence, leaving it without cause to distrust Main Street's assertions that the PTM loan and the Acorn CD were legally sound and marketable. Accepting Progress' allegations as true, the gist of its action against Sovereign does not arise from the performance or obligations contained in the parties' contract, but from the pre-contract assertions and conduct of Main Street. Therefore, the gist of the action doctrine is inapplicable to the facts of this case and will not bar Progress from going forward on its claim of fraudulent inducement.

### 4. *Statute of Limitations*

An action [*25] "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud" must be commenced within two years. *42 Pa. Cons. Stat. Ann. § 5524(7) (West 2004)*. Generally, the statute of limitations begins to run "as soon as the right to institute and maintain a suit arises . . . " *Pocono Int'l Raceway, Inc., v. Pocono Produce, Inc., 503 Pa. 80, 468 A.2d 468, 471 (Pa. 1983)*. However, if a

plaintiff, despite exercising due diligence, is unable to discover or know of the injury or its cause, the "discovery rule" exception applies to toll the statute of limitations until such time as the plaintiff discovers, or reasonably should have discovered, the injury *Pocono, 468 A.2d at 471*; *Pickett v. American Ordnance Pres Ass'n, 60 F. Supp. 2d 450, 454 (E.D. Pa. 1999)*; *Kirschner v. Cable/Tel Corp., 576 F. Supp. 234, 238 (E.D. Pa. 1983)*. Determination of whether a plaintiff has exercised due diligence in discovering the harm is generally a matter for the jury, making a dispositive determination inappropriate. [*26] *Kingston Coal Co. v. Felton Mining Co., Inc., 456 Pa. Super. 270, 690 A.2d 284, 288 (Pa. Super. Ct. 1997)*; *Haggart v. Cho, 703 A.2d 522, 528 (Pa. Super. Ct 1997)*; *Pickett, 60 F. Supp. 2d at 454*. However, if the facts are so clear that reasonable minds could not "differ as to whether the plaintiff should reasonably be aware that he has suffered an injury, the determination as to when the limitations period commences may be made as a matter of law." *Kingston, 690 A.2d at 288*. The standard for reasonable diligence is an objective or external one, focusing on whether a reasonable person in the plaintiff's position would have been unaware of the salient facts associated with the injury and its cause. *Haggart, 703 A.2d at 528*. Under Pennsylvania law, if the defendant actively conceals his fraudulent conduct the discovery rule applies to toll the statute until the plaintiff could reasonably have discovered the harm. *Dalzell v. Lewis, 252 Pa. 283, 97 A. 407, 409 (Pa. 1916)*; *Deemer v. Weaver, 324 Pa. 85, 187 A. 215, 216 (Pa. 1936)*; *Turtzo v. Boyer, 370 Pa. 526, 88 A.2d 884, 885 (Pa. 1952)*; *Lange v. Burd, 2002 PA Super. 158, 800 A.2d 336, 339 (Pa. Super. Ct. 2002)* [*27]

Progress has sufficiently alleged that Main Street actively concealed the true nature of the Acorn transactions for the purpose of fraudulently inducing Progress into purchasing and assuming liability for the PTM loan and the Acorn CD. The absence of the Account Verification Form from Main Street's production of documents during and leading up to the closing of the transaction provides sufficient support to assume, at this stage, that Progress was both unaware, and without the means of discovering independently, the alleged illegal activity surrounding both the loan and the CD. Taking all Progress' allegations as true and drawing all reasonable inferences therefrom, it cannot be said as a matter of law that Progress should have discovered the issues surrounding these transactions before it was served with a complaint by the SBA on June 3, 2003. The fact that Progress drew upon the Acorn CD to pay off the PTM loan on June 3, 2002 supports Progress' claim that it was unaware of any problems associated with such transactions prior to the SBA's action. Accordingly, the motion to dismiss this claim is denied.

D. Indemnification

In Count III Progress asserts a claim for "Indemnification. [*28] " (Pl.'s Am. Third-Party Compl. PP95, 98.) Sovereign argues in its Motion to Dismiss that Progress is not entitled to either contractual indemnification, based on the representations and warranties contained in the parties' P&A Agreement, or common law indemnification. (Third-Party Def.'s Mot. To Dismiss at 20-26.) The court finds that Count III, as written, is the same as the claim of fraud set out in Count II of the complaint. Therefore, the motion to dismiss is granted as to Count III.

Paragraph 87 of the Third-Party Complaint incorporates all previous allegations, including Count II—Fraudulent Inducement. Progress' description of the factual grounds for its claim for "Indemnification" under Count III consistently follows the elements necessary for a claim for fraudulent misrepresentation. For example, in paragraphs 89 and 90 Progress alleges that it "reasonably relied" on Main Street's due diligence and disclosures regarding the PTM loan and the Acorn CD which were "defective, false and misleading." Progress continues that it was "induced" to enter into the transaction by Main Street's assurances that the financial instruments were legal and proper. (Pl.'s Am. Third-Party Compl. [*29] P91.) Finally, Progress argues that Main Street "knowingly, deliberately and inequitably put Progress in harm's way of the SBA's eventual claims against Progress." (Id. at P92.) Taken together, the allegations contained in Count III only replicate the allegations contained in Count II of the same complaint, and is not a separate cause of action.

