# EXHIBIT I

LEXSEE 2002 U.S. DIST. LEXIS 17192

**CASTROL INDUSTRIAL NORTH AMERICA INC., Plaintiff, v. AIROSOL COMPANY, INC., Defendant. AIROSOL COMPANY, INC., Third-Party Plaintiff, v. SEXTON CAN COMPANY, INC., Third-Party Defendant.**

**No. 01 C 1077**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 17192*

**September 11, 2002, Decided**
**September 13, 2002, Docketed**

**DISPOSITION:** [*1] Third-Party Defendant Sexton Can Company, Inc.'s motion to dismiss Counts I-VI of the third-party complaint granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CASTROL INDUSTRIAL NORTH AMERICA INC., plaintiff: Fern C. Bomchill, Susan Elizabeth Brice, Mayer, Brown, Rowe & Maw, Chicago, IL.

For AIROSOL COMPANY, INC., defendant: Richard M. Johnson, Jr., Matthew Burn Stephens, Stone & Moore, Robert E. Burrows, Attorney at Law, Chicago, IL.

For AIROSOL COMPANY, INC., third-party plaintiff: Richard M. Johnson, Jr., Matthew Burn Stephens & Moore, Robert E. Burrows, Attorney at Law, Chicago, IL.

For SEXTON CAN COMPANY, INC., third-party defendant: Michael Joseph Grant, Blake T. Lynch, Patrick Joseph Fanning, Suzanne Marie Don De'Ville, Grant, Ross & Pittman, Chicago, IL.

**JUDGES:** John F. Grady, United States District Judge.

**OPINIONBY:** John F. Grady

**OPINION:**

**MEMORANDUM OPINION**

Before the court is the third-party defendant's motion to dismiss Counts I-VI of the third-party complaint. For the reasons explained below, the motion is granted.

**BACKGROUND**

Plaintiff Castrol Industrial North America Inc. ("Castrol") brings this products liability action against Airosol Company, Inc. ("Airosol"), claiming, [*2] inter alia, that defendant manufactured unsatisfactory aerosol cans that plaintiff purchased for ultimate distribution to automobile owners. The complaint alleges the following facts. In fall 1998, Castrol considered marketing a new product consisting of a mixture of oil and gas for use by consumers to recharge an automobile's air conditioning system. Castrol retained Airosol for advice on the selection of an appropriate container and testing of the manufactured product. After receiving information and oil and gas samples from Castrol, Airosol advised that the mixture be blended and placed in a certain type and size of aerosol can manufactured by third-party defendant Sexton Can Company, Inc. ("Sexton"), and that the filled Sexton cans be tested in a certain manner. Airosol provided Castrol with a price estimate for manufacturing and testing the product in accordance with its advice.

Castrol then contracted with Airosol to manufacture and test the product. Pursuant to the agreement, Castrol would supply the oil and Airosol would supply the gas and the Sexton cans. Airosol then filled, tested and shipped 179,604 cans for packaging by Fas-Pak Inc. ("Fas-Pak"). After Fas-Pak received [*3] the cans, it

assembled "Recharge Kits," each of which contained two cans and a hose, and delivered them to various retailers. Castrol alleges that by June 1999, over 71,000 cans were in the marketplace. Castrol paid Airosol $ 378,471.00 for the filled, tested and shipped cans and for approximately 46,000 empty cans located on Airosol's premises.

Between late May 1999 and mid-August 1999, Castrol was informed that the cans in Recharge Kits purchased by consumers in various states had exploded and caused personal injury and property damage. Castrol contends that in its investigation of these reports, it learned that Airosol knew or should have known about the likelihood of such explosions if the Recharge Kits were kept in automobiles. Castrol also learned that there had been previous "problems" with the Sexton Cans. Castrol stopped selling the Recharge Kits and recalled all kits in the marketplace.

The complaint against Airosol contains the following claims: professional negligence (Count I); intentional misrepresentation (Count II); negligent misrepresentation (Count III); breach of contract (Counts IV and V); breach of implied warranty of fitness for a particular purpose (Count VI); [*4] breach of implied warranty of merchantability (Count VII); strict liability (Count VIII); and negligence (Count IX).

Airosol filed a third-party complaint against Sexton, alleging, inter alia, that Sexton negligently designed, manufactured, and tested the aerosol cans and failed to warn that the cans would not vent properly and would instead rupture and explode. Airosol brings six claims against Sexton seeking contribution under the Illinois Contribution Act (the "Contribution Act"), *740 ILCS 100/2*: professional negligence (Count I); negligent misrepresentation (Count II); breach of implied warranty of fitness for a particular purpose (Count III); breach of implied warranty of merchantability (Count IV); strict liability (Count V); and negligence (Count VI). The third-party complaint also contains a breach of contract claim (Count VII).

Sexton now moves to dismiss Counts I-VI of the third-party complaint on the ground that they are barred by the economic loss doctrine.

## DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice [*5] and Procedure § 1356, at 294 (2d ed. 1990). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Hentosh v. Herman M. Finch Univ. of Health Sciences, 167 F.3d 1170, 1173 (7th Cir. 1999);*

*Jang v. A.M. Miller & Assocs., 122 F.3d 480, 483 (7th Cir. 1997).* Dismissal is appropriate only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations'" *Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997)* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)), Jones v. General Elec. Co., 87 F.3d 209, 211 (7th Cir.),* cert. denied, *519 U.S. 1008, 136 L. Ed. 2d 400, 117 S. Ct. 510 (1996)*

The economic loss doctrine, also known in Illinois as the Moorman doctrine, precludes tort liability in cases where the plaintiff suffers purely economic losses. See *Moorman Mfg. Co. v. National Tank Co., 91 Ill. 2d 69, 435 N.E.2d 443, 61 Ill. Dec. 746 (Ill. 1982)* "'Economic [*6] loss' has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property' as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Moorman, 435 N.E.2d at 449* (citation omitted). There are three exceptions to the economic loss doctrine:

> (1) where the plaintiff sustained damage, i.e., personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e., fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.

*In re Chicago Flood Litig., 176 Ill. 2d 179, 680 N.E.2d 265, 275, 223 Ill. Dec. 532 (Ill. 1997)* (citations and emphasis omitted).

## A. Strict Liability and Negligence (Counts V and VI) [*7]

Castrol and Airosol contend that the first exception to the economic loss doctrine applies to these claims because the complaint alleges that personal injuries and property damage occurred as a result of sudden and dangerous occurrences--the aerosol can explosions. Sexton does not dispute that the complaint adequately alleges sudden and dangerous occurrences, but argues that the exception applies to personal injury and property damage sustained only by the plaintiff.

"Absent injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort." *Mars, Inc. v. Heritage Builders, Inc.*, 327 Ill. App. 3d 346, 261 Ill. Dec. 458, 763 N.E.2d 428, 436 (Ill. App. Ct. 2002) (emphasis added) Thus, personal injury to consumers (which is alleged in the complaint) will not suffice, and there is no personal injury alleged to the plaintiff, which is a corporation. Accordingly, for the strict liability and negligence claims to escape the Moorman doctrine, the complaint must allege damage to the plaintiff's property. "Mere damage to any property is not sufficient; the property must be 'other property,' extrinsic from the product itself." Id.

The complaint [*8]    alleges that "Castrol was informed" that certain aerosol cans "purchased by consumers" exploded and resulted in "damage to customers' person and property and to other Castrol property." (Complaint, P 13.) Castrol also seeks damages "for the loss of its own property." (Id., P 15.) The complaint fails to specify exactly what "Castrol property" was damaged. Castrol explains in its brief that this "other property" was the packaged Recharge Kits, distinct from the aerosol cans that were a component of those kits. (Castrol's Response at 5 n.2.)