E. Contribution

In Count IV Progress asserts a claim for common law contribution against Sovereign. (Pl.'s Am. Third-Party Compl. P99-101.) In moving to dismiss Progress' claim, Sovereign argues that Progress is not entitled to contribution because Sovereign and Progress are not joint tortfeasors. (Third-Party Def.'s Mot. To Dismiss at 26.) This court finds that Progress has sufficiently established the necessary elements to continue to pursue a claim for contribution from Sovereign.

In 1951, Pennsylvania adopted the Uniform Contribution Among Tort-feasors Act ("UCATA"), *42 Pa. Cons. Stat. Ann. § § 8321-27 (West 2004)*, "to establish generally the existence of the right of contribution among joint tort-feasors and to provide the procedure whereby that right might be made effective in practice." *Swartz v. Sunderland, 403 Pa. 222, 169 A.2d 289, 291 (Pa. 1961)* [*30] The right of contribution is an equitable principle based on the understanding that "as between the two tort-feasors [] contribution is not a recovery for the tort but the enforcement of an equitable

duty to share liability for the wrong done." *Puller v Puller, 380 Pa. 219, 110 A.2d 175, 177 (Pa. 1955)*. See also *Swartz, 169 A.2d at 290* (holding that "the doctrine of contribution rests on the principle that, when two parties stand in aequali jue, the law requires equality; which is equity, and one of them shall not be obliged to bear a common burden in ease of the rest." (quoting *Parker to Use of Bunting v Rodgers, 125 Pa. Super. 48, 189 A. 693, 695 (Pa Super Ct 1937)*); *Mong v Hershberger, 200 Pa. Super. 68, 186 A.2d 427, 429 (Pa. 1963)* (finding that equity is the keynote of the doctrine of contribution); *Brown v. Dickey, 397 Pa. 454, 155 A.2d 836, 838 (Pa. 1959)* ("The right to contribution is an equitable right based on a common liability to plaintiff.") (emphasis in original).

*Section 8324 of the UCATA* outlines the requirements for contribution under Pennsylvania law:

> (a) **General rule:** The right of contribution exists among joint tort-feasors. [*31]
>
> (b) **Payment required:** A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.
>
> (c) **Effect of settlement:** A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

In other words, "the equitable obligation of contribution may be asserted where: (1) the parties combined to produce the plaintiff's injury; (2) the parties are each liable in tort to the plaintiff; and (3) a tortfeasor has discharged the common liability by paying more than his pro rata share." *Mattia v Sears, Roebuck & Co., 366 Pa. Super. 504, 531 A.2d 789, 791 (Pa. Super. Ct. 1987)*.

Before seeking contribution, a party must first establish that it and the defendant are joint tort-feasors. The fact that one party has paid money to settle the claim of the original plaintiff is not a sufficient basis for recovery in the absence of an established joint tortfeasor relationship. *Slaughter v. Pennsylvania X-Ray Corp., 638 F.2d 639, 642 (3d Cir. 1981)* [*32] The Uniform Contribution Among Tort-feasors Act defines "joint tort-feasors" as "two or more persons jointly or severally liable in tort for the same injury to persons or property,

whether or not judgment has been recovered against all or some of them." *42 Pa. Cons. Stat. Ann. § 8322* (West 2004). Under Pennsylvania law, "two actors are joint tortfeasors if their conduct 'causes a single harm which cannot be apportioned . . . even though [the actors] may have acted independently.'" *Mattia, 531 A.2d at 791* (quoting *Capone v. Donovan, 332 Pa. Super. 185, 480 A.2d 1249, 1251 (Pa. Super. Ct. 1984)*); *Kovalesky v Gain Rug Mkt., 422 Pa. Super. 116, 618 A.2d 1044, 1046 (Pa. Super. Ct. 1993)*; *Rabatin v Columbus Lines, Inc., 790 F.2d 22, 25 (3d Cir. 1986)*. In other words, a party can establish the joint tortfeasor relationship by showing either that both parties acted together to commit the wrong, or that the parties' independent acts caused a single injury. *Lasprogata v Qualls, 263 Pa. Super. 174, 397 A.2d 803, 805 n.4 (Pa. Super. Ct. 1979)* (looking to Black's Law Dictionary to find the joint tortfeasor relationship where the parties "either act together in committing [*33] the wrong, or their acts, if independent of each other, must unite in causing a single injury.").