We do not believe that it is reasonable to infer from the complaint that Castrol suffered any property damage due to the alleged can explosions. Even assuming that the Recharge Kits constitute a separate product extrinsic from the aerosol cans (which is debatable), the complaint does not allege that any of the cans in kits that remained Castrol's property exploded and caused damage. Rather, the only reasonable inference from the complaint is that some consumers alone suffered property damage as a result of the explosions. Damage to someone else's property is not a sufficient basis for applying this exception to the Moorman doctrine. The [*9] contribution claims for strict liability and negligence must be dismissed.

**B. Negligent Misrepresentation (Count II)**

Castrol and Airosol argue that the third exception to the Moorman doctrine applies to this claim because the complaint alleges that Airosol was in the business of supplying information for the guidance of others in their business transactions.

Where a defendant supplies information that is merely ancillary to a service or the sale of a product, it is not considered to be in the business of supplying information for the guidance of others in their business dealings. See *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 719 N.E.2d 288, 296, 241 Ill. Dec. 427 (Ill. App. Ct. 1999). However, where the value of a defendant's services lies in the analytical work

(where the end product is ideas), it is in the business of supplying information for the guidance of others in their business dealings. See *719 N.E.2d at 297.* The court in Tolan explained the relevant inquiry:

> "The Illinois Supreme Court's test for determining whether a defendant 'is in the business of supplying information for the guidance of others in their [*10] business transactions' is whether the end product of the relationship between plaintiff [sic] is a tangible object (i.e., a product) which could be readily described in a contract or whether it is intangible. In short, if the intended end result of the plaintiff-defendant relationship is for the defendant to create a product, a tangible thing, then the defendant will not fit into the 'business of supplying information' negligent misrepresentation exception.'"

*719 N.E.2d at 296* (citations omitted).

Castrol's negligent misrepresentation claim asserts that Airosol, "as experts in liquid and aerosol packaging," "is in the business of supplying information for the guidance of others in their business transactions." (Complaint, P 33.) In particular, the complaint alleges that Airosol provided Castrol with "services and products." (Complaint, P 1.) It further alleges that "because of Airosol's expertise with aerosol products and packaging," Castrol retained Airosol "to advise Castrol as to the selection of the appropriate container for the mixture and the appropriate testing of the manufactured product," id., P 6, and that Airosol provided such advice, id., P 8. Thereafter, [*11]    Castrol contracted with Airosol to manufacture and test the product. (Id., P 9.)

It is clear from the allegations of the complaint that the intended end result of the relationship between Castrol and Airosol was for Airosol to create a product--filled aerosol cans. Indeed, the complaint even alleges that Airosol provided a quotation to Castrol "for Airosol to manufacture and test the product in accordance with its advice." (Complaint, P 8.) Accordingly, the "business of supplying information" exception to the Moorman doctrine does not apply, and the claim seeking contribution for negligent misrepresentation must be dismissed.

**C. Professional Negligence (Count I)**

Castrol asserts that the "Illinois Supreme Court also recognizes an exception to the Moorman doctrine for a

professional negligence claim where the duty of a service professional arises outside of the contract between the parties," citing *Congregation of the Passion v. Touche Ross & Co., 159 Ill. 2d 137, 636 N.E.2d 503, 201 Ill. Dec 71 (Ill. 1994)* n1 (Castrol's Response at 8.)

> n1 Airosol also argues that the professional negligence claim is "excluded from the economic loss doctrine," (Airosol's Response at 7), but offers no substantive analysis of the issue as to this particular claim.

[*12]

In Congregation of the Passion, the Illinois Supreme Court held that "the economic loss doctrine does not bar recovery in tort for the breach of a duty that exists independently of a contract." *636 N.E.2d at 515.* According to the court, an attorney-client or accountant-client relationship fit within this limited exception (and an architect-client relationship did not) because the "knowledge and expertise [such a professional offers] cannot be memorialized in contract terms, but is expected independent of the [professional]'s contractual obligations." *636 N.E.2d at 514-15,* see also *Chicago Housing Auth. v. J.A. Hannah Inv. Advisory Serv., Inc., 1996 U.S. Dist. LEXIS 8046,* No. 95 C 5251, *1996 WL 328033,* at *6 (N.D. Ill. May 9, 1996) (stating that the "exceptions are premised on the idea that, because lawyers and accountants are professionals necessarily entrusted with a large degree of independent and discretionary latitude in decisionmaking, they owe a 'duty of competence' which exists independently of explicit contractual provisions.")

Thus, the issue is the source of the duty owed to the plaintiff. This is a fuzzy inquiry that courts have found difficult to apply, see [*13] *Fireman's Fund Ins. Co. v. SEC Donohue, Inc., 281 Ill. App. 3d 789, 666 N.E.2d 881, 887, 217 Ill. Dec. 212 (Ill. App. Ct. 1996)* (citing the dissenting opinion in Congregation of the Passion, which noted that the application of Moorman to professional malpractice has developed in a confusing fashion). Nonetheless, we believe that Illinois courts would not extend this limited Moorman exception to the facts alleged in the complaint, as any duty owed to Castrol simply arose from the purported contract. Castrol argues that Airosol had a duty to apply the knowledge and skills of an expert in liquid and aerosol packaging, but wholly

fails to explain how or why this duty was "extracontractual." In short, the relationship between Castrol and Airosol was simply not analogous to an attorney-client or accountant-client relationship, where a client is not required or expected to be able to direct the conduct of the professional through contractual provisions, and where the ultimate result of the relationship is something intangible. Therefore, the contribution claim for professional negligence must be dismissed.

**D. Breach of Implied Warranties (Counts III &** [*14] **IV)**

Sexton contends that the breach of implied warranty claims also must be dismissed because there must be tort liability in order to state a contribution claim. Under Illinois law, "potential liability" sounding in tort is sufficient for purposes of the Contribution Act. In other words, if either party's liability to the injured party is premised solely on a contract theory, there can be no action for contribution. See *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc., 89 F.3d 452, 456-57 (7th Cir. 1996)* (citing *St. Paul Fire & Marine Ins. Co. v. Great Lakes Turnings, Ltd., 774 F. Supp. 485, 488 (N.D. Ill. 1991)* and *Cirilo's, Inc. v. Gleeson, Sklar & Sawyers, 154 Ill. App. 3d 494, 507 N.E.2d 81, 83, 107 Ill. Dec. 417 (Ill. App. Ct. 1987))* Because we are dismissing the claims against Sexton that are based upon tort theories, Sexton is not "potentially liable" in tort. The Contribution Act thus precludes the claims seeking contribution for breach of implied warranty.

**CONCLUSION**

For the foregoing reasons, third-party defendant Sexton Can Company, Inc.'s motion to dismiss Counts I-VI of the third-party [*15] complaint is granted. n2

> n2 We leave to Airosol the decision as to whether to move for dismissal of any claims contained in the original complaint.

DATE: September 11, 2002

ENTER:

John F. Grady, United States District Judge

# EXHIBIT J

LEXSEE 2002 DEL. SUPER. LEXIS 441

**International Fidelity Insurance Company, a New Jersey Corporation, v. Mattes Electric, Inc., a Delaware Corporation; Delaware Technical & Community College, an Agency of the State of Delaware; and EDIS Company**

**C.A. No. 99C-10-065 WCC**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2002 Del. Super. LEXIS 441*

**January 23, 2002, Submitted**
**June 27, 2002, Decided**

**DISPOSITION:** [*1] Defendant EDIS Company's Motion to Dismiss Granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** Richard L. Abbott, Esquire, Wilmington, DE.

Marc P. Niedzielski, Esquire, Department of Justice, Wilmington, DE.

Dawn C. Stewart, Esquire, Washington, DC.

Donald L. Logan, Esquire, Wilmington, DE.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINIONBY:** William C. Carpenter, Jr.

**OPINION:**

The Court has before it a Motion to Dismiss filed by EDIS Company (EDIS) relating to the negligence claim included in International Fidelity Insurance Company's (IFIC) amended complaint. In essence, EDIS asserts that Count II of the Complaint is barred by the economic loss doctrine. The Court agrees, and the Motion will be granted.