Once the joint tortfeasor relationship is established, the party seeking contribution must further demonstrate "(1) that one joint tort-feasor has discharged the common liability or paid more than its pro rata share" and "(2) that the liability of the other joint tort-feasor to the injured persons has been extinguished by the settlement." *Swartz, 169 A.2d at 291*. Uniform Contribution Among Tort-feasors Act, *42 Pa. Cons. Stat. Ann § 8324(b)-(c)* (West 2004). As the Superior Court of Pennsylvania explained in *Svetz v. Land Tool Co., 355 Pa. Super. 230, 513 A.2d 403, 407 (Pa. Super. Ct. 1986)*:

> [A] tortfeasor's right to receive contribution from a joint tortfeasor derives not from his liability to the claimant but rather from the equitable principles that once the joint liability of several tortfeasors has been determined, it would be unfair to impose the financial burden of the plaintiff's loss on one tortfeasor to the exclusion of the other. It matters not on which theory a tortfeasor has been held responsible for the tort committed against the plaintiff. So long as [*34] the party seeking contribution has paid in excess of his or her share of liability, it would be inequitable under the Act to deny that party's right to contribution from a second tortfeasor who also contributed to the plaintiff's injury.

2004 U.S. Dist. LEXIS 25963, *

When, as here, settlement occurs before the plaintiff has proven his case at trial, the settling tortfeasor cannot enforce his right to contribution unless he establishes that the settlement figure was reasonable. *Nationwide Mut Ins. Co. v. Philadelphia Elec Co., 443 F. Supp 1140, 1143 (E.D. Pa. 1977)*.

Progress has sufficiently established its right to proceed against Sovereign for contribution. First, Progress conceded its status as a tortfeasor for the purpose of seeking contribution by averring that Main Street's alleged fraudulent representations led Progress to act negligently regarding the Acorn CD and the PTM loan. By honoring the Acorn CD and using the proceeds to pay off the PTM loan, Progress performed an act that tortiously injured Acorn and prompted the SBA to take action on Acorn's behalf. One may also reasonably infer from Progress' settlement that it conceded its status as a tortfeasor. Progress has also [*35] sufficiently pled that Sovereign was a joint tortfeasor. The majority of the allegations contained in the SBA action against Progress pertained to the negligent, reckless, and/or willful misconduct of Main Street. Progress argues that discovery may reveal that the collective actions of Progress and Main Street, although independent, united in causing a single injury to Acorn for which both are liable. Therefore, taking all Progress' allegations as true and drawing all reasonable inferences therefrom, Progress has sufficiently established that it and Sovereign are joint tortfeasors.

Second, Progress has sufficiently established that it has discharged its common liability with Sovereign through its settlement with the SBA. Although the court has not been made aware of the particulars of the settlement agreement between Progress and the SBA, it is reasonable to assume that Progress' settlement with the SBA regarding the Acorn CD and the PTM loan extended to Sovereign. By extinguishing its own liability regarding the Acorn CD and the PTM loan, Progress has effectively barred the SBA from seeking further recovery from Sovereign for the use of $ 2,000,000 of Acorn funds to purchase the [*36] Acom CD and collateralize the PTM loan. Furthermore, there has been no allegation by either Progress or Sovereign that Sovereign's liability for these transactions has not been extinguished by settlement or that the settlement was unreasonable. Therefore, Progress has established all the necessary elements to proceed against Sovereign for contribution.

F. Unjust Enrichment

Finally, Progress asserts a claim for unjust enrichment. (Pl.'s Am. Third-Party Compl. P102-06.) Sovereign has moved to dismiss Count V arguing that unjust enrichment is unavailable where the relationship between the parties is founded on an express agreement. (Third-Party Def.'s Mot. To Dismiss at 27.) Progress has answered that its claim for unjust enrichment should remain because it is entitled to plead an alternative form of recovery to its claim for breach of contract. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. To Dismiss at 36). The court agrees with Progress.

A claim for unjust enrichment arises when one party retains a benefit that in justice and equity belongs to another. *Lucey v. Workmen's Compensation Appeal Bd. (VY-CAL Plastics), 732 A.2d 1201, 1207 (Pa. 1999)*. Since unjust [*37] enrichment is an equitable doctrine, it is generally "inapplicable when the relationship between [the] parties is founded on a written agreement or express contract." *Schott v. Westinghouse Elec. Corp., 436 Pa. 279, 259 A.2d 443, 448 (Pa. 1969)*. See also *Villoresi v. Femminella, 2004 PA Super 256, 856 A.2d 78, 84 (Pa. Super. Ct. 2004)* ("Where an express contract already exists to define the parameters of the parties' respective duties, the parties may avail themselves of contract remedies and an equitable remedy for unjust enrichment cannot be deemed to exist."). However, under *Rule 8(a) of the Federal Rules of Civil Procedure*, plaintiffs are free to plead alternative theories of relief. Accordingly, Sovereign's motion to dismiss this claim is denied.

V. Conclusion

For the foregoing reasons, Sovereign's Motion to Dismiss is granted in part and denied in part. An appropriate Order follows.

ORDER

AND NOW, this 22nd day of December, 2004, upon consideration of the Third-Party Defendant's Motion to Dismiss Third-Party Plaintiff's Amended Third-Party Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, it is hereby ORDERED that Third-Party Defendant's Motion is GRANTED [*38] in part and DENIED in part.

BY THE COURT:

S/ James T. Giles

C.J.