IFIC is a surety company that issued payment and performance bonds relating to electrical work to be done by Mattes Electric, Inc. (Mattes) in the construction of a training facility at the Delaware Technical and Community College (Del Tech) Wilmington campus.

Mattes defaulted, and a dispute has arisen concerning IFIC's obligation under the bonds. EDIS was hired by Del Tech to act as the contract manager of the project, and in an amended complaint filed on August 27, 2001, IFIC asserts that they negligently performed this [*2] responsibility which led to IFIC suffering damages. In particular, IFIC claims that EDIS's failure to obtain an executed contract between Del Tech and Mattes provided the basis for Mattes to quit the project, not pay his suppliers or sub-contractors and has lead to claims being made against the bonds issue by IFIC. There is no contractual relationship between IFIC and EDIS and thus the asserted liability is strictly based on a negligent tort action. EDIS now requests dismissal based upon the economic loss doctrine, and IFIC argues the doctrine is not applicable to the facts of this case or the exceptions of negligent misrepresentation or professional malpractice apply.

On June 13, 2002, this Court issued an extensive decision on the economic loss doctrine and the applicability of the negligent misrepresentation exception in the case of *Christiana Marine Service Corporation v. Texaco Fuel and Marine Marketing Inc. And Texaco, Inc.* n1 While the cases are factually different, the case law and the reasoning in the *Christiana Marine* decision have equal application here and are relied upon in deciding this motion. The economic loss doctrine "prohibits recovery in tort for losses [*3] unaccompanied by a bodily harm or a property damage." n2 The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. n3 Economic loss is "any monetary loss, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of

good will, and diminution in value." n4 While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to nearly any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against increasing tort claims, which result when contract provisions limit a plaintiff's recovery, or where no contract exists at all.

n1 *Christiana Marine Service Corp. V. Texaco Fuel and Marine Marketing Inc., and Texaco, Inc., 2002 Del. Super. LEXIS 305,* Del. Super. C.A. No. 98C-02-217, Carpenter, J. (June 13, 2002) (Mem. Op.).

n2 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. 406, 406-11 (2001)* (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion) [*4]

n3 *Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1195 (Del. 1992)*(citing *Moorman Mfg. Co. v. National Tank Co., 91 Ill. 2d 69, 435 N.E. 2d 443, 448. 61 Ill. Dec. 746 (Ill. Supr. 1982)*

n4 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. at 406. See also Danforth, 608 A.2d at 1196*(quoting *Moorman Mfg. Co. 435 N.E.2d at 449)*(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits -- without any claim of personal injury or damage to other property.")

As a result of the above, the Court first rejects IFIC's argument that the doctrine of economic loss is only applicable in a "defective product" context. The doctrine, over time, has been expanded to other commercial transactions, and there is no reason to excuse the type of transaction present in this litigation. Secondly, the Court finds that if IFIC suffered any damages relating to [*5] any party in this litigation, it clearly is only economic in nature. If there is an obligation under the bonds, IFIC will be forced to pay money to compensate for Mattes'

failure to perform. Thus, if EDIS was in some manner negligent, the only damages that they caused IFIC to suffer were monetary in nature and fit the definition of economic loss. As such, unless EDIS' conduct falls within an exception, the economic loss doctrine would prevent recovery by IFIC.

The first exception claimed by IFIC is that relating to negligent misrepresentation. This exception was extensively addressed in the *Christiana Marine* decision and requires the finding of two elements. First, the plaintiff must show that the defendant supplied information to the plaintiff for use in business transactions with third parties and second, the defendant must be in the business of supplying such information. Neither of these requirements have been asserted nor can they be established by the plaintiff under the facts of this case. At best, this case involves the discovery of a lack of an executed contract after a claim under the bonds was made. IFIC never relied upon any information provided by EDIS since there [*6] was never any such communication. In fact, in their complaint there is no assertion that there was any contact between IFIC or EDIS until this litigation arose. Simply put, by any reasonable interpretation of the facts of this case, even in the light most favorable to IFIC, the negligent misrepresentation exception is not applicable.

In a final desperate attempt to maintain the negligence count, IFIC cites to a footnote in the *Danforth* decision in which the Supreme Court indicated that in that case they were not addressing whether the economic loss doctrine would bar recovery when the claim relates to professional malpractice. Unfortunately what was intended by the statement is not further reflected in the opinion. However, this Court finds that at a minimum some duty by the defendant to the plaintiff would be required consistent with the Supreme Court of Illinois opinion in *2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.* n5 This obligation and duty must be one generally recognized by the profession as traditionally owed the client or the group of persons the client intended to benefit. There is no dispute that there was no professional relationship [*7] or duty between EDIS and IFIC and no relationship between EDIS's client, that is Del Tech, and IFIC to infer an intended benefit. This Court does not believe that the economic loss doctrine can be overcome by a general claim of malpractice when no relationship between the parties exists. As such, this Court finds that to the extent an exception is recognized by the Supreme Court, the facts of this case will not support its application here.

2002 Del. Super. LEXIS 441, *

n5 See *2314 Lincoln Park West Condo Ass'n, Ill., 136 Ill. 2d 302, 555 N.E.2d 346, 144 Ill. Dec. 227 (1990)*

Finding that the economic loss doctrine would generally bar recovery and the exceptions to the doctrine are not applicable, the negligence claims set forth in Count II of IFIC's amended complaint are dismissed.

IT IS SO ORDERED this 27th day of June, 2002.

Judge William C. Carpenter, Jr.

# EXHIBIT K

LEXSEE 2002 DEL. SUPER. LEXIS 305

**CHRISTIANA MARINE SERVICE CORPORATION, Plaintiff, v. TEXACO FUEL
AND MARINE MARKETING INC. and TEXACO INC., Defendants.**

**C.A. No. 98C-02-217 WCC**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2002 Del. Super. LEXIS 305*

**January 2, 2002, Submitted
June 13, 2002, Decided**

**DISPOSITION:** [*1] Defendant Texaco Fuel and
Marine Marketing Inc., and Texaco Inc.'s Motion for
Summary Judgment Granted in part; denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** John D. Balaguer, White & Williams LLP,
Wilmington, Delaware, Attorney for Plaintiff, Christiana
Marine.

James J. Maron & John P. Daniello, Maron & Marvel,
P.A., Wilmington, Delaware, Attorneys for Defendants,
Texaco Inc.

Peter R. Kahana & Daniel M. Cohen, Berger &
Montague, P.C., Philadelphia, PA, Attorneys for
Defendant, Texaco Fuel and Marine Marketing, Inc. And
Texaco, Inc.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINIONBY:** William C. Carpenter, Jr.

**OPINION:**

   **MEMORANDUM OPINION**

**CARPENTER, J.**

   Defendants have filed a motion for summary
judgment pursuant to Superior Court Civil Rule 12(b)(6)
for failure to state a claim upon which relief could be
granted. The core of this controversy centers upon an
alleged oral long term requirement contract between
Texaco Fuel and Marine Marketing, Inc. (hereinafter

"Texaco"), and Christiana Marine Service Corporation
(hereinafter "Christiana") a bunker fuel provider. n1
Christiana seeks compensatory damages without
limitation to its lost profits; and consequential damages,
consisting of Christiana's economic [*2] losses. The
Court has heard oral argument on the motion and for the
reasons set forth below, Texaco's motion for summary
judgment is **denied in part, and granted in part.**

> n1 Christiana has sued Texaco's parent
> company, Texaco Incorporated, in addition to
> Texaco, pursuant to vicarious liability.

*FACTS*

   Christiana Marine was incorporated in 1986, after its
successor corporation, Compass Marine Corporation,
ceased doing business. Christiana was a barge contractor
that transported marine bunker fuel, a low grade black
oil, in the Delaware River. Usually, when ships are at sea
and need fuel, they will notify the oil providers in a
particular port, such as Texaco or its competitors. The oil
provider, is informed of the ship's arrival date, and the
amount of bunker fuel needed to which the oil companies
reply with their bids. Once awarded a contract, the oil
company hires a barge contractor to transport the oil to
the ships who requested the fuel. n2

> n2 Christiana had two business locations:
> one in Chester, Pennsylvania, where delivery
> vessels were berthed during non-use and repair,
> and one in Wilmington, Delaware, where orders

were received, invoices were sent, and where payments were received from Texaco.

[*3]

In 1988 Texaco purchased a new supply facility, the Delaware Terminal Corporation ("DTC") in Wilmington, Delaware to increase Texaco's market share in the Delaware River area. Because DTC was in Wilmington, and not in, or as near to Philadelphia, it was slightly alienated from (1) the highest business activity where most other supply facilities were located; and (2) where most of the ships that had to be serviced were located. n3 Bunker fuel deliveries from a more distant area, such as Wilmington, were assessed higher rates to transport bunker fuel, as compared to the established rates in the Delaware River zone. In addition, DTC was not equipped to handle bunkers, and had experienced substantial congestion problems because of this. n4 To solve these problems, Texaco needed a barge carrier who would agree to provide below market prices for fuel deliveries from DTC, and who would also agree to exclude demurrage for loading delays at Texaco's congested terminal. n5 It was in this environment that the business relationship between Texaco and Christiana began.

n3 Most supply facilities are located in Philadelphia, Pennsylvania. [*4]

n4 Bruce Bond Dep. at 51. Barge contractors like Christiana, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, Texaco would pay Christiana, Christiana's barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid Texaco for the fuel.

n5 Plaintiff's Response Brief at 2

Before the alleged contract with Texaco, Christiana had a virtual monopoly on small to medium size bunker jobs in the Delaware River area, n6 and had sufficient equipment to conduct its usual business successfully. According to Christiana, Texaco proposed a long term agreement, which provided that Texaco would employ Christiana as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for Christiana's commitment to have ample equipment on hand to deliver Texaco's requirements upon demand. n7 In addition to these terms, Christiana and Texaco

allegedly agreed that Texaco would receive discounted delivery charges, at below [*5] market rates, along with no additional penalties for loading delays at DTC. n8 In 1990, the parties apparently orally modified their business relationship and agreed that Christiana would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which Texaco may have encountered, in return for Texaco's commitment to put through an average 200,000 bbls. of oil per month. n9 Christiana considered the 200,000 quote a minimum average, with Texaco anticipating a 225,000 or 250,000 bbls a month throughput. In other words, Christiana presumed the 200,000 barrels was a floor, not a ceiling. Regardless, Texaco did not meet this alleged "guaranteed" minimum monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months Christiana and Texaco had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

n6 York's Report at 6 (citing the October 28, 1999 Bruce R. Bond deposition p. 238).

n7 Texaco even published a pamphlet, which stated "[Christiana], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [Christiana] operates several barge units ranging in capacity from 1700 - 3000 metric tons. DTC and [Christiana] offer Texaco flexibility second to none any supplier on the river." [*6]

n8 Because barge carriage is generally a small margin, fixed cost business, Christiana would have a unique opportunity to secure a steady, expanding stream of business, provided by Texaco, if it entered into this "agreement."

n9 Bates Dep. at 86

Based upon Texaco's alleged representations that it planned to put through 200,000 bbls. of oil per month, Christiana went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work Texaco and Christiana anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he

2002 Del. Super. LEXIS 305, *

investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a "favorable reference from Mr. Bruce Bond of Texaco," that Texaco referred to Mr. Bates as a "no-nonsense businessman who always gets the job [*7] done," that on a "monthly basis, Christiana moves roughly 150,000 barrels of bunkers, and [Texaco] wants to increase this to 200,000," and that "Texaco is looking for a long term relationship with Christiana." n10

n10 June 20, 1989 loan document.

The alleged oral contract between Christiana and Texaco ensued until Christiana wrote Texaco a letter in August of 1995, informing them that Christiana could not continue to provide bunker transportation because of the lack of Texaco's business and the cost of providing the service. n11

n11 "It is with regret that [Christiana] had to inform Texaco last week that we could no longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high . . . " August 16, 1995 letter from William Bates to C. Michael Bandy of Texaco.

## *PROCEDURAL POSTURE* [*8]

On February 20, 1998, Christiana filed a complaint against Texaco and alleged six separate counts: (1) breach of contract - volume of business; (2) breach of contract-duration; (3) breach of contract - notice of termination; (4) breach of contract - duty of good faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. Texaco has filed a summary judgment motion requesting the dismissal of all claims.

## *STANDARD OF REVIEW*

A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. n12 If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate. n13 Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied. n14 The Court is required to examine all pleadings, affidavits and discovery material provided to the Court, n15 accept all non-disputed facts as true, and must accept the non-movant's version of any [*9] disputed facts. n16

n12 *See Schueler v. Martin, 674 A.2d 882, 885 (Del. Super. 1996); Pierce v. International Ins. Co. of Ill., 671 A.2d 1361, 1363 (Del. 1996); Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979)*

n13 *Kysor Industrial Corp. v. Margaux, 674 A.2d 889, 894 (Del. Super. 1996)*

n14 *Vanaman v. Milford Memorial Hospital, Inc., 272 A.2d 718, 720 (Del. 1970)*

n15 *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., 312 A.2d 322 (Del. Super. 1973)*

n16 *Merrill v. Crothall-American, Inc., 606 A.2d 96 (Del. 1992)*

## *DISCUSSION*

### *A. Doctrine of Laches / Statute of Limitations*

Texaco asserts that Christiana's breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because Christiana's time to bring suit started in July 1993, when it became clear the terms of the contract as alleged [*10] by Christiana were not being met. n17 Additionally, Texaco claims that Christiana consulted counsel in 1995, when it went out of business, to consider bringing a claim against Texaco; that Christiana intentionally misled Texaco "by writing Texaco a soothing, non-accusatory" 1995 letter saying nothing about a claim; that Christiana and its former attorney deliberately chose not tell Texaco about the alleged claim to inhibit Texaco from taking steps to defend itself. Texaco alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by Christiana's delay because: (1) out of the 48 months Christiana transported Texaco's bunker oil, Texaco only reached the alleged 200,000 barrels a month for 8 months, so if Christiana considered this "lower throughput" a breach of contract, they had an obligation to notify Texaco so it could have limited its damages by terminating the alleged contract at that point in time, and (2) Texaco is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. Texaco stated that its computer files only date back until 1994, which makes locating precise [*11] and complete data for the relevant time period impossible.

n17 Texaco's Brief at 20.

2002 Del. Super. LEXIS 305, *

Christiana contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated. Christiana claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to Texaco notifying it that Christiana would be unable to participate in further business. Christiana also asserts that a laches agreement is unavailable to Texaco because Texaco "effectively" caused the termination of the agreement in its continuously low throughput, which caused Christiana to be prejudiced and to go out of business. And lastly, Christiana claims that Texaco is responsible for the lost computer files and documents, as Texaco took their mainframe computer out of service at the end of 1993. Christiana also points out that Texaco has been on notice of this lawsuit since May 1, 1996, and thus, could've kept records and documents for its [*12] defense as of that date. n18

n18 Plaintiff's Brief in Opposition to Defendant's Motion at 20.

"The test of laches is both unreasonable delay and consequent significant prejudice." n19 In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations. n20 Delaware's statute of limitations for contract and negligence actions is found in 10 Del. C. § 8106. The 3 year limitation on cause of actions for an alleged breach of contract accrues at the time of the breach, n21 whereas a tort claim accrues at the time of the injury. n22

n19 Wilkes v. H.M. Wrangell & Co., 293 F. Supp. 522, 524 (D. Del. 1968)(citing Gutierrez v. Waterman S.A. Corp., 373 U.S. 206, 215, 10 L. Ed. 2d 297, 83 S. Ct. 1185 (1963), Claussen v. Mene Grande Oil Co., 275 F.2d 108, 113 (3d Cir. 1960))

n20 Wilkes, 293 F. Supp. at 524. [*13]

n21 Fineberg v. Credit Int'l Bancshares, Ltd., 857 F. Supp. 338 (D. Del. 1994), Nardo v. Guido DeAscanis & Sons, 254 A.2d 254 (Del. Super. 1969)

n22 Howmet Corp. v. City of Wilmington, 285 A.2d 423 (Del. Super. 1971).

The Court finds that the statute of limitations, 10 Del. C. § 8106, did not begin to run until there was an affirmative termination by one of the parties. Christiana wrote the August 1995 letter to Texaco, which terminated the arrangement between these two parties. Until then, the two parties continuously conducted business with one another and Christiana operated as Texaco's bunker fuel contractor. As such, under the statute of limitations applicable to contracts, Christiana had until August, 1998 to file its claims against Texaco. n23 Since Christiana filed the instant action on February 20, 1998, it appears that Christiana successfully brought its claims within its window of opportunity. The Court finds that Christiana's claims have not been unreasonably delayed.

n23 An issue not addressed by the parties is whether the statute of limitations would prevent the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

[*14]

Additionally, the Court is not convinced that Texaco has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue the passing of time has limited Texaco's access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that Texaco, during its business relationship with Christiana, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by Christiana to terminate the relationship so Texaco could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. Texaco is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and [*15] ones goodwill to perform an important business function. To argue that Christiana has tricked or mislead Texaco is simply an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds

2002 Del. Super. LEXIS 305, *

neither unreasonably delay or prejudice and thus the claims are not barred by the doctrine of laches.

### B. Breach of Contract Claims

While it is the Court's province to define a contract, it is the jury's function to decide whether a contract exists. n24 In *Universal Products Co. v. Emerson*, n25 the Supreme Court of Delaware followed numerous other court's holdings that it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged. n26 The *Emerson* court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved." n27 Stated differently, when other facts and circumstances germane to the issue are to be considered in addition to any documentary [*16] evidence, a jury is to decide whether or not a contract was formed, not the Court.

> n24 *Corletto v. Morgan. 27 Del. 530, 4 Boyce 530, 89 A. 738 (Del. Super. 1914)*
>
> n25 *Universal Products Co. v. Emerson, 36 Del. 553, 6 W.W. Harr. 553, 179 A. 387 (Del. 1935)*
>
> n26 *Id.* at 393.
>
> n27 *Id.* at 394.

Texaco contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, Texaco's expert, Patrick J. Studdert, stated in his report that

> in all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between Christiana and Texaco and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry. n28

Texaco asserts that "it is undisputed in the bunker fuel barge delivery industry - that deliveries are made by barge carriers [*17] for oil companies on an "as available basis." n29 Texaco further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by

Christiana - long term oral contracts with minimum guaranteed monthly delivery quotas. Texaco then asserts that because Christiana did not exclusively work for Texaco, and it continued to conduct business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of Texaco's alleged "long term agreement" to put through the amount of oil it allegedly promised.

> n28 Studdert's Report at 3.
>
> n29 Texaco's motion at 3.

Christiana contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. Christiana points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland ("FNBM")'s representative); and the [*18] mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. Christiana's expert, Robert B. York contends that Christiana and Texaco's relationship was contractual, and more specifically stated in his report that

> "[a] contract existed between [Christiana] and [Texaco] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract. n30

> n30 York's Report at 20.

The Court first finds that whether an oral contract, or a contract created by conduct was established between Christiana and Texaco, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, Texaco and Christiana had mutual, beneficial interests at stake in this business venture, and as such, an enforceable contract was created. The [*19] *Restatement Second of Torts § 19* provides that "the manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." n31 Subsection (3) further states that "the conduct of a party may manifest assent even though he does not in fact assent." n32 The jury may find that Texaco's conduct manifested an assent to be bound, based upon Mr. Bates'

testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. Texaco's arguments are simply ones that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between Texaco and Christiana is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

n31 *Restatement (Second) Torts § 19.* [*20]

n32 *Id*

### C. Negligent Misrepresentation Claim

Finally, Texaco asserts that Christiana's negligent misrepresentation claim is barred by the economic loss doctrine and must be dismissed as all of Christiana's alleged losses are purely economic in nature, *i.e.*, lost profits, lost investments, and acquired debt. Texaco also asserts that Christiana cannot employ the *Restatement (Second) of Torts § 552*, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine. n33

n33 The Court need not decide whether federal maritime law governs this action as Christiana's negligent misrepresentation will be dismissed on other grounds.

Christiana admits its damages are purely economic in nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable [*21] to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to Christiana's claims, Delaware has adopted the *Restatement (Second) of Torts § 552*, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. Christiana asserts it falls within this exception.

The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage." n34 The doctrine in its purest form

forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. n35 Economic loss is "any monetary loss[], costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value." n36 While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount [*22] of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that Christiana's damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim.

n34 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today. A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. 406, 406-11 (2001)* (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

n35 *Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1195 (Del. 1992)*(citing *Moorman Mfg. Co v. National Tank Co., 91 Ill. 2d 69, 435 N.E. 2d 443, 448 (Ill. Supr. 1982)*

n36 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today. A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. at 406. See also Danforth, 608 A.2d at 1196*(quoting *Moorman Mfg. Co 435 N.E.2d at 449)*(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits -- without any claim of personal injury or damage to other property.").

[*23]

The *Restatement (Second) of Torts § 552* provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson.* n37 The Restatement provides that

One who, in the course of his business, profession or employment, or in any other

2002 Del. Super. LEXIS 305, *

transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

n37 *583 A.2d 1378 (Del. Super. 1990)*

Delaware's narrow application and strict construction of § 552, has thus far held that for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, "the plaintiff must show that the defendant supplied the information to the plaintiff [*24] for use in business transactions with third parties." n38 Christiana has satisfied this element. When viewed in a light most favorable to Christiana, there is sufficient evidence, which would indicate that Texaco allegedly informed Christiana, on several occasions, that it intended to put through 200,000 bbls. of oil per month. Christiana relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug boats, barges, and equipment to transport Texaco's bunker oil. Thus, it appears that Christiana shared the information Texaco supplied to it, to use in its business transactions, the loans, with FNBM. Christiana as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

n38 *Danforth v. Acorn Structures, Inc.*, Del. Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem. Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.*, n39 the [*25] Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that "the defendant is in the business of supplying information." n40 In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations. n41

n39 The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely economic losses and were thus barred by the economic loss doctrine. *Danforth v. Acorn Structures Inc.*, C.A. No. 90 C-JN-30, 1991 WL 215658 (Del. Super. Aug. 27, 1991). Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the *Restatement (Second) of Torts § 552* exception to the economic loss doctrine, and thus his negligent misrepresentation claim against the defendant should survive. *Danforth v. Acorn Structures, Inc.*, C.A. No. 90 C-JN-30, 1991 WL 269956 (Del. Super. Nov. 22, 1991). The Court's expansive discussion concerning the *Restatement (Second) of Torts § 552*, and the two requirements a plaintiff must satisfy to lift the economic loss doctrine's bar are found in the November 22, 1991 opinion. [*26]

n40 *Danforth v. Acorn Structures, Inc.*, Del. Super. C.A. No. 90 C-JN-30, 1991 WL 269956, (Del. Super. Nov. 22, 1991). Since Danforth, Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 719 N.E.2d 288, 296 (App. Ct. Ill. 1999)

n41 *Danforth*, at *4 (citing *Rankow v. First Chicago Bank, 870 F.2d 356, 360-366 (7th Cir. 1989), Gerdes v. John Hancock Mutual Life Insurance Co., 712 F. Supp. 692, 697-98(N.D.Ill. 1989))

In *Rankow v. First Chicago Corp.*, n42 the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that "[a] precise, case-specific [*27] inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." n43 The *Rankow* court went further to hold that "whether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its

2002 Del. Super. LEXIS 305, *

relation to the kind of business being conducted." n44 In its attempts to determine whether a bank was "in the business of supplying information" the *Rankow* court noted that while "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that "manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information." n45 The *Rankow* court then noted that

a great many businesses involve an exchange of information as well as of tangible products - manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of [*28] these cases, it becomes clear that the product (a building, pecipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental. n46

n42 *870 F.2d 356 (7th Cir. 1989).*

n43 *Rankow, 870 F.2d at 360.*

n44 *Rankow, 870 F.2d at 361.*

n45 Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.. 109 Ill. App. 3d 132, 440 N.E. 2d 282 (Ill.App.Ct. 1982)*(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp., 117 Ill. App. 3d 304, 453 N.E. 2d 8 (Ill.App.Ct. 1983)*(holding a roofing materials supplier was not in the business of supplying information); *Tan v. Boyke, 156 Ill App. 3d 49, 508 N.E 2d 390 (Ill.App.Ct. 1987)*(seller of an apartment building was not a supplier of information); *Vacuum Industrial Pollution, 764 F.Supp 507 (N.D.Ill 1991)*(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information); [*29]

n46 *Rankow, 870 F.2d at 364*

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.*, n47 the Illinois court noted that "a great many businesses exchange information as well as products" and "where the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." n48 The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services . . . may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." n49

n47 *308 Ill. App. 3d 18, 719 N.E.2d 288 (Ill.App.3d 1999).*

n48 *Tolan Sons Inc., 719 N.E.2d at 296*

n49 *Tolan, 719 N.E.2d at 297*

The [*30] Court finds the above cited reasoning to be a fair interpretation of what it means to be "in the business of supplying information" for the purposes of a negligent misrepresentation claim. Based upon the above reasoning, and in heeding the prior precedent of *Guardian Construction*, and *Danforth*, the Court finds that Texaco was not "in the business of supplying information for the guidance of others." n50 The information Texaco supplied to Christiana is more aptly categorized as information incidentally supplied to Christiana for the ultimate service - that of transporting bunker fuel oil. Clearly, Texaco is generally in the business of supplying oil, not information. n51 The information Texaco supplied, if any, is best classified as ancillary to the provided service. n52 As such, this litigation will move forward as a contract dispute only and the tort claim is dismissed.

n50 *See Tolan, 719 N.E.2d at 296-96*(delineating what business are pure information providers where the end product is an idea, what businesses are tangible product end manufacturers, and what businesses fall between the two.). *Tolan* notes that businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite inspectors and environmental assessors are "pure information providers, which would constitute "in the business of supplying information for the

2002 Del. Super. LEXIS 305, *

guidance of others. *Tolan* also notes certain professions that are tangible good providers, which is where this Court finds Texaco falls - that of manufacturers of computers and software or products of any type. [*31]

n51 *See Vacuum Industrial Pollution, Inc. v. Union Oil Co., 764 F. Supp. 507 (N.D. Ill. 1991)*(holding that a defendant oil company was not in the business of supplying information.)

n52 *See* the *Restatement (Second) of Torts § 552* comment a explaining that "by limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests."

While this Court has followed the earlier decisions of the Court that have addressed this issue, other jurisdictions have taken a more expansive view of § 552 n53 and clearly an argument can be made that the decisions from Illinois followed by Delaware are too limiting and fail to give full effect to the negligent misrepresentation exception. The question of when does a business cross the line into the world of "supplying information" or whether [*32] that requirement is mandated, is anything but clear. If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

n53 *See Walpert, Smullian & Blumenthal, P.A. v. Katz, 361 Md. 645, 762 A.2d 582 (Md. 2000)*(holding that the negligent misrepresentation requires: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge hat the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence."); *Jacobson v. Environmental Risk Limited, No. CV 950550991, 1996 WL 168086,* at *3 (Conn. Super. Mar. 4, 1996)(following the "governing principals" of the *Restatement (Second) of Torts § 552* and holding that negligent misrepresentation requires a plaintiff to "allege and prove that the reliance on the misstatement was justified or reasonable," and "reasonableness is a question of fact for the trier to determine based on all of the circumstances.")

[*33]

### CONCLUSION

For the reasons set forth above, Texaco's motion for summary judgment as to the breach of contract claim is denied, but Texaco's motion for summary judgment as to Christiana's negligent misrepresentation claims is granted.

Judge William C. Carpenter, Jr.

# EXHIBIT L

LEXSEE 1991 DEL. SUPER. LEXIS 454

**GEORGE DANFORTH, Plaintiff, v. ACORN STRUCTURES, INC., a Massachusetts corporation, Defendant.**

**CIVIL ACTION NUMBER 90C-JN-30**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1991 Del. Super. LEXIS 454*

**October 18, 1990, Submitted**
**November 22, 1991, Decided**

**PRIOR HISTORY:** [*1] Upon Motion of Plaintiff for Reargument

**DISPOSITION:** DENIED

**LexisNexis(R) Headnotes**

**COUNSEL:** John K. Newcomer, Jr., Esq., of Bayard, Handelman & Murdoch, P. A., attorney for plaintiff George Danforth

Howard M. Berg, Esq., and Paul Cottrell, Esq., of Berg, Bifferato, Tighe & Cottrell, P. A., attorneys for defendant Acorn Structures, Inc.

**JUDGES:** HERLIHY

**OPINIONBY:** HERLIHY

**OPINION:**

*MEMORANDUM OPINION*

HERLIHY, Judge

Plaintiff George Danforth [Danforth] has moved for reargument of this Court's decision of August 27, 1991. He argues that his claim falls within the negligent misrepresentation exception to the economic loss rule which was recognized in *Guardian Construction Co. v. Tetra Tech Richardson, Del Super., 583 A.2d 1378 (1990).* Specifically, Danforth contends that Guardian allows his claim because he signed a "Custom Design Agreement" [agreement] with Acorn Structures, Inc. [Acorn] which agreement contained defective plans which were used to build his house. Danforth obtained a

home building package from Acorn after completion of the agreement. The home building package is the material used to construct the house.

*Guardian* adopted for Delaware *Restatement, Second, Torts* § 552 n1 The cause of action recognized in *Guardian* [*2] is known also as negligent misrepresentation. Danforth's motion for reargument requires this Court to reexamine *Guardian.* That reexamination further requires a clarification of *Guardian* and its adoption of § 552 and its application to this case.

n1 Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends to influence or

knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Restatement, Second, Torts* § 552.

[*3]

It has been noted that § 552 is unclear whether an element of a claim for negligent misrepresentation is that the information be supplied for a transaction not involving the defendant. *Colorado Nat. Bank of Denver v. Adventura Assoc., D Colo., 757 F Supp. 1167 (1991).* The court in *Guardian* did not specifically address this issue, however, an examination of the facts in *Guardian* clearly shows that the Court applied § 552 to just that kind of situation.

The defendant in *Guardian* supplied information to a state agency for the preparation of bid specifications. The successful general contractor bidder used those specifications not only to prepare its bid but to eventually subcontract out the work. Later it was found that the defendant's specifications were faulty causing increased cost to the subcontractor and, thus, to the state.

Without expressly so ruling, the *Guardian* court found that the plaintiff general contractor had used the defendant's information in dealings with third parties, neither one of whom was the defendant. There were two third parties. One was the state agency to whom the general contractor offered a bid, using the specifications [*4] to develop a price. The other third party was the subcontractor who used the information to prepare its work, including the price to be charged to the general contractor.

As noted in this Court's original decision, *Guardian* was presaged in *Hodges v. Smith, Del Super., 517 A 2d 299 (1986).* In that case, too, the plaintiff used the defendant's survey information in transactions with third parties. *Hodges, 517 A 2d at 301.* While not expressly stated in *Hodges,* the factual setting clearly implicates, as did *Guardian,* the need for the plaintiff to use the defendant's information in transactions with third parties. The Court in *Hodges,* when using the negligent misrepresentation basis of liability, cited an Illinois case as authority. Illinois has had much litigation in this area and had adopted and used § 552 for a period of time prior to Delaware's adoption in *Guardian. See Penrod v. Merrill, Lynch, Pierce, Fenner and Smith, Ill App Ct., 385 N E 2d 376, 381 (1979).*

Illinois has now made it clear that in order to sustain a claim for negligent misrepresentation, the information must be supplied for the guidance of [*5] others in their business transactions. *Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach., Ill App Ct., 440 N E 2d 282, 284 (1982).* This requirement has been further refined to mean that the information supplied must be "for the guidance of others in their business relations with third parties". *Id.* The Illinois Supreme Court has confirmed this as an element in a negligent misrepresentation cause of action. *Moorman Mfg. Co. v. National Tank Co., Ill Supr., 435 N E 2d 443, 452 (1982).*

Subsequent litigation has made it clear that Illinois retains the element of third party involvement as a prerequisite to recover for negligent misrepresentation. *Rankow v. First Chicago Corp., 870 F 2d 356 (7th Cir. 1989); Gerdes v. John Hancock Mut. Life Ins. Co., D C N D Ill, 712 F Supp. 692 (1989), Vacuum Industrial Pollution, Inc. v. Union Oil Co. of California, D C N D Ill., 764 F Supp. 507 (1991).* Illinois is not alone in requiring that the information be used in transactions involving third parties. *See Meier v. Alfa-Laval, Inc., Ia Supr., 454 N W 2d 576, 581 (1990)* [*6] where Iowa joined Illinois. Iowa, too, had previously adopted § 552. *Id at 581.*

Colorado also has adopted § 552. *First National Bank in Lamar v. Collins, Colo Ct App., 616 P 2d 154 (1980).* In that case, the plaintiff had relied on information from a franchisor to mortgage property he owned. The plaintiff bank (mortgagee) filed foreclosure and the plaintiff cross-claimed against the franchisor, including a claim for negligent misrepresentation. Colorado also would appear to require the involvement of third parties as an element of cause of action under negligent misrepresentation and § 552. *Jardel Enterprises, Inc. v. Triconsultants, Inc., Colo Ct App., 770 P 2d 1301, 1304-05 (1988). Colorado Nat. Bank, 757 F Supp. at 1173.*

In *Devore v. Hobart Manuf. Co., La Supr., 367 So.2d 836 (1979),* Louisiana recognized the existence of the tort of negligent misrepresentation under § 552. However, the facts of that case show an implicit acknowledgment of the need for involvement of third parties.

Thus, it is clear that in order for a plaintiff to invoke a cause of action under negligent misrepresentation [*7] involving § 552, the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties. In other words, the information must be used in a transaction not involving the defendant. Insomuch as this is a clarification of *Guardian's* adoption of § 552, the

definite weight of authority, particularly recent decisions, justifies such a clarification.

Danforth's claim fails on this ground alone. He did not and does not claim that he took Acorn's information in the agreement and in any way used that with a third party. There is no claim that he selected any contractors or subcontractors based on that information. In addition, while Danforth may have contracted with a third party, a general contractor, to build his house from the package (materials) Acorn provided, Danforth used Acorn's "information" to sign a second contract with Acorn. That step hardly meets the test of a transaction involving a party other than the defendant. Accordingly, on this ground, Danforth's negligent misrepresentation claim must fail.

There is an additional element to the cause of action under negligent misrepresentation. Again, while neither [*8] *Hodges* nor *Guardian expressly* made this second element a prerequisite to recovery under this type of tort, it can be fairly read into the opinions.

The second element is that the plaintiff must show that the defendant is in the business of supplying information. A surveyor such as the defendant in *Hodges* clearly meets that criteria. *Hodges* cited as support for its holding the Illinois case of *Rozny v. Marnul, Ill. Supr., 250 N.E.2d 656 (1969)* allowing a negligent misrepresentation cause of action against a surveyor. Again, it is constructive to examine Illinois case history in understanding the development of this cause of action. The Illinois Supreme Court clarified after *Rozny* that negligent misrepresentation requires the defendant to be in the business of supplying information. *Moorman Mfg. Co., 435 N.E.2d at 452. See Rankow, 870 F.2d at 362; Black, Jackson and Simmons, 440 N.E.2d at 284; Gerdes, 712 F.Supp. at 696.*

In *Guardian,* while again not explicitly stated as an element of negligent misrepresentation under § 552, the facts clearly show the defendant was [*9] in the business of providing information. The defendant was a design engineer.

In light of the extensive litigation history in Illinois involving claims of negligent misrepresentation, this Court deems it appropriate to adopt explicitly that which was implicit in *Hodges* and *Guardian.* That is, a plaintiff must show as an element of this cause of action that the defendant is in the business of providing information.

"There has been no clear discussion in the [Illinois] cases to date as to what principle should be applied in determining whether a party is 'in the business of supplying information'." *Rankow, 870 F.2d at 363.* Various Illinois cases, *Hodges* and *Guardian* do provide guidance applicable to this case. *Black, Jackson and Simmons, 440 N.E.2d at 284* (computer hardware and software supplier not in business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp., Ill.App.Ct., 453 N.E.2d 8, 11 (1983)* (roofing materials supplier not in information business); *Tan v. Boyke, Ill.App.Ct., 508 N.E.2d 390, 396, appeal denied, Ill.Supr., 515 N.E.2d 127 (1987)* [*10] (seller of an apartment building); *Vacuum Industrial Pollution, 764 F.Supp. at 514* (oil company not in business of supplying information).

As the Court in *Rankow* stated:

Obviously, a great many businesses involve an exchange of information as well as of tangible products - manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.

*Rankow, 870 F.2d at 364.*

It is not necessary for this Court to presently delineate those types of businesses which are or are not in the business of providing information. Lists of those which clearly are in the information business are found in *Rankow, 720 F.2d at 360-66* and *Gerdes,* F.Supp. at 697-98.

Suffice it to say that Acorn in this instance does not fall into the category of concerns which are in the business of supplying information. Danforth's complaint makes it clear that Acorn primarily [*11] sold a tangible product - materials with which to build homes. The design and "assembly instructions" were incidental.

Even if the design function approaches the level of an architect providing information and perhaps placing Acorn in the business of providing information, Danforth's claim still fails. It is the instructed use of a water proofing and/or insulating material which is the gravamen of Danforth's complaint. In the context of the construction of the house that was an assembly instruction relating to a tangible product. It was incidental to the home's construction and had nothing to do with design in the traditional architectural sense.

Accordingly, Danforth has not met his burden of showing that as an element of the claim of negligent misrepresentation, Acorn is in the business of providing information. On this ground alone, and/or in conjunction with his failure to meet the first element of involvement of third parties, Danforth's claim fails.

1991 Del. Super. LEXIS 454, *

For the reasons stated herein, Danforth's motion for reargument is *DENIED*

*IT IS SO ORDERED.*

Herlihy, J.

# EXHIBIT M

LEXSEE 2004 DEL. SUPER. LEXIS 355

**TECHTON AMERICAN, INC., Plaintiff, v. GP CHEMICALS, INC., Defendant.**

**C.A.No. 04C-05-271 CLS**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2004 Del. Super. LEXIS 355*

**July 26, 2004, Submitted**
**October 25, 2004, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Defendant's Motion to Dismiss GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:** Attorney for Plaintiff: Francis G.X. Pileggi, Esquire, Fox Rothschild, Wilmington, Delaware.

Attorney for Defendant: Ronald A. Brown, Jr., Esquire, Prickett Jones & Elliott, P.A., Wilmington, Delaware.

**JUDGES:** Calvin L. Scott, Jr., Superior Court Judge.

**OPINIONBY:** Calvin L. Scott, Jr.

**OPINION:**

    **MEMORANDUM OPINION**

**SCOTT, J.**

**I. INTRODUCTION**

This case arises from an alleged breach of contract. Plaintiff Techton American, Inc. ("Techton") alleges, in addition to breach of contract, breach of implied warranty of merchantibility, breach of implied warranty arising from course of dealing or usage of trade, breach of implied warranty of fitness for a particular purpose, and breach of express warranty.

Defendant GP Chemicals, Inc. ("GP") has filed a Motion to Dismiss based on a statute of limitations defense.

For the reasons stated below, the court **GRANTS** GP's Motion to Dismiss.

**II. BACKGROUND**

Techton alleges GP breached a contract to supply 10,000 kg succinimide. The contract [*2] was entered into in March 1998. GP knew the succinimide was to be re-sold to a Korean company, which had specific requirements for the quality of the succinimide. The succinimide was shipped in 1999. At the end of 1999 or early 2000, the Korean company notified Techton the succinimide was defective. GP requested re-testing which still showed the succinimide was defective. On January 31, 2000, GP sent a portion of succinimide as replacement, but that batch was also defective. The end of October 2000, another attempt was made to ship acceptable succinimide, but that batch was also defective. Techton then purchased new succinimide from the supplier it had previously used at a cost of $ 2.50 per kg more than the price quoted by GP. GP made another attempt to offer acceptable succinimide in early 2001, but Techton refused to take another risk with GP. A last attempt to provide acceptible succinimide was made in October 2002.

Techton seeks the $ 74,517.60 it paid to GP before realizing the succinimide was defective.

**III. STANDARD OF REVIEW**

The parties have submitted materials in addition to the pleadings. The Motion to Dismiss, therefore, must be analyzed as a Motion for Summary [*3] Judgment. n1

2004 Del. Super. LEXIS 355, *

The court will grant summary judgment only if there are no genuine issues of material fact "and the moving party must show he is entitled to judgment as a matter of law." n2 In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the non-moving party. n3 Summary judgment, therefore, is appropriate only if, after viewing the evidence in the light most favorable to the non-moving party, the court finds no genuine issue of material fact. n4

n1 "Once the court decides to accept matters outside the pleading, it must convert the motion to dismiss into one for summary judgment." *Hilfirty v. Shipman*, 91 F.3d 573, 578 (3d Cir. 1996) (internal citation omitted) n2 *Deakyne v. Selective Insurance Co.*, 728 A.2d 569, 570 (Del. Super. 1997) (internal citation omitted) n3 *Moore v. Sizemore*, 405 A.2d 679 (Del. 1979) n4 *Guy v. Judicial Nominating Com'n.*, 659 A.2d 777, 780 (Del. Super. 1995); *Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1087 (Del. Super. 1994).

[*4]

## IV. DISCUSSION

GP argues the statute of limitations has run on any claim Techton may have had. GP argues that, at most, Techton had four years after the sale of the goods to bring suit under *6 Del.C. § 2-725(1)*. As the sale was in 1999, GP concludes this suit, filed May 27, 2004, is time-barred.

Techton counters that the statute of limitations is extended because there was a warranty for future performance -- that the succinimide be tested and acceptable to the Korean company. Techton concludes this extends the time the cause of action accrues to the time the breach is discovered. Techton also argues GP continued to make attempts to cure the problem as late as 2002 so that GP should be estopped from advancing a statute of limitations defense.

The court concludes the contract was for the sale of goods and thus controlled by the provisions of the Uniform Commercial Code ("UCC"). n5 The UCC mandates that an action "must be commenced within 4 years after the cause of action has accrued." n6 *6 Del.C. § 2-725(2)* clearly indicates "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty [*5] occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods . . . ." n7 The statute begins to

run, even if the buyer does not know the goods are defective. n8 If, however, there is a warranty of future performance, the time the cause of action accrues is extended to the time "the breach is or should have been discovered." n9

n5 *6 Del.C. § 2-102* n6 *6 Del.C. § 2-725(1)* n7 *6 Del.C. § 2-275(2)* n8 *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 175 (Del. Super. 1986) (internal citation omitted) n9 *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 652 (Del. Super. 1985).

Allegations that defendant's promise to cure the defect caused plaintiff to delay bringing suit generally do not preclude the running of the statute of limitations. n10 A defendant's fraudulent concealment of a cause of action may toll the statute of limitations. n11 Fraudulent concealment [*6] requires allegations of both defendant's knowledge of the alleged wrong as well as an affirmative act of concealment by the defendant of the alleged wrong. n12 Defendant's promise to make repairs or remedy the alleged breach is insufficient to toll the statute of limitations. n13

n10 *Ontario Hydro v. Zallea Systems, Inc.*, 569 F.Supp. 1261, 1272 (D. Del. 1983) n11 *Sellon v. General Motors Corp.*, 571 F.Supp. 1094, 1099 (D. Del. 1983) n12 *Id.* at 1099-1100; *see also Lecates*, 515 A.2d at 176 (internal citation omitted) n13 *Ensminger v. Merritt Marine Constr., Inc.*, 597 A.2d 854, 855 (Del. Super. 1988) (holding party must allege facts to indicate defendant affirmatively acted to mislead and induce that party from bringing suit to support a theory of estoppel to toll the statute of limitations).

For the purposes of analyzing the present Motion to Dismiss, the court will assume there was a warranty [*7] for future performance. n14 Even with a warranty of future performance, the statute of limitations begins to run once the defect is known. n15 The court concludes the statute of limitations began running no later than January 31, 2000 when GP sent 5000 pounds of succinimide to "replace a portion of the failed prior shipments." n16 The court concludes Techton must have been aware that the October 1999 shipment failed to meet the standards of the Korean company by this time or there would not have been a replacement shipment. Even with a warranty of future performance, the breach

2004 Del. Super. LEXIS 355, *

occurs once the "defect is or should be known." n17 The court concludes the statute of limitations had run by no later than January 31, 2004.

> n14 Whether there is actually a warranty for future performance is a question of fact that ordinarily would be left for the fact-finder. In viewing the facts in a light most favorable to the non-moving party, the court, for the sake of argument, will assume there was such a warranty. n15 *Pack & Process, 503 A.2d at 652* n16 Docket # 5, P 13 n17 *Pack & Process, 503 A.2d at 652.*

[*8]

The court finds nothing in the pleadings or other material submitted that would extend the time of discovery of the defect to beyond May 26, 2000. Viewing the facts in a light most favorable to the non-moving party, the court finds the most favorable date for the running of the statute of limitations to have commenced was January 31, 2000. The court concludes the statute of limitations had run prior to May 27, 2004 when the instant suit was filed.

Techton cannot rely on GP's promises to cure to extend the time they had to bring suit. n18 It is clear that Techton had given up on GP's ability to provide acceptable succinimide at least by October 2002. There is no explanation of why Techton then waited until the end of May 2004 to bring suit. The court finds the offers to cure did not continue beyond the time Techton had to file suit. Had the offers to cure been made close to the time when the statute of limitations had run, the court would reach a different conclusion on an estoppel argument. n19

> n18 *See Ontario Hydro, 569 F. Supp. at 1272.* n19 *Id.*

[*9]

The court concludes that if other courts will not toll the statute of limitations for attempts to cure in actions by consumers of retail products against manufacturers, n20 there is even less reason to toll the running when the parties are sophisticated businesses such as the parties to the present suit. The court is mindful that parties should be encouraged to work to cure problems with the quality of the goods or other potential breaches of contract and not immediately rush to court with a lawsuit. The court concludes, however, that the generous time allowed for an aggrieved party to bring suit under the provisions of the UCC n21 precludes tolling the statute of limitations for attempts to repair or replace the goods, absent an express agreement to the contrary between the parties. Neither party argues there was any such agreement here. The court concludes there was none.

> n20 *See Lecates, 515 A.2d at 175; and Sellon, 571 F. Supp. at 1099.* n21 As noted above, the UCC has a four-year statute of limitations. *10 Del. C. § 8106* gives a three-year statute of limitations for other breach of contract actions.

[*10]

**V. CONCLUSION**

For the above reasons, the court finds the statute of limitations has run on Techton's claims. The court, therefore, **GRANTS** GP Chemicals, Inc.'s Motion to Dismiss.

**IT IS SO ORDERED**

Calvin L. Scott, Jr.

Superior Court Judge